```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION
```

**UNITED STATES OF AMERICA,**

            Plaintiff,

                        **HONORABLE AVERN COHN**

    v.

                        **No. 16-20143**

**D-2 DEAUTA BELCHER and**
**D-3 ANDRE WATSON,**

            Defendants.
_____/

**JURY TRIAL EXCERPT - VOLUME 13**
Closing Statements
**Monday, October 22, 2018**

Appearances:

```
Shane Cralle
Terrence Haugabook
U.S. Attorney's Office            John A. Shea
211 W. Fort Street, #2300         Law Office
Detroit, Michigan  48226          120 N. Fourth Avenue
(313) 226-9100                    Ann Arbor, Michigan  48104
  On behalf of Plaintiff          (734) 995-4646
                                    On behalf of Deft. Belcher

                                  Bertram L. Johnson
                                  Law Ofc of Christian Ray & Assc.
                                  23756 Michigan Avenue, #300
                                  Dearborn, Michigan  48124
                                  (313) 598-4193
                                    On behalf of Deft. Watson
```

                    -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)234-2604 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial Excerpt*
*Monday, October 22, 2018/Vol. 13*

**I N D E X**

                                                      Page   Vol.

Government's Closing Argument ...................3     13

Defendant Belcher's Closing Argument ...........24    13

Defendant Watson's Closing ......................55    13

Government's Rebuttal Closing ...................81    13

Certification of Reporter .......................98

- - -

**E X H I B I T S**

Number     Description                Id'd Rcvd Vol.

***None Marked, Offered or Received***

- - -

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 3*

1        Detroit, Michigan

2        Monday, October 22, 2018

3                -   -   -

4    (Beginning of excerpt.)

5                                              (9:36 a.m.)

6        **MR. HAUGABOOK:**  Good morning.

7        **THE JURORS:**  Good morning.

8        **MR. HAUGABOOK:**  Ladies and gentlemen, I want to thank

9    you for the fulfillment of your civic duty as jurors over the

10   last three weeks.  It has often been said that the performance

11   of jury service is one of the anchors upon which all of our

12   liberties as United States citizens rest upon.  So, on behalf

13   of the Government's trial team, I'm sure my brother counsel and

14   its trial team and this Honorable Court, we would like to

15   thank you for serving as jurors.  Our system of jurisprudence

16   is one of the things that makes us an envy of the world

17   because, whether you know it or not, there are still other

18   countries that don't have this system of government that we do.

19   So thank you.

20       Ladies and gentlemen, based upon the evidence, there is no

21   question Devin Wallace died at the hands of Andre Watson and

22   Deaunta Belcher.  Three of the five participants have all told

23   you of their collective involvement with Belcher and Watson in

24   that murder.  From this we know Watson, an enforcer on

25   Belcher's payroll, along with Brown, killed Wallace in exchange

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 4*

1   for money and items promised by Belcher.  Phones were used to

2   coordinate it.  Money, cars and a condo were promised.  As a

3   result, Wallace died after Watson shot at him twelve times at

4   point-blank range, with six shots directed to Wallace's head.

5        Before you go back to deliberate I want to describe to you

6   how the evidence you heard over the past three weeks satisfies

7   the elements of the crimes charged beyond a reasonable doubt

8   starting with Count One, Murder for Hire.

9        First, both Deaunta Belcher and Andre Watson are charged

10  with use of a facility of interstate commerce in the commission

11  of a murder for hire.  That sounds complicated, but really it's

12  not.  There are four elements or four different things you must

13  find beyond a reasonable doubt to find the defendants guilty of

14  this offense.

15       First, that the defendants used or caused another person

16  to use a facility of interstate commerce or foreign commerce.

17  In this case that facility is a cellular phone.  So you will

18  simply need to decide whether Deaunta Belcher and Andre Watson

19  used or caused someone else to use a cell phone in connection

20  to this murder-for-hire scheme.

21       Second, that the cell phone, or phones, were used with the

22  intent that a murder be committed.

23       Third, that this murder was done in exchange for something

24  of value.  In other words, it was committed for money, a car or

25  something of value.  Also, that money need not have changed

*16-20143; U.S.A. v. Belcher/Watson*

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 5*

1  hands actually.  All that is required is a promise to pay

2  someone in exchange for the murder; and

3      Four, that death resulted and that death satisfies the law

4  of Michigan for first-degree murder.

5      During this trial over the past three weeks the evidence

6  has shown that on September 11, 2015 at roughly 5 o'clock

7  Devin Wallace sat outside They Say Restaurant in a white

8  Mercedes Benz, a car that his widow and even Defendant Belcher

9  said he did not frequently drive.

10      Wallace sat in his car talking to Darnell Bailey, his

11  supposed good friend and business partner in a fraudulent car-

12  and truck-trafficking scheme.  Mr. Bailey is the cousin of

13  Defendant Belcher, their other partner in the fraudulent car-

14  and truck-trafficking scheme, who also engaged in drug dealing

15  with Wallace and others.

16      The evidence has shown that their drug dealing was

17  intertwined with their car fraud scheme because certain drug

18  customers' identities were used as sham car buyers in

19  conjunction with other drug customers who worked at the

20  dealership, employees, to push the paperwork through, all

21  for the purpose of faking the purchaser identities on cars

22  that ultimately were subleased to other people in the

23  drug-trafficking world or other drug dealers.  The cycle of

24  drug dealing and car fraud was completely entangled and

25  repeatedly fed itself.  In fact, they were two sides of the

*16-20143; U.S.A. v. Belcher/Watson*

1  same coin.

2      The evidence has shown that an unsuspecting Wallace

3  thought that he was going to meet with several other men,

4  including Deaunta Belcher and Darnell Bailey, to discuss a

5  business deal, but that meeting never happened because days and

6  weeks before this date and at least before August 25th a

7  nefarious plot to kill Wallace was hatched at a meeting at

8  Zeidman's between Belcher, a/k/a Byrd; Bailey, a/k/a Gino;

9  Brown, a/k/a Twin; and Watson, a/k/a Dre, Lil Stunna or Stunna.

10     From the evidence, we know that the plot to kill Watson

11 was in effect by August 25th of 2015 because information from

12 the call detail records or CDRs, as will be discussed in

13 Exhibit 16.13 and 13.5, along with the testimony of Bailey and

14 Brown about a failed attempt, tell us so.

15     Bailey said there was a failed attempt to kill Wallace at

16 the Pantheon Nightclub in Dearborn.  Brown said he and Watson

17 went there based upon a call from Belcher and that they

18 followed Wallace but could not keep up with him.

19     As seen in Exhibit 16.14, Belcher, Watson and Brown all

20 talked on August 25th.  As depicted in Exhibit 13.5, you can

21 see that on August 25th, 2015 Wallace was in the vicinity of

22 the Pantheon Club around the same time as Brown and Watson.

23 Wallace's number ended in 5618, Brown's ended in 1332, Watson's

24 ended in 3909.  In other words, everyone's phone is in the same

25 area.  Everyone was in the same area.

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 7*

1   On the fateful day of September 11, 2015 the evidence has
2   shown that Wallace, as we are going to see in Exhibit 2, pulled
3   up outside the restaurant at 16:34:05.  Recall that the clock
4   on this video was a minute and 45 seconds fast.  In other
5   words, based upon the time in the video, he really pulled up at
6   16:32.  So, ladies and gentlemen, as you saw in the video, you
7   have to subtract a minute and 45 seconds to get the true time.

8   As we are about to see in Exhibit 13.7, by the time the
9   victim pulled up and parked, Chambers, Brown and Watson are
10  already on the way to his location in Chambers' 2007 black
11  Charger.  Looking at Exhibit 13.7 and the testimony of
12  Chambers, Brown and Agent Jenson, between 4:25 and 5:10 p.m.
13  Chambers is en route southbound from Faircrest Street with
14  Brown, his front seat passenger, and Watson, his rear seat
15  passenger, in response to Belcher's follow-up call to Brown
16  about a definite location, that being the They Say Restaurant
17  location, to find, as Brown testified, the big fish on the
18  line.

19  By 16:51:30, as depicted in Exhibit 13.7, Watson, Brown
20  and Chambers have reached the area of They Say Restaurant.  As
21  you can see in Exhibit 13.8, Watson's and Brown's phones are in
22  the immediate area before, during and after the murder.  Recall
23  that Chambers and Brown both told you they were in the car as
24  driver and front seat passenger respectively and that
25  Andre Watson was the rear seat passenger, who exited the car

1    and killed Wallace.

2          As we are about to see in Exhibit 16.5, within that same

3    block of time Brown and Belcher are in contact with one another

4    numerous times.  There is even contact with Belcher from

5    Watson's phone, which aligns with Brown's testimony that due to

6    a battery issue he borrowed that phone from Watson and used it

7    to call Belcher.  Remember, Brown says those calls were related

8    to execution of the plan hatched at Zeidman's to kill Wallace,

9    and, and, and by his refusal to tell the Detroit Police the

10   truth about all he talked about, about all he talked to before

11   and after the murder.

12         I'm sorry, let me start over.  To tell DPD the truth about

13   who all he talked to before and after the murder, Defendant

14   Belcher by that glaring omission and untruth tells you himself

15   that it was indeed Brown he was talking with when he was

16   talking with him about killing Wallace.

17         You saw that video interview with the Detroit Police

18   Homicide Detectives Mitchell and Lucy where they confronted

19   Belcher regarding the number belonging to Stephen Brown and the

20   number of contacts between Belcher and Brown's phone.  In the

21   interview the detectives told Belcher his phone had contact

22   with Brown's phone 188 times the month before September 11,

23   2015 and at least 23 times on the day of the murder.

24         In the interview Belcher refused to say the 1332 number

25   was Brown's or Steph's, as he called him; refused to say he

1  associated with Steph or that he ever talks to Steph, for that

2  matter, even though he talked to Brown as he pulled up to the

3  They Say Restaurant on September 11th, which I'll talk about

4  more in a moment.  In the interview Belcher said the last he

5  heard of Steph was in jail and refused to admit he even knew

6  his last name.  But, as you saw from the video, Detective

7  Mitchell found Brown's full name and picture in the Facebook

8  contact from Belcher's phone, one of the second phones he

9  possessed in that interview.

10      But, suffice it to say, Defendant Belcher, by those

11  glaring omissions and untruths, tells you himself that it was

12  indeed Brown that he was talking to.  Defendant Belcher, by all

13  of those glaring omissions and untruths, tells you himself that

14  the calls between he and Brown involved a plan to kill Wallace.

15      Also, recall before the murder he had told his then fiance

16  and drug coconspirator Miss Latasia Banks that Bailey asked him

17  to help take out Wallace, and when confronted by Banks after

18  the murder, he confessed and in his own words said, "Nigga was

19  greedy and had to go."

20      As we are about to see in Exhibit 4, by the 16:48:04 mark

21  in conjunction with Exhibit 16.7, you can see that as Belcher's

22  Camaro arrives he has just been in contact with Bailey's phone,

23  he had just been in contact with Bailey's phone, and he is in

24  contact with Brown's phone twice, a 10-second and a 95-second

25  call.  These are outbound calls, meaning Belcher is calling

1  Brown, calling Brown's phone.

2       The 95-second call starts at 16:48:24 of Exhibit 16.7 and

3  Exhibit 4.  That means, ladies and gentlemen, that that

4  95-second call runs until 16:49:59, and as you can see from the

5  video, Mr. Belcher is still in the car.  He never exited the

6  Camaro until he completed that call with Mr. Brown.  Therefore,

7  before he even gets out of the car with his daughter he is on

8  the phone engaged in fulfilling the plan to execute Wallace.

9       Next, we will look at another clip from Exhibit 4, which

10  ends at the 16:53:03 mark, and compare it with Exhibit 16.7.

11  From this clip you can see that Belcher is back into his

12  Camaro, and a second later at 16:53:04 when we look at

13  Exhibit 16.7 he gets a call from Andre Watson's phone, another

14  call he refused to acknowledge to Detectives Mitchell and Lucy.

15       Looking at Exhibit 13.7, you can see that at 16:51:31, by

16  that little box down there closest to -- it looks like it's

17  sitting in the water there, you can see that at that time when

18  we look at Exhibit -- when we look at that, you can see that he

19  gets a call from Andre Watson's phone number and you can see

20  that Watson's phone is indeed in the immediate area of the

21  restaurant.  In fact, it is already in the area before making a

22  46-second call to Belcher's phone.

23       Brown and Chambers told you that on the -- Brown and

24  Chambers told you that on the ride to They Say Brown and Watson

25  shared each other's cell phones to talk to Belcher.  In fact,

1   Brown told you that due to a battery issue he used Watson's

2   phone to call Belcher.  Remember, Brown told you that they were

3   sitting on the corner of Joseph Campau and Jefferson for a few

4   minutes and there was a phone call with Belcher.

5         Looking at another clip from Exhibit 4, which starts at

6   the 16:53:04 mark, you can see, when we look at Exhibit 16.7,

7   you can see that that call that starts at 16:53:04, which lasts

8   46 seconds, is enough and just long enough for Belcher to

9   arrive a block away onto eastbound Wight Street.  Brown

10  testified Belcher was told they were nearby, and Brown told you

11  they saw Belcher pull off in that Camaro.  As we just saw,

12  Watson's phone was there at 16:51:03, about two minutes before

13  the call and two minutes before the defendant pulled off, and

14  as Brown told you, they could see him pull off in the white

15  Camaro.

16        The evidence proves that by the time he got home a block

17  away to attempt to drop his daughter off, Belcher already made

18  the phone calls to carry out the plan hatched at Zeidman's to

19  kill Wallace.  Given the testimony Belcher was paying for this

20  and held a bitter animosity with Wallace, this all explains why

21  Belcher was definitely in a rush to get in and out of the

22  house, like Ms. Banks said.

23        Belcher wanted to get in and out of the house because, in

24  his words, he had a play on the floor with Darnell Bailey, and

25  that play, ladies and gentlemen, was to kill Wallace.  I submit

1  that Belcher wanted to get back so he could watch the aftermath

2  of Wallace's execution and commence the false narrative that

3  Wallace was killed for snitching.

4  　　His daughter's return to the scene with him was by sheer

5  happenstance and accident.  In fact, her presence in the car

6  with Belcher did not even stop his phone call and planning with

7  Brown when Belcher first pulled up and parked outside the

8  They Say Restaurant before the murder.

9  　　Looking at another clip from Exhibit 4, which starts at

10  the 17:03:42 mark, which we will later compare with this

11  Exhibit 16.7.  You can see that after the shooting occurs

12  Bailey is at Belcher's car a block away on Wight Street at

13  17:04:23.

14  　　Looking at another clip from Exhibit 4, which starts at

15  the 17:04:24 mark, which we will compare to Exhibit 16.7.  You

16  can see Belcher then headed westbound on Wight and circled the

17  block before arriving back at the restaurant scene.

18  　　Belcher's Camaro arrives and parks on southbound

19  Joseph Campau at the corner of Franklin at 17:06:02.  By the

20  time this clip ends at 17:06:06, in that short window that it

21  takes for him to leave Wight and circle the block and get

22  there, you can see that he doesn't get out the car until after

23  he has had a 36-second call with Andre Watson on the phone.  If

24  you do the math, 17:05:30 plus 36 seconds will take you to

25  17:06:06, which is just before he gets out of the vehicle right

1  there.  As you can see, Belcher was on the phone with Watson
2  before he got out of the car after returning to the scene, and
3  yet that's another communication he denied making to detectives
4  Lucy and Mitchell.
5      You know that payment was promised to Brown and Watson
6  because Brown told you so.  Chambers testified that while in
7  jail Brown said he received some money but was due more.  Brown
8  also testified about this conversation and said he promised to
9  give Chambers a cut of the money he was to receive from
10 Belcher.
11     You also heard that Brown called Belcher for payment and
12 was directed to Bailey, who promised to pay him at Motor City
13 Casino, but Brown could not go because he was on tether and he
14 sent Watson instead.
15     Bailey told this account as well.  You also heard that
16 Brown called Bailey, who said he gave $10,000 to Belcher to pay
17 them.  Brown then contacted Belcher, who said he gave it to
18 Watson, yet Brown did not get a cut of the money.
19     You heard that in one instance Brown sought money from
20 Belcher, but Belcher mocked him and questioned whether he
21 deserved any because he failed to shoot directly with his .40
22 caliber gun.
23     You also heard that Brown was getting the runaround
24 regarding full payment from Belcher.  In fact, Brown and
25 Chambers told you about Brown's hunt for him in the

1  Warren-Conner projects.  Chambers and Brown both told you they
2  found him and that Brown was paid.

3      Brown said he even went there with an AK-47 or chopper
4  because he was so incensed that he was getting the runaround
5  and the money was not being paid off as promised.  You heard
6  Brown say as a result he received some money from Belcher the
7  evening of that encounter in the projects.  You also heard, it
8  was brought out on cross-examination of Agent Rienerth, that
9  Brown told Rienerth he was offered a house and car by Belcher
10  for killing Wallace.

11      Ladies and gentlemen, the Government has overwhelmingly
12  proven the elements of Count One, murder for hire, involving
13  Defendants Belcher and Watson.  Both Belcher's and Watson's
14  involvement with the others in this killing has been
15  established by the testimony of the witnesses and the evidence,
16  and I believe the Court will instruct you on what evidence is.
17  It's the testimony of witnesses and the exhibits admitted into
18  evidence and any stipulations and anything else that the Court
19  tells you you may consider as evidence.

20      However, there is even more evidence of Watson's guilt
21  because of his lies to Agent Rienerth.  You recall Agent
22  Rienerth, who not only testified about the creation of
23  Exhibit 16, but he also testified about his interview of
24  Watson.  Agent Rienerth said that Watson admitted the 3909
25  phone number was his.  A phone with that number was seized by

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 15*

Detroit Police during a traffic stop and arrest of Watson's

female companion, as testified to by Officer Penn.

However, just like Belcher, Watson's untruths proves his

guilt and involvement also.  Watson told Rienerth he did not

even know anyone named Chambers, but as we see in Exhibit 24C,

he had three contacts for B.J. Chambers saved in his phone,

including Chambers' number ending in 1987.  Likewise, in

Exhibit 17B, Chambers had Watson's 3909 phone number saved in

his phone under the name Stunna.  Watson said he did not know

or associate with Steph, even though there was a video on his

phone of him and Steph Brown that was made a couple weeks

before their arrests.

Watson denied going downtown or near They Say even though

his phone shows him in the area at about the 16:51:03 mark

until the murder was concluded.  While in the area, Watson's

phone was in contact with Belcher's or Byrd's phone and

remained there throughout the murder.  Watson denied knowing

Byrd, but as we see in Exhibit 24D, Brown had several entries

in his phone for a Byrd and described him as a tall, skinny

light-skinned man.  As you heard from Agent Rienerth, those

numbers there were other numbers found for Belcher in his

drug-trafficking activity.

The lies of Defendants Belcher and Watson in the face of

the independent cell phone evidence, such as cell site location

and actual cell phone content, coupled with the testimony of

1  Chambers, Brown, Jackson, Bailey, and Ms. Banks, proves these
2  defendants' guilt as to Count One.

3      There's no question these defendants used a phone, an
4  instrument of interstate commerce, with the intention to commit
5  a murder.

6      There's no question that they did so based upon a promise
7  to pay.  Brown even mentioned he was promised money, a car and
8  a condo.  This is consistent with Belcher's capability to pay
9  because Ms. Banks told you about Belcher's involvement with a
10  drug customer realtor and Belcher's exchange of a car for a
11  condo or house.  Also, you know that Belcher was involved in a
12  car fraud scheme so it stands to reason that Belcher could
13  indeed promise such things.

14      There is no question these defendants caused the death of
15  Wallace.  They intended to kill him, when you can take into
16  account the Zeidman's plan, the surveillances, the failed
17  attempt on August 25th, and finally the 12 shots fired at
18  point-blank range on September 11th.

19      There's no question that this was a premeditated killing.
20  You take into account the Zeidman's plan, the surveillance, the
21  August 25th attempt, the two calls to Brown about big fish on
22  the line with a promise to call back with a definite location,
23  and in fact a call back with a definite location at They Say,
24  and the calls with the Brown and Watson phones as Defendant
25  Belcher was arriving to the restaurant location, again calls

1    which he denied making and lied about who the other person was

2    on the line when he was interviewed by Detroit Police.

3        The evidence has shown that the execution of this

4    nefarious plan on Mr. Wallace by all participants, including

5    Chambers as the driver, and these two defendants, Belcher and

6    Watson, on September 11 was just plain heinous and cold

7    blooded.

8        As we see from Exhibit 6CC and Exhibit 11, Watson shot at

9    Wallace twelve times, and six of the nine shots struck Wallace

10   in his head.  Nine took effect to his body, four of which

11   exited his head, while the remaining two were removed during an

12   autopsy.

13       There's no question the killing of Wallace was deliberate.

14   The Defendant Belcher had the opportunity to weigh the pros and

15   cons as he pulled up on Franklin Street in the first instance.

16   Watson had the same opportunity as he took that long ride from

17   Faircrest down to They Say, as he sat at the corner of

18   Joseph Campau and Jefferson, even as he sat at the corner of

19   Franklin and Chene watching the events ahead of him.  They each

20   had the opportunity to reflect upon it, weigh the pros and

21   cons.

22       Moving on to Count Two, Conspiracy to Distribute

23   Controlled Substances.  There's overwhelming evidence about

24   Belcher's drug dealing, from the jail call where he sent

25   Ms. Blanks to pick up drug money and deliver drugs, the

1  testimony of Ms. Banks, the testimony of Frank Aday, the

2  drug-related text messages and notations in Belcher's phone,

3  the testimony of Brown that Belcher supplied him with

4  marijuana, the testimony of Bailey regarding Belcher's drug

5  dealings with Wallace and others, and the testimony of Jackson

6  regarding admissions told him by Bailey, which were admitted to

7  you, Mr. Jackson testified for you, to show that Mr. Bailey was

8  being consistent about everything he told you later here in

9  court because before he even had a deal or anything like that

10  he had a catharsis.  He started explaining himself to

11  Mr. Jackson.

12      And there's no question about the inseparable role the

13  drug dealing played in the fraudulent car scheme.

14      There's no question Belcher conspired with others to

15  distribute and did distribute drugs such as marijuana, cocaine

16  and oxycodone.

17      There's no question that the drug conspiracy fed into the

18  car scheme and vice versa.

19      There's no question Belcher knowingly and voluntarily

20  joined the conspiracy with all of his drug coconspirators.

21      With regard to Mr. Watson in Count Two, the elements are

22  there was a conspiracy or agreement among two or more people to

23  commit an illegal act, to wit, sell drugs and the defendant

24  knew of or joined the conspiracy.

25      There's no question that Belcher's car fraud/drug

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 19*

1  conspiracy existed or that two or more persons conspired or

2  agreed to join it.  So did Watson.  You heard testimony that

3  Watson was an enforcer for Belcher.  That was his role in

4  connection to the drug conspiracy.

5      You heard testimony that Watson was at Zeidman's where

6  Belcher offered him and Brown compensation to kill Wallace.

7  Recall that this was a scheme prompted in part by Belcher's

8  drug trafficking.

9      Afterwards, Watson did surveillance with Brown for the

10  express purpose of finding and killing Wallace.

11      From the testimony of Chambers, Brown and Bailey, who says

12  Belcher told him Watson was the killer.

13      Watson was there on September 11th with his phone and did

14  the killing.

15      Given that Belcher denied calls with Brown's or Watson's

16  phones and Watson denied knowing this Byrd when interviewed by

17  Agent Rienerth and Watson had no explanations for why his phone

18  was in connection with Belcher's or this Byrd's phone on

19  September 11th, coupled with Watson's denial of being in the

20  area of They Say when his phone does put him there by at least

21  16:51:30, all of this shows Watson's consciousness of guilt.

22  It shows Watson's attempts to hide his connection to Belcher

23  and his whole involvement in this murder scheme.

24      One does not solely have to join the car fraud/drug

25  conspiracy as a dealer or customer.  Also, this Court may give

*16-20143; U.S.A. v. Belcher/Watson*

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 20*

1  you an instruction that to join a conspiracy does not require

2  proof that Watson knew everything about the conspiracy or

3  everyone involved.  Also, I believe this Court may instruct you

4  that once a conspiracy is shown an individual's slight role or

5  connection is enough to find him guilty.  Ladies and gentlemen,

6  that is satisfied by Watson's role as the enforcer for Belcher.

7      Moving on to Count Three, Use of a Firearm.  The third

8  charge is use of a firearm during and in relation to a

9  drug-trafficking crime.  This count dovetails with the drug

10  conspiracy I just finished talking with you about.

11      With regard to Count Three, causing death through the use

12  of a firearm during and in relation to a drug-trafficking

13  crime, to be clear, ladies and gentlemen, although Belcher did

14  not use a gun, the law does not require him to personally use

15  the gun for him to be guilty of this offense.

16      I believe this Judge may instruct you that a person can be

17  guilty of this charge as an aider and abettor or as a

18  coconspirator.  Here, although Watson used a gun and committed

19  the murder, he was aiding and abetting Belcher, who offered to

20  pay him and Brown to commit the murder.  You even heard from

21  Brown that before this proffer was made he didn't know Wallace,

22  he had no reason to go and find Wallace, he had no reason to

23  kill Wallace.

24      There's no question Belcher committed the drug-trafficking

25  crime that was interwoven with this car fraud scheme.  In fact,

*16-20143; U.S.A. v. Belcher/Watson*

1  Belcher and Bailey lured Wallace there to participate in the

2  car fraud and drug-trafficking scheme.  There's no question

3  Belcher and Bailey wanted Wallace dead because of disputes that

4  arose during and in relation to that car fraud and

5  drug-trafficking scheme.

6  　　　There's no question, based upon the testimony, cell site

7  analysis and physical exhibits, that Chambers, Brown and Watson

8  were all there.  Even surveillance video puts Bailey and

9  Belcher there.

10  　　　There were two guns, a .40 caliber and a 9mm, and the

11  testimony was that Watson used the 9mm which killed Wallace.

12  　　　You heard from MSP Officer Molnar, and he told you twelve

13  of those casings were 9mm, eleven of them came from the same

14  gun.  He talked about one just being kind of unavailable to say

15  it was or wasn't, and I submit to you when you looked at the

16  video you saw at least seven or eight vehicles that rolled

17  through there or what have you.  I submit that's what made that

18  inability to read that last shell.  But he also told you that

19  there was a .40 caliber casing there as well.

20  　　　There's no question a gun or guns would be used because

21  the killing had to be quick and fast.  There's no question

22  Watson did the killing based upon Belcher's admission to Bailey

23  and the testimony of Brown and Chambers as supported by the

24  cell site analysis and the spent bullets and gun casings.

25  　　　There's no question that an unsuspecting Devin Wallace

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 22*

1  lost his life due to twelve of the 9mm bullets being fired at

2  him and six hitting him in the head all at point-blank range.

3       For aiding and abetting I believe that this judge will

4  tell you in the instructions that any assistance is enough.

5  Belcher's assistance to Wallace was the Zeidman's offer of

6  payment to commit the murder, the passing along of information

7  to Watson through the phone call with Brown, the location as

8  well as who was standing outside the car and who was seated

9  inside.

10      As that surveillance video proves, in the split second

11  that he exited the car Mr. Watson already knew to avoid Bailey

12  and go straight to the occupant of the car.  Think about it.

13  Mrs. Wallace said her husband rarely drove that car, and in his

14  video interview Belcher recounted only three times of seeing

15  Mr. Wallace inside that car.  Brown said he and Watson got

16  their information about what cars Wallace drove from Belcher.

17  Brown even talked about seeing Mr. Wallace in a Jeep, in a

18  white Jeep.

19      It took Belcher and his calls to the Brown/Watson phones

20  on September 11 to tell them Wallace was inside that Benz.

21  Even in their failed attempt at surveillance Brown told you and

22  testified that he merely saw Wallace in a white Jeep.  Watson

23  assisted Belcher by performing the execution of Wallace with

24  the firearm based upon the information Belcher passed to Brown

25  as relayed to Watson that Wallace was the occupant of the car

*16-20143; U.S.A. v. Belcher/Watson*

1   and Bailey was standing outside.

2       For Count Three there is another way in which both

3   defendants are liable, and that is under the rule of law that

4   the acts committed by one coconspirator is attributable to all

5   of the members of the conspiracy.  These defendants conspired

6   at Zeidman's to commit a murder.  As I mentioned before, it

7   obviously had to involve a gun or guns to be quick and fast.

8   Both of these defendants joined the conspiracy at the Zeidman's

9   meeting and remained in it until the killing of Wallace was

10  achieved.  The deliberate killing of Wallace was done to

11  continue the car fraud drug scheme without Wallace's

12  participation and interference in the money earned from the

13  scheme.  The killing of Wallace, ladies and gentlemen, was

14  obviously committed during and in relation to the car

15  fraud\drug-trafficking scheme.

16      Count Four, Obstruction.  The fourth and final charge

17  relates to Deaunta Belcher only.  He is charged with making

18  misleading statements to police to hinder the investigation.

19  The evidence is that Belcher knowingly tried to mislead police

20  in September 2015 when he told them:  One, he didn't know

21  Stephen Brown personally; that he did not have Stephen Brown's

22  phone number, two; and three, that he thought Stephen Brown was

23  still in jail.

24      With regard to Count Four, Obstruction of Justice,

25  Defendant Belcher, by being untruthful about calls to his phone

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 24*

1   before and after the murder, claiming he didn't know

2   Stephen Brown, claiming Stephen Brown was still in jail,

3   claiming the 1332 number belonged to Block, claiming he didn't

4   associate with Stephen Brown, claiming he didn't know

5   Stephen Brown's last name, these false statements obstructed

6   justice.  Deaunta Belcher should have known these false

7   statements would be passed along to DEA because he planted the

8   cover story moments after the murder, and you heard what that

9   story was, that Wallace was killed for snitching in a federal

10  investigation.  In fact, I submit he thought his false

11  statement would send the investigation in a different

12  direction, away from him, his cousins Bailey and Brown, and

13  Watson to other drug dealers already under investigation by the

14  DEA.

15       Ladies and gentlemen, over these last three weeks the

16  Government has provided you with overwhelming evidence

17  consisting of exhibits and testimony to prove the defendants'

18  guilt for each crime charged beyond any doubt, certainly beyond

19  a reasonable doubt.  As a result, we ask you to return the only

20  verdict which this evidence supports, and that's that the

21  defendants are guilty on each and every count as charged.

22       I thank you for your time and attention.

23            **THE COURT:**  Mr. Shea.

24       **MR. SHEA:**  Yes.  Thank you, Judge.

25       Good morning, ladies and gentlemen.  I want to start by

1    addressing the less-serious counts because I'm not going to

2    spend a lot of time on them.  I'm going to start in fact with

3    Count Four, which is the count that charges Mr. Belcher with

4    obstruction of justice.

5        One of the elements that -- well, first, I mean, obviously

6    one element is that the person charged did something to mislead

7    or try to deceive law enforcement, and you heard the audio

8    clips of Mr. Belcher's statements to the police on September

9    the 24th.  This count relates to his interview with DPD on

10   September the 24th, and I don't think you are going to have too

11   hard a time concluding that he didn't tell the truth all the

12   time in that interview, particularly when it came to his

13   relationship with Mr. Brown.

14       However, another critical element of that count is that he

15   must tell those untruths with the intent to hinder, delay or

16   prevent the communication of that information to a federal law

17   enforcement officer.  I don't think there's any evidence

18   whatsoever to suggest that when he was talking to Detectives

19   Mitchell and Lucy on September the 24th at the Detroit Police

20   Department that he had the specific intent to somehow --

21   whatever it is he was saying was going to get communicated to a

22   federal law enforcement officer.  So I think that, absent that

23   element, you can't convict him of that count.

24       With respect to Count Two, the drug conspiracy, and as I

25   said to you in opening statement, there's been a lot of

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 26*

1  evidence that's been presented to the effect that Mr. Belcher

2  was a drug dealer and that in connection with his drug dealing

3  he engaged with various people who in one form or another

4  assisted him in connection with that.  That would include

5  Frankie Aday.  That would include Steph Brown.  That would even

6  include Latasia Banks, according to the evidence.  And, of

7  course, you heard Mr. Belcher admit that he was a drug dealer

8  to police on September the 24th.  So the fact that he was a

9  drug dealer is not in dispute.

10      As I also said to you in opening statement, that doesn't

11  make him a murderer, and he's -- Count Two just charges him

12  with the drug conspiracy.  Count Three charges him with the

13  murder of Devin Wallace as an outgrowth of the drug conspiracy.

14  And merely because you may believe that the Government is

15  satisfied with its proofs with respect to Count Two doesn't

16  mean the Government has satisfied its proofs with respect to

17  Count Three, and that's what's of critical importance to

18  Mr. Belcher today.  Nor does the fact that Mr. Belcher was a

19  drug dealer conclusively prove that Andre Watson was in that

20  conspiracy.

21      The fact that Mr. Belcher may have associated with

22  Frankie Aday and Nancy Eaton, Latasia Banks and Steph Brown

23  doesn't mean he's associated with Andre Watson in connection

24  with those drug-dealing activities.  I'll let Mr. Johnson

25  address that more fully because I think that more centrally

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 27*

1    goes to his client's concerns, but I wanted to point that out.

2        It should be obvious to everybody in this courtroom that

3    the main reason why this trial has taken place is over, at

4    least from Mr. Belcher's point of view, is over whether or not

5    Mr. Belcher was involved in the death of Devin Wallace.  So I'm

6    going to turn to that, and I'm going to spend the rest of my

7    time on that issue, that broad overarching issue.

8        And I want to start by saying -- this may help you

9    understand my argument, the structure of it as I go through,

10   and it may help me as I try to keep it structured as I go

11   through.  There are three broad reasons why I will be arguing

12   to you at the conclusion of this summation why I believe you

13   need to acquit Mr. Belcher of the murder charges.

14       First, the Government's case relies primarily on you

15   believing beyond a reasonable doubt a collection of very

16   untrustworthy people, who are habitually untrustworthy, who

17   have lived practically their entire adult lives as being

18   untrustworthy.

19       Second -- and I am talking about again primarily

20   Billy Joe Chambers, Darnell Bailey and Steph Brown.  We'll talk

21   about Latasia Banks and Sean Jackson in a little bit, but the

22   three primary witnesses whom the Government relies on are

23   Chambers, Bailey and Brown.

24       Second, not only did Chambers, Bailey and Brown

25   demonstrate through their lifestyle that they are untrustworthy

1  people, they have undeniable and clear motive to lie about

2  Mr. Belcher in this case.

3  And, third, the evidence that the Government points to

4  that it would argue corroborates these untrustworthy people's

5  version of events does not necessarily corroborate those

6  untrustworthy people's version of events.

7  So, with that sort of structure, let's dive into it in a

8  little more detail.  Let's start with what we know for sure

9  because even the untrustworthy people admit it.

10  We know that Chambers, Brown and Bailey were involved in

11  the murder of Devin Wallace.  Bailey tried like heck to say he

12  wasn't really, and we'll talk about that in a minute as well,

13  but we know, I mean these people have pled guilty to murder for

14  hire.  It's not a whodunit when it comes to them.  The issue is

15  can the Government prove beyond a reasonable doubt to you that

16  Deaunta Belcher was part of their conspiracy.

17  I believe the judge will instruct you, I believe the judge

18  will instruct you that proof beyond a reasonable doubt is proof

19  that is so convincing that you would not hesitate to rely on it

20  in making the most important decisions in your own lives, and I

21  submit to you that the testimonies of Chambers, Bailey and

22  Brown aren't that kind of proof, don't carry that kind of

23  convincing weight.

24  We know that Stephen Brown previously had been convicted

25  multiple times of felonies involving theft and stolen property.

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 29*

1   We know that he was on parole at the time of the murder.  We

2   know that he's 29 years old.  For virtually all of his 20s he

3   was locked up.

4       We know that Billy Joe Chambers had multiple convictions

5   involving stolen property and robbery.  We know he was on

6   parole at the time of the murder.

7       We know that Darnell Bailey had multiple convictions,

8   three I believe, two for unemployment insurance fraud, one for

9   receiving and concealing a stolen automobile.  He was on

10  two separate probations at the time of the murder, and we know

11  that he was engaging in various ongoing frauds, notwithstanding

12  his convictions, up to and through the time of the murder.  We

13  know that Darnell Bailey was so incorrigible in connection with

14  his frauds and deceptions that he sought to educate others,

15  like Sean Jackson, while he was locked up on how to commit

16  frauds and deceptions.

17      We know that he even had his family send a deceptive

18  letter to Judge Marlinga in the Macomb County Circuit Court

19  seeking early discharge from probation, telling the Court that

20  he was at present locked up on charges of murder but that he

21  wasn't a murderer.  This was in October of 2017, a few months

22  before he pled guilty to being a murderer.

23      I don't think I'm saying it too strongly when I say that

24  Misters Brown, Chambers and Bailey are habitual liars and

25  cheats.  Then they come to this case.  During the investigation

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 30*

1   of this case they remained true to form.

2       Billy Joe Chambers had three separate police interviews.

3   He lied until -- about his own involvement until the very end

4   of the third interview.

5       Mr. Bailey spoke to police twice on September the 11th,

6   wasn't forthright with them; spoke to them on September 17th,

7   wasn't forthright with them; spoke to them on March the 8th,

8   wasn't forthright with them.  Always played off that he didn't

9   know anything about it, that he suspected that Wallace was

10  killed by others because he was snitching.

11      Mr. Brown, likewise, in the first interview he gave with

12  the federal agents on March 9, 2015 acknowledged lying

13  throughout that.

14      When they ultimately confessed their involvement, when

15  eventually they put themselves in the crime, they didn't do it

16  out of some sense of moral obligation or ethical obligation.

17  Mr. Chambers told us that he confessed because law enforcement

18  showed him the evidence and he didn't want to go away for life.

19      Mr. Bailey confessed after reviewing the indictment and

20  after having been told by police repeatedly on March 8th, 2016

21  that he needed to do damage control, and they were offering him

22  a way out through cooperation from a life sentence.

23      Stephen Brown acknowledged to us that he had been locked

24  up for most of his 20s, as I have previously mentioned, and he

25  wanted an opportunity to get out some day, and the Government

1   gave him that opportunity through cooperation.

2       None of these people ultimately came to Jesus with respect

3   to their involvement in these cases because they had all of a

4   sudden an epiphany about doing the right thing.  They all came

5   to the table because they wanted something pretty important to

6   them in return, and the fact they didn't have a plea agreement

7   yet doesn't change that elemental fact.  These people came to

8   the table because they wanted something important in return.

9       Their lack of candor continued through their testimony at

10  trial.  Let's start with Mr. Chambers.  No fewer than six times

11  he refused to answer my questions.  I didn't count how many

12  times he refused to answer Mr. Johnson's questions.

13      At least twice he acknowledged testifying at trial

14  differently than he had testified before the grand jury.  At

15  least once he acknowledged testifying at trial to you

16  differently than he had told law enforcement just three weeks

17  earlier.

18      In connection with that last one, you will remember him

19  testifying about bleaching the car and you will remember him

20  testifying to you that Steph Brown didn't help him bleach the

21  car, and then he acknowledged having told law enforcement

22  three weeks earlier for the first time that he had bleached the

23  car and that Steph Brown had helped him.

24      The point is this.  Ultimately Mr. Chambers agreed with me

25  that he didn't always tell facts the same way, and isn't that

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 32*

1   sort of the essence of somebody who is untruthful and

2   unreliable and how can you believe him in connection with the

3   most important decisions of your life?

4       It also tends to put the lie -- Mr. Chambers had these --

5   it's been a long time, but I think you probably can remember

6   back.  Mr. Chambers had a way of speaking that was kind of

7   repetitive, and one of the things that he kept repeating was "I

8   lied then, but I'm telling the whole truth now because my

9   cooperation agreement requires me to be truthful and honest

10  with the jury and with everybody in the courtroom."  Can you

11  remember him saying that any number of times?

12      Well, when on cross-examination he has to acknowledge he

13  didn't tell the facts the same way twice even to you, it kind

14  of undercuts that sentiment.  And, furthermore, how would you

15  know with somebody like that when they really mean it?  Okay,

16  I'm telling you the truth now, I really mean it.

17      Let's move on to Mr. Bailey and his testimony here.  He

18  constantly tried to weasel out of responsibility for

19  everything, it seemed, that he's done in his life that was

20  wrong.  Early on Mr. Cralle tried to get Mr. Bailey to explain

21  one of his convictions, it was the receiving and concealing a

22  stolen automobile conviction, and you will remember Mr. Bailey

23  saying, well, yeah, I pled guilty to it, but it was really a

24  technical violation.  I learned afterwards that when a car gets

25  repossessed it's not really mine anymore, it's theirs, and so

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 33*

1   technically I was in possession of a stolen vehicle and that's

2   why I pled guilty to it.

3        He told you that until he got involved with the Government

4   he didn't consider straw buying to be fraud.  He told you that

5   when he educated Sean Jackson as to how to commit frauds when

6   they were together in pretrial detention it was because he

7   wasn't used to the federal system and didn't realize that he

8   shouldn't have opened up to Mr. Jackson in that sense, in that

9   respect.  He blamed Mr. Jackson for essentially getting the

10  information out of him.

11       He told you that he didn't know that the letter that his

12  family sent on his behalf to the judge would say what it said.

13  He told you he didn't know that Mr. Wallace was going to be

14  killed on September the 11th.

15       And his last words to me on cross-examination were:  "I

16  don't feel like I should do any time except for the frauds, to

17  be honest with you," and this is from a guy who earlier this

18  year or late last year, I forget what day it was, but you could

19  check it out, on his Rule 11 Plea Agreement pled guilty to

20  Murder for Hire.  This is a man who not only doesn't have a

21  moral compass, he doesn't seem to have the capacity to be truly

22  forthright even when he's on the witness stand under oath and

23  talking to you.

24       Mr. Brown is another person who can't seem to tell --

25  can't seem to tell a story the same way twice.  I'll give you

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 34*

1    some examples.

2          To you he testified that he received $500 directly from

3    Deaunta Belcher in partial payment for the murder.  To agents

4    he said he never received anything from Deaunta Belcher.

5          To you he said I didn't have any telephone conversations

6    with Darnell Bailey before the murder.  To agents he said he

7    did have telephone conversations with Darnell Bailey before the

8    murder.

9          To you he said he didn't have any discussions with

10   Darnell Bailey after the Zeidman's meeting about getting the

11   murder done.  To agents he did have those discussions.

12         He couldn't keep his story straight even between day one,

13   when he testified on direct examination, and day two, when he

14   testified on cross-examination.  Again, some examples:

15         The Government asked him about whether he had gotten a

16   telephone call from Mr. Belcher about trying to locate

17   Mr. Wallace on Grand River near a mechanic shop, and Mr. Brown

18   said I got a telephone call from Mr. Belcher about that and

19   this occurred between August 26th and -- August 25th and August

20   the 31st.

21         On cross-examination the next time we were in court --

22   maybe it wasn't the next day, I don't remember if there was a

23   weekend in between because the dates blend together, but I

24   think it was the very next day -- his story had changed.  He

25   still says he got the telephone call from Mr. Belcher but that

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 35*

1   it occurred sometime between August the 11th and August the

2   25th.

3       There is a second example, and then I'm going to tell you

4   why these are important.  On day one in direct exam after the

5   discussion of whether Mr. Brown was asked to try to locate

6   Wallace near Grand River and the mechanic shop, after that the

7   next line of questioning had to do with did you receive

8   frequent calls from Mr. Belcher after that, between the end of

9   August and September the 11th, and Mr. Brown described it yes,

10  he had.  On cross-examination the next day he, again, changed

11  his mind and, again, he said, well, those calls actually

12  started -- I got frequent calls between August the 11th and

13  September the 11th, an entire month.

14      Why am I harping on this?  Why is this important?  It's

15  important because, if you accepted Mr. Brown's testimony on

16  direct day one, you would know they were lies because if you

17  look at the call detail records there were no telephone calls

18  from Mr. Belcher to Stephen Brown from August the 26th until

19  September the 9th.  He could not have been calling Mr. Brown to

20  try to find Wallace on Grand River between the 25th and the

21  31st.  He could not have been calling Brown frequently between

22  the end of the month and September the 11th because they

23  weren't having conversations or at least Mr. Belcher was not

24  calling Mr. Brown.

25      There are times when people aren't telling the truth

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 36*

1  because they are simply mistaken.  People make mistakes.  Then,

2  there are times when people aren't telling the truth because

3  they don't want to be forthright.  Mr. Brown's -- I'm just

4  giving you some examples.  Mr. Brown's discrepancies, his

5  change of testimony from one day to the next, his change in

6  recollections from one interview to the next or from

7  one interview to his testimony today, they are too numerous,

8  they are too regular to simply be mistakes.

9       Mr. Brown's demeanor with the Government was completely

10  different than his demeanor with me.  I could have challenged

11  him on whether the sun rose in the east, and he would have said

12  it didn't or he never testified that it did.

13       He clearly wanted to feed the Government the information

14  that the Government wanted fed and he wanted to fight with

15  everybody else, and he caught himself up in numerous

16  discrepancies as a result of that and that's a sign of someone

17  who doesn't have candor, who is not honest, who is deceptive,

18  not just someone who is mistaken.

19       In addition to these cooperators being liars by nature and

20  liars by habit, it can't be denied that they have a strong

21  motive to lie about Mr. Belcher in this case.  They knew that

22  the only way they were going to have an opportunity to walk the

23  streets again was to cooperate.

24       As we heard Sergeant Eby say to Darnell Bailey, they had

25  to tell on people.  That was the only way they could do damage

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 37*

1 control.  Implicating Mr. Belcher was not hard to do even if it

2 wasn't the truth.

3     Mr. Chambers was shown four photos and asked to describe

4 the roles of each them.  Well, he knew that Mr. Belcher wasn't

5 in his car.  He knew that Mr. Belcher wasn't at the window of

6 the victim's car.  He knew that Mr. Belcher was a boss of

7 Stephen Brown in the drug business.  He knew that Mr. Belcher

8 and Mr. Bailey were associated.  It's not hard to say, well,

9 jeez, if I'm being shown the photograph he must have a role,

10 his role must be as some guy who gives instructions or is a

11 director of some kind or is behind the scenes in some fashion.

12 It's not hard to make that up.

13     With respect to Stephen Brown, by the time he was

14 cooperating he had the indictment and the indictment laid it

15 out.  This is the original indictment, which is in evidence as

16 Defendant's Exhibit G1, and if back in the jury room you look

17 at Defendant's Exhibit G1 and you go to Page 3 that describes

18 the manner and means of the conspiracy, you will see language

19 that says the Government alleges Deaunta Belcher agreed to pay

20 Stephen Brown a sum of U.S. Currency to murder Devin Wallace

21 because of his cooperation with the DEA.  You will see the next

22 paragraph says that Deaunta Belcher and Darnell Bailey arranged

23 to meet with Devin Wallace on the afternoon of -- at They Say

24 Restaurant, and it will continue on, regarding that being the

25 way that Wallace was killed.  Brown has the indictment by the

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 38*

1  time he's cooperating.  He knows what the Government's theory

2  is.

3       With respect to Mr. Bailey, he also had the indictment by

4  the time he was cooperating, but in addition to that, he had

5  Sergeant Eby telling him in their interview in March of 2015

6  what everybody's roles were, and Sergeant Eby said to him, hey,

7  we know Belcher was the mastermind, you've got to tell on him.

8  It's not hard for any of these three men to know how to frame

9  Deaunta Belcher within the Government's theory.

10      And Bailey was more than happy to adopt that theory

11  because if you look at the evidence it looks kind of compelling

12  that he actually was the one who organized this whole thing.

13  He acknowledged on cross-examination that he had plenty of

14  motive.  Wallace had cheated him out of tens of thousands of

15  dollars over the previous two or three years, and he detailed

16  it.

17      Brown told us that the Zeidman's meeting was initially

18  arranged between him and Belcher by phone so that he could get

19  a resupply of marijuana to sell.  He told agents that when he

20  was on that call with Belcher setting up that meeting he heard

21  another voice over the phone screaming about how the victim had

22  to be killed because he was messing with that guy's money.  At

23  the Zeidman's meeting he met Bailey and he recognized the voice

24  as having been Bailey's.

25      So the first contact, if Brown's statement to the agents

*16-20143; U.S.A. v. Belcher/Watson*

1  is to be believed, that he knew that somebody wanted the victim

2  dead was through Bailey telling him that, not Belcher telling

3  him that.

4       Brown also told agents that he and Bailey communicated by

5  phone before the murder about it and that Brown used a

6  different number than the one we became familiar with through

7  the call detail records, which is why you wouldn't see those

8  calls in the call detail records.

9       The evidence is that Bailey paid money that filtered its

10  way to Brown through the Motor City Casino meeting.  That,

11  Brown testified, was set up by a phone call that he and Bailey

12  had, which confirms that he and Bailey were capable of

13  communicating by telephone directly.

14      Bailey also told us that he was associated with a number

15  of other people who were beefing with Wallace and at least

16  one of whom who had actually said that he wanted Wallace dead,

17  and that these other people knew that Bailey was associated

18  with the victim, Bailey was close to the victim, and presumably

19  could help facilitate state that.

20      We know, just talking about September 11th, we know that

21  the victim was in a hurry.  We know that he kept his engine

22  running.  We know that he didn't want to come into the

23  restaurant.  We know that Bailey engaged him in conversation

24  for 20 minutes outside on the side of the road.  You can watch

25  the full 20 minutes at some point, if you'd like.  We know that

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 40*

1  Bailey knew he was in a white Benz.  We know that, we have

2  evidence that suggests that Bailey and Brown had the ability to

3  communicate directly with each other.  Bailey actually told us

4  that he knew that Wallace was going to be driving the white

5  Benz before Wallace even arrived at the They Say meeting, and

6  finally, Sean Jackson testified that when Bailey was talking to

7  him about the murder when they were locked up together Bailey

8  omitted any mention of Bailey's beefs with Wallace.  Obviously

9  he didn't want to talk about that, he wanted to deflect

10 attention elsewhere, and yet Jackson was insightful enough

11 about Bailey to tell the grand jury that Bailey had a motive to

12 deflect blame onto Belcher so that Bailey wasn't blamed on the

13 street for Wallace's murder.  There's a fair amount of evidence

14 here that points to Bailey as the real mastermind in this

15 conspiracy and not Mr. Belcher.

16      The Government claims that Chambers' and Bailey's and

17 Brown's stories about Mr. Belcher's role in this are

18 corroborated by other evidence, but that isn't necessarily so.

19 There's a series of things.

20      Let's start with the suggestion that Mr. Belcher had

21 motive.  The only person who has told you that Mr. Belcher had

22 a motive to kill Wallace is Mr. Bailey.

23      And what did Mr. Bailey say first about that?  In his very

24 first interview after he signed his proffer agreement in

25 November of 2017 he said that Mr. Wallace and Mr. Belcher had a

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 41*

grudge because Mr. Belcher stiffed Mr. Wallace on a drug deal.

He didn't say anything about anything else.  He didn't say Belcher was mad at him because of fraud.  He didn't say Belcher was mad at him because of any other drug-related reason.  But, by the time we got to trial, Bailey's story had morphed into Belcher was mad at Wallace for the same reasons that all of us were, because Wallace kept messing with our money, and also because Wallace had sold Belcher some bad heroin.

Well, if that were true, why didn't Bailey say that to the agents in the same interview that he signed his proffer agreement where he agreed he was going to tell the truth and he was going to volunteer all information reasonably related and not omit things.  Why didn't he tell it then?

The reason Mr. Bailey's story had to change over time is because it doesn't make sense for Mr. Belcher to be mad at Mr. Wallace over the fact that Mr. Belcher stiffed him on a drug debt.  That's not, you know -- if I were Mr. Wallace and I had been stiffed on a drug debt, I might have wanted Mr. Belcher dead, but it doesn't work the other way around.  It's doesn't make sense.  So that's why Mr. Bailey's story changed, and that's why it's not reliable.

The Government points to the fact that Mr. Belcher lied to police about knowing Brown, about knowing Watson, about Brown's 1332 number belonging to another worker of his by the name of Block or Blockhead.  Mr. Belcher did lie about those things.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 42*

1   That doesn't make him a murderer.  That doesn't corroborate

2   Bailey's and Brown's and Chambers' story about Belcher being

3   involved in this murder.

4       Detective Mitchell acknowledged that people lie to him all

5   the time in police interviews whether they are guilty or not.

6   He acknowledged that a drug dealer might lie about the identity

7   of persons who work for him, particularly if that drug dealer

8   is under charges himself, which Mr. Belcher was.  That a drug

9   dealer might lie about people who work for him if they have

10  their own troubles with the law, which we know Stephen Brown

11  did.  He was on parole.  He was not supposed to be selling

12  drugs at all, but particularly not when you're on parole.  So

13  there's any number of reasons why Mr. Belcher may have lied to

14  police, but they are unrelated to whether or not he was

15  involved in a murder.

16      The Government points to the Pantheon episode supposedly

17  occurring on August the 25th.  First, I don't know how

18  Steph Brown could have remembered from the witness stand last

19  week that he knew specifically that episode happened on August

20  the 25th, 2015.  He couldn't even tell me how far it was or how

21  long it would take to get from Faircrest Street to the Family

22  Dollar or to get from the Family Dollar to his house,

23  notwithstanding the fact that he was familiar with all of those

24  places, but he remembers specifically August the 25th, that was

25  the date of the Pantheon episode.  I don't think his memory is

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 43*

1    that good.  He was rehearsed.

2        More to the point, on cross-examination he acknowledged

3    that the Pantheon episode happened at night.  It didn't happen

4    in the afternoon.  He wouldn't have gotten any calls from

5    anybody about where Wallace was at The Pantheon Club after

6    8 o'clock at night.  He said that.

7        So all of the calls that the Government is pointing to in

8    that Exhibit 16, I think, that showed a bunch of back and forth

9    between 4:00 and 5:00 or 3:30 and 4:30 or whatever it was are

10   not related to the Pantheon episode, and they are testament to

11   the fact that these people talk to each other all the time

12   anyway about other stuff.  I mean, the Government wants you to

13   think that they were just fixated, all five of them, on

14   Devin Wallace all of the time.  That's not true.  They have

15   other lives.  They were doing other things, a lot of them were

16   illegal, but they had any number of reasons why they would be

17   talking to each other.

18       They point to Zeidman's as the place where the plot was

19   hatched, except that we know from Mr. Brown's testimony, and he

20   had no reason to lie about this, that the reason he was going

21   to Zeidman's in the first place was to get resupplied with

22   marijuana by Mr. Belcher.  That doesn't mean that he had a

23   discussion with Mr. Belcher at that meeting about killing

24   Wallace, although certainly could have had that discussion with

25   Mr. Bailey at that meeting because he was present.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 44*

1    They point to Latasia Banks, Mr. Belcher's former

2  girl friend, mother of his children, as corroboration of his

3  involvement because of her testimony that he confessed to her a

4  month afterwards.  First, I'm not sure that the words "nigga

5  too greedy, he had to go" is a confession as opposed to an

6  observation.  Mr. Belcher may have known why Wallace was

7  killed.  That doesn't mean he was involved in it.

8    But even if you accept it as her testimony, that he

9  confessed to her, you shouldn't believe it.  This is more

10  bought-and-paid-for testimony.  It is testimony that was given

11  in return for leniency in her own very recently brought case,

12  and it's inconsistent with two other significant pieces of

13  evidence.

14    I invite you back in the jury room to listen to jail call

15  Government Exhibit 18A.  That's the call that we heard between

16  Mr. Belcher and her where the call begins with some just

17  general hi, how are you doing sort of things, and then we're

18  going to talk more about that beginning.  It segues.  It was

19  important to the Government because it demonstrated Mr. Belcher

20  instructing Ms. Banks about who owed money for drugs.  So

21  that's why it was played.

22    But, if you go back and you listen to the early portion,

23  you hear Mr. Belcher ask what happened, and you hear Ms. Banks

24  say that on the news the night before they had described him as

25  the one who had put the hit out and then you hear her say, she

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 45*

1  thought to herself, "yeah, right."  And then you hear

2  Mr. Belcher say, "That shit's crazy, I had nothing to do with

3  that shit."  And Latasia responds, "Keep your head up, babe.

4  Stay strong."

5       This is not the kind of conversation that two people have

6  if they previously had a conversation where Mr. Belcher has

7  confessed to Latasia Banks, "Hey, I had something to do with

8  this."  Go back and listen to that conversation.

9       The second significant piece of evidence that belies her

10  claims that Mr. Belcher confessed to her is the fact that last

11  April she talked to my investigator Desiree Edwards, who asked

12  her whether she had any information that indicated that

13  Mr. Belcher was involved, and she said no.  At that time she

14  didn't have any reason to lie to Desiree Edwards.  She didn't

15  have any reason to mislead me, but she had plenty of reason to

16  lie to the Government.

17       Let me point out one other thing as an aside.  She

18  testified under oath that she was only involved in

19  Mr. Belcher's drug business after his arrest, but we know from

20  Frankie Aday's testimony that's not true.  Frankie Aday

21  testified that early on when he and Nancy were getting drugs

22  from Deaunta they were also getting them from Latasia, and they

23  were getting them dropped off at Nancy's house where Frankie

24  lived and the reason they were getting dropped off there is

25  because it was close to where Latasia worked and Latasia

1   sometimes made the deliveries.  And so she lied to you about

2   that, too.  She's not believable.

3        Let's talk about the call detail records and particularly

4   the call detail records on September 11th.  The Government

5   suggests that these records, combined with the video,

6   corroborate the fact -- corroborate Stephen Brown's testimony

7   that Belcher was giving them directions.

8        I suggest that you can't just look at the dates and times

9   of the records themselves and the video.  You have to pay

10  attention to the testimony that Brown gave in connection with

11  them.

12       And just to introduce this part, remember that there are

13  exhibits, Defense Exhibits K1 and K2, for instance, that show

14  that he and Brown had very regular, very extensive contact for

15  weeks and weeks leading up to September the 11th.  So it

16  certainly wasn't unusual for them to have a lot of discussions.

17       We even heard Agent Rienerth testify that on some days

18  they talked just as often, just as many times on those other

19  days as they did on September the 11th.  So it's not like it

20  sticks out like a sore thumb and that it never happened before.

21       There's nothing intrinsically suspicious about calls

22  between, even a lot of calls, between Belcher and Brown.  What

23  makes them suspicious to the Government is the timing of them.

24  I've got to give them that, the timing is something that if

25  you're the Government you're going to be suspicious about it,

1    but also what Mr. Brown says about those calls.  And so that

2    means you've got to believe Mr. Brown, what he says about those

3    calls.

4        Again, what Stephen Brown actually says about those calls

5    depends on the day on which he was testifying.  On day one he

6    testified that he got all kinds of telephone calls from

7    Mr. Belcher starting with the "big fish" call all the way while

8    they were traveling to They Say from Theodore Street and until

9    they arrived there, all of these telephone calls from

10   Mr. Belcher he testified to having occurred on direct

11   examination.  The problem with his testimony is that, again,

12   there aren't that many telephone calls from Mr. Belcher to

13   Mr. Brown on that day.  There's only two.  There's three if you

14   count one that goes to voice mail, but in terms of

15   voice-to-voice contact, there was two.

16       So on day two, of course, Mr. Brown's testimony has

17   changed.  These aren't all telephone calls from Mr. Belcher to

18   him.  They are telephone calls that Mr. Brown has placed to

19   Mr. Belcher, which is a little closer to the truth.  He does

20   place some telephone calls to Mr. Belcher on that day in that

21   period of time.  Not nearly as many as he says and ultimately

22   not at the times he says that he placed them.

23       So, for instance, he says that he sees the white Camaro

24   that Mr. Belcher was driving, driving away from him on

25   Joseph Campau.  We have all seen that on the video.  He makes

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 48*

1  the left-hand turn off Franklin on Joseph Campau, makes another

2  left-hand turn, we hear from Officer Mitchell, that he parked

3  in front of his residence for a few minutes.

4  　　Brown testified that after he saw Belcher pull away that

5  he called Belcher from his phone a number of times and he

6  called Belcher one time on Watson's cell phone after he sees

7  Belcher drive away.  This can't be true.  It isn't true.

8  　　The video tells us that Belcher pulled off at 4:51 p.m.

9  if you correct the video time by subtracting a minute and

10  45 seconds.  The video tells us that Chambers' car drives that

11  same route down Joseph Campau passing Franklin Street where the

12  Benz is parked and Gino is standing next to the window at

13  4:55 p.m., four minutes after Belcher is already gone.

14  　　After that, of course, after 4:55, Chambers' car does the

15  big loop to get back to Franklin Street to pull up and ambush

16  Wallace from behind.  There are no calls, no calls, zero calls

17  to or from Belcher and Brown or Belcher and Watson in that

18  period of time.

19  　　Brown says that when they were stopped behind the school

20  bus very shortly before pulling up on Wallace that's when he

21  used Watson's phone to call Belcher.  Again, there are no

22  records that confirm that.  As a matter of fact, they confirm

23  the opposite.  There were no calls then.

24  　　So it doesn't make sense for the explanation for these

25  clear inaccuracies to be they are just innocent inaccuracies.

1    Mr. Brown met with the Government prior to taking the stand.

2    He went over his reports.  He went over his anticipated

3    testimony.  There's only one explanation for why Mr. Brown

4    can't tell the story correctly, and that's that he can't keep

5    his lies straight.  He's not believable.

6        It is not Mr. Belcher's burden to prove to you what might

7    explain events differently than how the Government wants you to

8    believe them, but let's think about some things.  One thing

9    that everybody seems to agree with is there was supposed to be

10   a meeting at They Say late that afternoon, and Mr. Bailey said

11   there were two reasons for it:  One was to sell a car and

12   one was to meet with some other people about some other general

13   business-related accounts, some Juan guy and somebody else.

14       It's not disputed that Mr. Bailey arrived first, that

15   Mr. Wallace arrived second, somewhere around 4:30 or 4:35, that

16   Mr. Belcher somewhere around 4:45.  There's no dispute that

17   Mr. Belcher and his daughter exited the Camaro, walked up to

18   the door of They Say, you see some conversation between him and

19   Mr. Bailey, and Mr. Belcher turns around and walks back.

20   Mr. Bailey tells us that he told Mr. Belcher there's nobody

21   here.

22       Mr. Belcher goes back to his car, gets in the car,

23   and after a few minutes drives away at 4:51.  Per

24   Detective Mitchell, who reviewed video that we don't have,

25   but who reviewed the River Place Apartment video, Mr. Belcher

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 50*

1  arrived home around 4:52.

2      According to the call detail records, Detective Mitchell

3  confirmed Mr. Bailey placed a call to his girl friend at 4:54.

4  We know from the call detail records he got a call from

5  Mr. Bailey at 4:57 that lasted 80 seconds.  During that period

6  of time, if you do the math, Mr. Bailey would have had to have

7  been at the window of Mr. Wallace's car during that

8  conversation.  You can actually see, if you look at the video

9  around that time, Mr. Bailey going into his pocket and pulling

10  something out.

11      According to Detective Mitchell, at 4:59, after the

12  80-second contact with Mr. Bailey, Mr. Belcher leaves the car,

13  goes in the apartment complex where his residence is for a

14  couple minutes, comes back out, it's 5:01, gets back in the

15  car, immediately turns around and heads back to the scene.

16      Belcher could not have known that Wallace had been killed

17  by then.  He hadn't had any communication with anybody to have

18  let him know that.  The more reasonable explanation is he was

19  going back to the scene as an outgrowth of that 80-second call

20  he had gotten from Bailey at 4:57.  That's the more reasonable

21  explanation.

22      Bailey says we didn't actually have a call.  I dialed him,

23  and then I thought better of it and I just forgot to hang up

24  and it was 80 seconds of dead air.  There's a problem with

25  that, ladies and gentlemen.  It's a very serious problem.  It's

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 51*

1   Mr. Belcher's records that show the 80-second call.

2       If I call one of you and I'm not talking and it sounds

3   like a butt dial, are you going to wait for a minute and-a-half

4   before hanging up?  No, you are going to hang up.  After

5   realizing, okay, this isn't a real call, you are going to hang

6   up.  It's not going to show up as an 80-second call on the

7   recipient's records.  It may show up as an 80-second call if

8   it's a butt dial on the dialer's, but the fact that the

9   recipient's records show an 80-second connection indicates that

10  Mr. Belcher was doing something on that connection and what he

11  was doing was talking to Mr. Bailey and probably Mr. Wallace.

12  It's another example of how Mr. Bailey is a liar.

13      Why is Gino lying about that?  Is it because he placed

14  that 80-second call to Mr. Belcher at 4:57 p.m. in order to

15  hold Mr. Wallace at the scene a little bit longer?  Is he doing

16  that because he knew that the shooters were getting close or

17  were imminently arriving, as they did just a couple minutes

18  later, and did he know that because he had the capacity to have

19  direct communications with Stephen Brown that don't show up in

20  the call detail records because Stephen was using a different

21  phone?  Why else would Mr. Bailey lie about not actually having

22  what clearly was an 80-second contact with Mr. Belcher at

23  4:57 p.m.?

24      This doesn't change the fact that Mr. Belcher had contacts

25  with Mr. Brown that afternoon, and he had a couple with

1   Mr. Watson as well.  But, again, in order for you to construe

2   those contacts as being related to the murder of Devin Wallace,

3   you've got to believe Stephen Brown beyond a reasonable doubt,

4   and I don't think that Stephen Brown's testimony carries that

5   weight.

6        I'm almost done here.

7        Let's remember a couple other things.  This murder

8   occurred a block and-a-half from where Mr. Belcher lived at

9   5:00 p.m. on a Friday afternoon, broad daylight.  Who does

10  that?  I mean, if you really want to kill somebody are you

11  going to do it a block and-a-half from your house at 5:00 in

12  the afternoon?  Are you going to go back to the scene, and

13  innocent or not, you are going to take your daughter with you?

14       He told Gino to call 9-1-1.  He stayed and he spoke with

15  the police.  Those are not actions that are consistent with

16  somebody who is involved in a murder.

17       I'm going to conclude.

18       The foundation for the Government's murder case against

19  Mr. Belcher is built on sand.  Every relevant law

20  enforcement -- I'm sorry, non-law enforcement witness in this

21  case is singing for their supper, is telling you something that

22  they want you to believe so the Government gives them something

23  in the end that is very significant, their liberty.  They get

24  to go home.  Maybe not right away, but a hell of a lot sooner

25  than they would otherwise.  That is a powerful, powerful

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 53*

1  motivator, and they are seeking to bury Mr. Belcher so they can

2  go free.

3      The judge may instruct you on how to consider such

4  evidence, and I ask you to take that instruction really to

5  heart.  These are people who have lived their lives as liars,

6  cheats and thieves, as I have said more than once, and the

7  other evidence in this case, the videos, the call records make

8  sense to the murder case only if you believe these liars,

9  cheats and thieves beyond a reasonable doubt, only if you would

10  rely on their word in making the most important decisions in

11  your own life.  I don't think their word is worth that kind of

12  reliance, and so I'm asking you to find Mr. Belcher not guilty

13  of the homicide counts.  Those are Counts One and Three.

14  Thank you.

15          THE COURT:  We'll take a short recess, ladies and

16  gentlemen.

17          MR. JOHNSON:  Judge, may we approach after the --

18          THE CLERK:  All rise for the jury.

19      (Jury out at 11:04 a.m.)

20          THE COURT:  Yes, Mr. Johnson.

21          MR. JOHNSON:  Yes, Judge, I wanted to approach.

22          THE COURT:  Pardon?

23          MR. JOHNSON:  I wanted to approach on an evidentiary

24  issue.

25          THE COURT:  Go ahead.

*16-20143; U.S.A. v. Belcher/Watson*

1    **MR. JOHNSON:**  I believe that Mr. Haugabook argued to

2  the jury that my client made a statement, he talked about the

3  substance of that statement, and he based an argument on that

4  statement.  That statement never came in.  There was no

5  testimony to that statement.  That statement was not admitted,

6  no, and -- unless I overlooked it.

7        **MR. CRALLE:**  You did.  The statement came in.

8  Special Agent Rienerth testified on Monday about his interview

9  with your client.  He did not introduce the oral statement.  He

10  testified to the substance.  Every single bit of that came in.

11  We can pull the transcript.

12     I asked the questions.  That was the testimony.  That was

13  Monday.

14        **MR. JOHNSON:**  I don't recall that, Judge.

15        **MR. CRALLE:**  Well, I recall it distinctly, last

16  Monday.

17        **THE COURT:**  The jury will recall the testimony.  You

18  can argue that he didn't make the statement, but it's up to the

19  jury to decide whether he made it or not.

20     I'm not going to correct anything Mr. Haugabook said.  You

21  can argue that Mr. Haugabook said Mr. Watson made a statement.

22  "My recollection, ladies and gentlemen of the jury, is he did

23  not make a statement.  It's for you to decide."  I mean, you

24  will deal with that in your argument, and you will deal with it

25  in your argument.

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 55*

1    **MR. CRALLE:**  Yes, Your Honor.

2    **THE COURT:**  Thank you.  I'll be back.

3    **MR. SHEA:**  How long, Judge?

4    **THE COURT:**  I will tell you, the Marshals govern the

5    time of the recess, okay?  You have control of it.

6    **MARSHALL:**  You've got it.  All right.

7    **THE COURT:**  I may not like what you do, but you still

8    have it.

9    **MARSHALL:**  Will do.

10   **THE COURT:**  Unless you want to use the public

11   restroom.

12       (Recess from 11:07 a.m. to 11:37 a.m.)

13   **THE COURT:**  Okay.  Everybody be seated, please.

14       Bring in the jury.

15   **THE CLERK:**  All rise for the jury.

16       (Jury in at 11:38 a.m.)

17   **THE COURT:**  Be seated.

18       Mr. Johnson.

19                                              (11:39 a.m.)

20   **MR. JOHNSON:**  Good morning, ladies and gentlemen.

21       Thank you for serving.  Thank you for your attentiveness.

22   If there's been any exchanges between me and the judge or the

23   Government lawyers that you find offensive, I apologize, and I

24   ask you not to hold that against my client.  I have the utmost

25   respect for counsel at this table as well as the Court.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 56*

1    If you recall when we first met, I told you that I was

2  going to make a promise to you, and that promise was to try to

3  dig into this case and deliver you facts and information that

4  you wouldn't normally get through the Government and I asked

5  you in return to be attentive and to be objective and I thought

6  that if we worked together it would help you reach a verdict, a

7  verdict that was fair based on objective and impartial,

8  unbiased consideration.  Even though I didn't have the burden,

9  I told you I was going to take on that burden.

10   I think from watching you, from being here with you, that

11  you have been attentive.  This has been a very difficult task

12  because of the nature of the evidence, and when I say "nature

13  of the evidence," I mean, as brother counsel pointed out, the

14  lies, the inconsistencies, the sort of witnesses that we're

15  dealing with here.

16   So I want to further assist you in ferreting out this

17  evidence, and in doing that, I'm not going to go over a lot of

18  things that brother counsel has gone over.  He's done a fine

19  job pointing out those things, but what I want to do -- and I

20  told you when we first met, I told you I thought you had a very

21  difficult task, and that difficult task, it seems to be

22  extremely difficult in this case because of the nature of the

23  evidence, and the nature of the evidence are lies and

24  inconsistencies based on testimony coming from liars, cheats,

25  murderers, thieves, professional impersonators, and that's very

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 57*

1  difficult.

2      And the instructions the judge may give you will talk

3  about the nature of the evidence, but what I want to do is I

4  want to get into the nuts and bolts of the instructions because

5  that's where you are going to have to go.  And I'm not going to

6  go through all of the testimony of these liars.  I'm going to

7  take out that testimony that I think you can pigeon-hole into

8  these instructions so that when you get back in the back you

9  will understand these instructions and how to apply the --

10  adjudicate the facts, the facts that this case turns on.  So

11  I've got a little bit more work to do with you so just bear

12  with me.

13      I'm going to talk about some of the instructions that the

14  Court may give that I think are very important for you to

15  consider and that I want you to consider strongly in my case,

16  and that is -- and I'm going to try to move as quickly as I can

17  because I'm on a time schedule here.

18      There may be an instruction that talks about proof beyond

19  a reasonable doubt, and what I want you to know is that the big

20  thing that I'm relying on in this, in this instruction is that

21  you have to look at the possible doubts and doubts based purely

22  on speculation are not reasonable doubts.  So you've got to

23  look at that testimony real close.

24      I'm real big in this case on the lack of evidence, and the

25  lack of evidence I think is so important in this case because a

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 58*

1   lack of evidence you can attach a reasonable doubt to.  So

2   you've got to look at the evidence, and if there's a lack of

3   evidence in respect to where is the gun, a lack of evidence

4   into a number of factors, you can attach reasonable doubt.

5       You have to look at all the evidence.  If it has more than

6   one reasonable explanation, and I'm going to give you some

7   examples, if there's more than one reasonable explanation,

8   there may be a reasonable doubt.  If there's two or

9   three reasonable explanations, there may be a reasonable doubt,

10  and that's why I think the lack of evidence is so important.

11      It's also important when you talking about circumstantial

12  evidence, you know, and that circumstantial evidence gets into

13  the links in the chain, you know, does the links connect.  The

14  Government has a theory.  I want you to look at that theory.  I

15  want you to look at if there's -- follow that theory.  Follow

16  my theory.  My theory is going to talk about the evolution of

17  the lie, where the lie started, where the lie ends.  There can

18  be more than one reasonable explanation to this case, to their

19  theory, and if I give you one, then we may -- you can say

20  there's a reasonable doubt.  So that's very important.

21      The nature of the evidence.  You clearly have to look at

22  the fact that this evidence comes in through liars, cheaters,

23  con artists.  You've got to look at that because that's the

24  nature of this case.  So credibility is going to be very

25  important on your part, looking at whether the evidence is

credible.

Judge the testimony of the snitches, okay?  They are the government witnesses, but I need you to, as the instructions will tell you, use your common sense.  I just need you to use your common sense, common sense when you're talking about what Watson did when he was standing next to someone while an agreement was being made, were there words spoken, were there acts, were there gestures.  Remember, I told you in the beginning that you have to connect -- if you commit a crime, you have to connect the actus reus with the mens rea.  You can't have a crime unless you connect the mental state with some sort of act.

So if you're looking at what Watson may have said, did he say anything?  I'm big on that.  I'm talking about were there words spoken, not what somebody else said, and is there corroborating facts, okay?

So that instruction, I think, is very important, and when you're talking about reasonable doubt, it will explain to you what it means, and I always like to say, and recall I said, demand the quality of evidence that you would want your loved one to be, if they were on trial, and I think that's big.

In this case the Government had the burden of proof.  There's been hours of interrogation with Brown, Bailey, Paymond, the interrogating detectives.  There were audio recordings of statements by my client.  They didn't produce

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 60*

1   that.  The Government didn't produce that so you won't see

2   that.  You won't see all of the evidence in this case so I have

3   to ferret through what you do have, but you can look at -- I'm

4   here to try to get to the truth.  Sometimes the Government

5   doesn't give you all the evidence, okay?  And you can look at

6   that, but the only thing you can judge is the evidence before

7   you.

8       I want to go to another instruction that talks about the

9   circumstances, and I talked to you about that, the chains in

10  the link -- the links in the chains, I'm sorry.

11      Now, another instruction is very important here, and

12  that's the state of mind, the intent, okay?  That's very

13  important because they want you to believe that -- they want

14  you to read Watson's mind in this case when Watson is with

15  Brown, when Watson is in the car, when Watson is at Zeidman's.

16  Watson doesn't say anything.  There's nothing to say that

17  Watson said anything so they want you to read their minds.

18  Well, this instruction talks about that.  No one can read

19  another person's mind and tell what that person is thinking,

20  but a defendant's state of mind can be proven indirectly from

21  the surrounding circumstances.  So when you're looking at the

22  Zeidman's and you're looking at him being in the car with

23  Brown, you've got to look at are there any other corroborating

24  facts besides what Brown says was in Watson's mind?

25      Let's take, for instance, the Zeidman's meeting.  Remember

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 61*

1  the evolution of a lie?  And I'm going to get to that, but the

2  lie evolves to a point where we get to a meeting at Zeidman's.

3  And the facts that you've got to remember and look at closely,

4  I believe, is Brown and Bailey infer, they try to infer that

5  Watson was present.  We don't know, but they say Watson was

6  present, and Brown was offered a car, a condo and money.

7       The conclusion was that, of Bailey and Brown at some point

8  was Watson stood there so Watson heard and agreed.  The

9  inference was he stood there and Watson heard and agreed, but

10  there's no way to infer what was in Watson's mind from his just

11  being present at an alleged meeting.  We don't have Watson's

12  words, acts or gestures to weigh what was in his mind.  Nothing

13  independent to show he agreed or acknowledged and agreed.  No

14  actus reus, no mens rea, no act that we can infer his mental

15  state.

16       Mental state.  Words of intent are very important, and

17  when you look through this case, for instance, Brown, when you

18  look at Brown, there's evidence.  You can look.  Brown says the

19  only thing that's on the mind is to kill Devin Wallace and get

20  a car and get a condo.  That's corroboration.  That gives you

21  an opportunity to weigh what's in Brown's mind.  You see -- and

22  that's very important.  That's instruction 13 when you start

23  talking about intent.

24       Brown testified he and Watson rode together.  Well, what

25  happened then?  What did they talk about?  Does he ever talk

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 62*

1    about what they talked about?  Nobody really testifies to what

2    Watson ever really said in this case.  Nobody.  There's no

3    words or acts that anybody can assert that Watson made.  No one

4    has given us Watson's actual words.

5        Another part of -- I think is very important and I told

6    you when I first started out in this case, I think I mentioned

7    that I didn't think demeanor was going to be that important in

8    this case because we had professional liars.  We had con

9    artists.  We had impersonators that could take that stand

10   without sweating, could take that stand with a stern face and

11   testify, but it didn't turn out to be that way and instruction

12   number 7 that the judge may give, it talks about looking at the

13   demeanor of the witness, and the demeanor evidence -- demeanor

14   evidence is evidence.

15       And you can look at that demeanor.  Look at Brown.  Look

16   how Brown sat.  Look how Brown got vague.  Look how when I

17   asked Brown about you said there were six, there were five and

18   you, and I asked him and he wouldn't answer.  He became silent.

19   Well, his silence spoke.  Six people in that -- involved,

20   possibly four people in the car.

21       Look at Paymond.  Paymond's demeanor was fairly good after

22   he decided that he was going to tell the truth.  I had to turn

23   him around a little bit.  My cross-examination sometimes were

24   objected to, but they weren't to try to put my words in his

25   mouth but to create a relationship.  Let's look at what Paymond

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 63*

1    said.  Let's look at what Paymond gave us.

2        Paymond was one of the Government's better witnesses.  His

3    demeanor was fairly good after I got him to tell the truth.  He

4    first gives us nothing.  He denies really knowing Watson.  He

5    knows Steph and BJ.  He tells us BJ and Steph are together on

6    9/11.  He tells us that Steph and BJ leave around 4:00 p.m.

7    That's what the detectives really were trying to pound him in,

8    to get into their theory that timeline.  He tells us that Steph

9    and BJ leave around 4:00 p.m. and return afterwards.  He

10   clearly supports the Government's theory at first.

11       However, on cross-examination I open him up.  I stress the

12   importance of the truth.  He begins to agree with me and

13   appears to start telling the truth.  His demeanor is good, his

14   eye contact.  He recalls good.  He's not vague.  He answers the

15   questions.  And what facts did we learn?  We learned he watched

16   the video.  We learned he saw the commission of the crime.  We

17   learned he originally slanted the truth because he feared being

18   charged with new crimes.  That was real.

19       But he revealed -- he also revealed he deals with stolen

20   goods and auto parts, which he didn't want to do that at first.

21   He didn't want to do that too much with the interrogations of

22   the officers because he didn't want to get charged with any new

23   crimes.

24       But he also gave us some of the culture that you can rely

25   on.  He tells us -- he agreed that he knows Watson steals cars

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 64*

1    and deals in stolen parts.  He's an in-between man on deals.
2    That's his hustle.  Brown and Watson hang together a lot.  It's
3    important because Brown tries to play down -- Brown, if you
4    recall, tries to play down his relationship with Watson
5    initially.

6        We learned that the DPD maintained that Steph fired the
7    shots from the car.  DPD is telling Paymond that's their
8    theory.  He told us he agreed with the police that Steph had on
9    black as he wore on 9/11 while at his house the day before.  He
10   gives us a limited ID.

11       He tells us four people are in the car.  He gave their
12   description, 6'1", 6'2," the men got in the car.  Detective Eby
13   never told you that they believed Watson was the shooter.

14       He tells us he never saw Watson carrying a gun.  So we get
15   a lot from Paymond.  Paymond also tells us DPD told him how
16   they believe Brown and Chambers were involved in the murder.
17   This begins to start that lie, that lie to evolve.  He tells us
18   that the FBI was trying to get him to accept their scenario of
19   the shooting.

20       DPD told him they had cell phone results from Brown being
21   at his house, that he could not identify the guy in the video
22   who done the shooting.  He didn't -- he was real.  He said he
23   couldn't identify him, but he could identify the clothing.

24       After constant presentation of the agents and the police,
25   he agreed it could be Brown, and that's how these facts evolve.

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 65*

1   He never seen Watson carrying a gun.  He never knew Watson to

2   do hits or shoot people, and nobody ever came back and told him

3   Watson was the shooter.

4        So, you see, that even with Paymond the Government is

5   beginning to push their theory.  They want to disregard the

6   other two men in the car.  There's no real investigation going

7   on with respect to suspect Brown, but Brown becomes one of the

8   main suspects of DPD.

9        See, DPD, if you remember, with Detective Mitchell, DPD

10  did a solid investigation.  DPD had a video.  DPD got the phone

11  records.  DPD watched the video.  Mitchell was straightforward.

12  Mitchell talked about his crew.  They finally got Brown as a

13  suspect.  They used him to insert his information in the

14  affidavits, to get cell phone records, and Brown became a

15  suspect.

16       But Brown wasn't arrested at that point.  Brown was out

17  there with Chambers and had an opportunity to talk about the

18  case, look at the case, and finally Brown was named as the

19  suspect.

20       Well, what happened later is that the feds came in, and at

21  some point the feds decided they were going to arrest and bring

22  an indictment, and it was at that point that Brown decided that

23  he could be a shooter.  That's how the lie begins to evolve.

24       Let's go back to the instructions and talk about

25  Count One.  Count One of the indictment charges the defendants

1    with the use of certain interstate facilities in the commission

2    of a murder for hire.  The judge may give an instruction that

3    you are going to have to look at these elements, and I would

4    like to point you to element C, the third, and the reason I

5    want to go there is because it talks about as consideration for

6    receipt of a promise or agreement to pay anything of pecuniary

7    value.  Also, in Count One it talks about the use of certain

8    interstate facilities in the commission for hire.

9        Well, the Court may instruct you that you must prove each

10   and every element beyond a reasonable doubt, and if you look

11   at -- I'm going to ask you to look at A when you get back

12   there.  A is going to become important.  Did Watson use the

13   phone?  And you are going to have to prove that Watson used the

14   phone beyond a reasonable doubt to in some way further this

15   theory of murder for hire.

16       Let's refer to the most credible evidence to some extent

17   that the Government has.  It was the phone records that first

18   led to the discovery of Brown as the shooter.  We heard from

19   the experts.  We heard from their opinions.  We have heard

20   their analysis.  We have talked about the cell towers, then

21   finally we were hit with the Government's toll records

22   analysis.

23       And what we know, and I'm going to go straight to the

24   jugular on this, the Government only decided to use Belcher's

25   phone records that led to other phone call and records to

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 67*

1   support their theory, and it's based upon their circumstantial

2   evidence that they want you to find beyond a reasonable doubt

3   my client used a telephone to commit this murder.

4        So I'm going to refer you to Government's Exhibit 16A, and

5   when you get back in the back, you will be able to review this

6   exhibit, and as you will see, I'm going to point you to

7   Andre Watson at 978-3909.  That shows one incoming call and one

8   outgoing call.  Now, this is on September 11th at the scene of

9   the crime between 4:38 p.m. to 5:15 p.m., and in those records

10  it will show you a timeline on these calls.  And when you look

11  at these facts, you will see that Watson's phone did not get

12  busy until -- remember what Brown said.  Brown said -- and

13  again, that message is the link in the chain of the

14  Government's theory because up until -- these phone records

15  they rely heavily on.  The phone records are probably some of

16  the most credible evidence the Government has, and that's what

17  they base their theory on.

18       As you know, there weren't requests made to get phone

19  records for a lot of other times that might have been relevant.

20  However, dealing with this, we have got Andre Watson.  Well,

21  this was fine until their witness gets on the stand and says,

22  oh, I used Andre Watson's phone at that time.  If you recall,

23  at 4:51 Watson's phone called Belcher.  It will show that, but

24  Brown says he gave the phone to Watson.  Brown says, I plugged

25  my phone in to charge it, and I used Watson's phone and I

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 68*

1   called Belcher.

2         Now, as brother counsel said, we don't know what the

3   nature of those calls are.  We know that there's another

4   exhibit of Mr. -- I think it's my exhibit, Watson's Exhibit

5   Number 1, that talks about other phones that were used with

6   Belcher's number.  Well, we know that Watson had a relationship

7   with Belcher.  We know that Watson had called Belcher on other

8   occasions.  So -- but Watson wasn't calling everybody around

9   the time of the incident.  Brown was.  Brown was, and I'm going

10  to point that out to you.  Brown was making the calls to

11  everybody, and the phone records are going to show that.

12        What was Watson's purpose in calling Brown?  If Watson in

13  fact did call -- I mean, call Belcher -- what was it for?  It

14  could have been for anything.  The first call Andre Watson

15  is -- it's an incoming call, and then Belcher has an outgoing

16  call.  In looking at these records, there is really no pattern

17  in the calls to suggest Watson was planning or participating in

18  a plan to execute Wallace at the time he was shot.

19        Belcher, by this, calls back, but that could be for any

20  reason.  That could be because a call came in to him.  He

21  talked to Brown, and he returned that call.  That doesn't

22  necessarily mean that that's the only explanation for that call

23  and that that call was related to the homicide.  It's also

24  reasonable to conclude that Belcher called back because he had

25  just talked to Brown on the phone.  So when you look at that

*16-20143; U.S.A. v. Belcher/Watson*

 1   instruction, weigh that evidence heavily, on whether or not he

 2   used the phone to in fact facilitate the homicide.

 3        When you look further into that instruction, it's

 4   important to look at, as I said, C and 7 on Page 18.  7 talks

 5   about:

 6        The Government must prove a quid pro quo between the

 7   person who solicits the murder and the person who would commit

 8   the murder.  In other words, it requires a mutual understanding

 9   that something of value will be exchanged for committing a

10   murder.  You may find the defendant guilty regardless of

11   whether the payment occurred or was to occur in the future.

12        B, and I'm going to tie it together, B says that:

13        The defendant did so with the intent that a murder be

14   committed under violation of a Michigan law.

15        So we really don't have any evidence of Watson's intent.

16   What we do know is intent must be shown by words and actions.

17   So if you look at what Brown did, Brown testified that Chambers

18   covered up the plate.  Brown said he got out, looked at the

19   plate, and made sure it was covered.  Brown went into -- Brown

20   went in and bought the gloves.  Brown claims he fired his gun

21   at Wallace and he intended to kill Wallace.  Brown testified

22   that Mr. Chambers pulled off when the bus moved.  Brown used

23   Watson's phone just before the murder.  Brown agreed to accept

24   money, condo and car to kill Wallace.  Brown said his purpose

25   was to kill Wallace.  Brown asked Bailey for locations of

Wallace.  Brown was in communication with Bailey on an unknown

phone.

There's no testimony to corroborate independently of the

lies of Brown or the other con artists or the thieves or the

other professional liars that Watson was involved at that time.

We don't have any acts that we can attribute to Mr. Watson

other than their lies that he shot and things of that sort.

The quid pro quo?  That brings us to looking at what

really happened at Zeidman's.  Brown tells us a lot about

Zeidman's on cross-examination.  Mr. Brown agreed he never saw

Watson get any of the money or property offered at Zeidman's.

Brown agreed he never heard Watson accept $2,000 for the

killing of Wallace.  Brown agreed he never heard Watson accept

15,000 for the Wallace killing.  Brown agreed he never heard

Watson agree to kill anybody for any amount of money at that

time.  Brown agreed he never heard Watson tell Bailey that

Watson would get involved and kill Wallace because Wallace was

getting in the way of Byrd or Gino's drug business.

That's important.  That's going to be important when it

comes to looking at the conspiracy count and the

drug-trafficking count.  Brown agreed he didn't know of

Watson's contacting Belcher after the beating.

What did Bailey testify to about the Zeidman's killing?

And this goes to quid pro quo and things of that sort.  Bailey

testified Brown walked up to the car window.  Brown talked to

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 71*

1  Belcher, as brother counsel said.  That was supposed to be

2  about marijuana, but what would Watson know?  Watson was in his

3  car with a girl, but Brown, Brown didn't want to really testify

4  to that.  He was untruthful.  We had other evidence that came

5  in that said Brown was with a girl -- I mean, Watson was with a

6  girl.

7      Brown is discussing marijuana with Belcher.  Bailey agreed

8  Watson never got out of the car and approached him at

9  Zeidman's.  These are acts that never happened.  There's

10  nothing to infer from Watson's conduct at that time other than

11  the fact that he was present.

12      Bailey agreed that Watson didn't get out of the car and

13  talk to him about killing Wallace.  Watson didn't get out of

14  the car, and Bailey never offered him 15,000 to kill Wallace.

15  Bailey agreed he did not promise Mr. Watson payment of any sort

16  for killing Mr. Wallace.  Bailey said we never discussed it

17  ever.

18      These are words.  These are the kind of corroborating

19  facts that you can use that are independent of what somebody is

20  trying to get you to infer.

21      Remember, the claim is Bailey also wanted Wallace killed,

22  but Bailey makes it unequivocally clear there was no

23  discussions in the presence -- in his presence with Watson to

24  kill.

25      Brown attempts to inject Watson's mental state and intent

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 72*

1    by asserting Watson agreed with him to kill.  That's what Brown

2    does throughout the case.  Brown begins to put Watson with him

3    because around March 8th when the indictment came down Brown

4    learned that he was facing death.  Brown learned that he could

5    no longer be the shooter.  Brown knew that he had to make

6    someone else the shooter.

7         There's no evidence Watson agreed with any solicitors.

8    Who was soliciting?  They maintain it was Belcher and Bailey.

9    There's nothing to suggest that Watson ever spoke with

10   Mr. Belcher throughout this case about killing anyone.

11        There's no evidence independent of what Brown, BJ and

12   Bailey are saying Watson did.  All we have is the testimony of

13   the liars, the cheaters and so on.

14        Brown tells Chambers at the detention center that he wants

15   to get his money, 15,000, a car and a condo.  He wants his

16   money for the deal that he made for the killing that he, he had

17   done.  Brown tells Chambers Watson was offered the same thing.

18   Here again, we have got Brown telling Chambers that Watson was

19   offered the same thing, but we have those facts before us.

20        You have to use your common sense in these instances.

21   Have you ever stood next to someone?  One person is making a

22   representation, you are standing there, and you are like I'm

23   not agreeing with what he's saying.  I'm not with that.  That's

24   the kind of common sense that we have to look at here.

25        Brown told Chambers I hope my cousin don't play me because

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 73*

1  if he do I'm going to kill him too.  This is when he's talking

2  about getting his payment.  But you don't have any, any words

3  or acts that you could infer that type of intent with Watson.

4       Brown and Bailey even agree that Brown was offered a car,

5  money and condo to kill Wallace.  This is all in the evidence.

6  This is what's before you.  This is what you take back and

7  apply to these instructions.

8       There's no facts that Watson tried to reach a mutual

9  understanding about what he would do or what he would receive

10 for killing Wallace.  Where do we get those facts?  Where do we

11 get the facts that Watson said anything out there?

12      When Brown said he went to the Family Dollar, Brown said I

13 went in and purchased gloves.  That's different than a lot of

14 evidence we heard on the Family Dollar.  We know Brown said

15 earlier in other statements he didn't even go to a Family

16 Dollar.

17      And Brown says he bought gloves, not any other items.

18 Brown then says -- he changes.  He says, well, that was

19 something else.

20      Watson never spoke any words while allegedly standing near

21 Bailey, Brown or Belcher while in discussion of any plan.  The

22 only facts we have that Watson received anything are based on

23 Brown and Bailey's statements.  Brown pled.  He was made an

24 offer.  He pled it in his plea agreement, though at first he

25 tried to deny it.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 74*

1    He pled.  He was made an offer.  Not him and Watson.
2  Watson stood near.  Those are the facts.

3    Brown and Chambers testified that Brown went looking for
4  Belcher and Bailey for payment.  Brown told us he was armed
5  with a chopper, an AK, and in the car with Chambers.  Brown and
6  Chambers again.

7    Brown says when he pulls up, "Damn, man, shit, what's up
8  with that money?"  Those are words spoken.  You can take those
9  to the bank.  Those are real facts.

10    "I told Chambers to pull in front of Belcher's car."
11  Those are the kind of facts you plug in.

12    Brown gave Chambers the chopper.  And I asked him, "You
13  were trying to put somebody in fear?"  He didn't, didn't say he
14  had the .40 caliber that he allegedly had.  He's got a chopper.

15    Brown tells Chambers in the detention center -- see, these
16  go to number 7, pecuniary, what were you getting?  Receipt,
17  payment.

18    Brown tells Chambers in the detention center that he's
19  going to give him a couple of dollars.  We further learn Brown
20  called Bailey.  Bailey said, "I've got 1600 for you."  Brown
21  tells Bailey he has a tether.  That's what Brown tells us, he's
22  on a tether.  Brown says he sent Watson.  What do we have to
23  support that?  What do we have to corroborate that fact other
24  than a liar?  You saw his demeanor.  He lied when he wanted to.

25    So then Brown says he sent Watson.  Did Watson go?  Do we

1  have any evidence that Watson ever went to the casino?  Do we
2  have any videos?  Is there any other corroborating facts that
3  that occurred?

4       And if Watson did go, do we know that Watson even knew
5  what he was receiving money for?  It's just we don't have
6  anything there but Brown's words.

7       Bailey says he gave Watson $2,000.  So these lies are
8  inconsistent, and my argument is they are made to just tie
9  Watson into the conspiracy to kill and to establish he received
10 proceeds for his part in the killing.

11      Bailey says when he saw Watson at the casino we did not
12 talk.  He just handed Watson the money, and he left.  Bailey
13 paid that money to Watson allegedly because he wanted to get
14 Brown paid something, he says, because Brown was looking for
15 his money.

16      When you go down and you look at the rest of Count One of
17 the indictment, you will be able to consider the intent that we
18 talked about.

19      And, as you go into Count Two of the indictment, Count Two
20 is talking about conspiracy to distribute controlled
21 substances.  I think that this is going to be a little bit more
22 easier for you to deal with at the beginning, but it gets
23 complicated at the end, and we believe that there's no, no
24 criminal partnership whatsoever with Belcher and Bailey in the
25 drug conspiracy, and you will be able to look at that and I'm

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 76*

1    going to move quickly through that.

2         There's no testimony that Mr. Watson distributed or sold

3    cocaine, Oxycontin or any other drugs, and you can go down and

4    look at whether or not there was an agreement with anyone.   Of

5    course there's no evidence of that, no evidence he ever joined

6    a conspiracy.

7         And the instructions that the judge may give you can plug

8    in the facts, as we have been doing.   Bailey testified that

9    Watson never accompanied him or Belcher on any runs or anything

10   of that sort.   You've got to look at who did he conspire with,

11   and I think these instructions, you know, you have to look at

12   the facts.   There's nothing to suggest that he was ever present

13   packaging, delivering, anything that shows that he acted in

14   furtherance of the conspiracy.   More importantly, there's no

15   facts that he was present and associated with Belcher, that he

16   agreed to work for Belcher or sell drugs for Belcher.

17        And there's another issue that the Government is going to

18   really attempt to ride on, and that is enforcer.   And the

19   enforcer first came up based on my cross-examination, and I

20   cross-examined because I had no fear there.   I wanted you to

21   know how the lie had evolved.   See, the enforcer came in later,

22   recent.   That's one of the most recent fabrications.   That's

23   how far the lie evolved.

24        So now we had enforcer, and you've got to look at that

25   evidence.   You've got to look at Brown trying to, to hint that,

1  that he saw Watson standing on the porch on Beniteau.  Well, if

2  you look at these instructions, and one of the main

3  instructions is going to be in one, two, three, part four of

4  that instruction.

5       One more point about the agreement.  The indictment

6  accuses the defendants of conspiring to commit several drug

7  crimes.  The Government must prove an agreement to commit at

8  least one of them.

9       And then if you look at 4 of Part C:  But proof that a

10  defendant simply knew about a conspiracy or was present at

11  times or associated with members of the group is not enough.

12       You see, Brown tries to say at one point he saw Watson

13  standing on a porch with a gun hanging off of him.  The

14  testimony was so bad.  Hanging off from where?  I mean, hanging

15  off from where?  You've got to look at that.  I mean, it speaks

16  for itself.

17       It's not enough to put him there.  He's trying to, what,

18  make him an enforcer?  Look, use your common sense.  We know

19  what enforcers do.  Enforcers don't go around killing the

20  people that owe the debt.  They go around threatening.  They go

21  around collecting.  They go around trying to get payment for

22  the debt.  There's no evidence.  There's not one incident.

23       Aday didn't know him.  Mr. Belcher's woman didn't know

24  him.  Nobody's seen him.  No evidence that he approached

25  anybody to collect a debt.  No evidence that he worked with

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 78*

1    anybody, Brown, as an enforcer.

2        So look and see closely what the Government attempts to do

3    in this case.  They can't give you anything else that ties him

4    to a drug conspiracy, and the fact that he was at somebody's

5    house, the fact that he was seen, the fact that he even knew

6    Belcher sold drugs, the fact that he knew Belcher sold drugs

7    and other things is not enough to make him a part of the

8    conspiracy.

9        Read that closely.  It's big on association.  Even if he

10   approved of what was happening, that's not enough.  Even if he

11   had done something that he didn't even know that he helped,

12   it's not enough.

13       You've got to look at the drug-trafficking count with this

14   conspiracy to sell drugs because that's where they are

15   trying -- you are not going to find any evidence of the drug

16   conspiracy, but what happens is they are trying to connect it

17   to the drug trafficking, the use of a firearm, the homicide.

18   That's what they are trying to do, and there's no testimony

19   Watson knew the murder was going to happen.  They want to place

20   him in the car.  All we have is the conflicting evidence, no

21   independent corroborating facts to support any circumstances.

22       And, again, you are going to have to look at the intent.

23   Brown says me and Chambers pulled off after the bus pulled off.

24   Look at those facts.  I talked to you about what Brown and

25   Chambers did, and look at how the lie evolved.  Just 30 days

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 79*

1  before this trial we get a new statement from the Government

2  and the agents that says Brown and Chambers took the vehicle

3  13 days after the killing, washed it down with bleach to hide

4  the evidence, and they found a slug, a shell casing in the car.

5      How convenient.  How self-serving.  I'll bet you it was a

6  .40 caliber, right?  That shows the evolution of the lie.  That

7  shows you how still -- their incentive to lie to try to better

8  their deal.

9      Remember, they violated -- that shows -- these recent lies

10  show that they violated every agreement that they ever entered

11  into.  The *Kastigar* agreement, I questioned him on that.

12  *Kastigar* says tell everything.  The plea agreements.  The

13  cooperation agreements.  They are liars, they are cheaters, and

14  they violated every, every promise that they made to the

15  Government, and the Government --

16          **THE COURT:**  Mr. Johnson, you have five minutes.

17          **MR. JOHNSON:**  That quick?

18          **THE COURT:**  Five minutes.

19          **MR. JOHNSON:**  Oh, Lord.  Okay.  Judge, I'm going to

20  need more time.

21      All right.  Ladies and gentlemen, look at the indictment.

22  I believe the indictment is part of the evolution of the lie.

23  They couldn't make this case, they couldn't make this case so

24  they brought a superseding indictment.  Look at that closely.

25  Look at that closely.

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 80*

1   And what I want to say to you is that when you go back and

2   decide this case, look at the facts.  I need you to carry the

3   ball in this case.  Don't be intimidated by anybody else, their

4   education, their status or anything of that sort, but I need

5   each and every one of you all to hold the line.  If you believe

6   after you hear this evidence, if you believe that there's not

7   sufficient evidence, then I need you to hold the line.

8       That means, when you get back there and you talk about

9   this case and you deliberate and you objective and you go over

10  it, if you believe in your mind as an individual that my client

11  is not guilty, I need you to hold the line.  If you have to

12  come back out and be instructed by that judge again, if you,

13  you go back, you discuss this case again with an open mind, but

14  if you believe that the Government has not proved each and

15  every element on each one of these counts beyond a reasonable

16  doubt, then I need you, each and every one of you all, to hold

17  the line.

18      My client deserves to go home.  I believe that if you look

19  at the evidence squarely that you can enter a verdict of not

20  guilty.  I believe that the evidence will show that the

21  government has not met its burden.

22      Thank you.  I'm out of time.

23          **THE COURT:**  Thank you, sir.

24      Mr. Cralle.

25                                        (12:37 p.m.)

1    **MR. HAUGABOOK:**  Ladies and gentlemen, the Government

2   agrees.  You should not convict unless you find them guilty

3   beyond a reasonable doubt, but in this case there is no doubt.

4       I want to start first with Mr. Shea, and one of the things

5   that he said, brother counsel, Mr. Shea, he said during that

6   week there were no phone calls.  Well, I want to call your

7   attention to Exhibit 16.2.  It should be on the screen here.

8       And if you look at Exhibit 16.2, it shows that during that

9   week there were phone calls between Belcher and all of the

10  people involved.  Between the week of the murder he said that

11  there was no calls there.  There were calls in that week.  It's

12  right there, Exhibit 16.2.

13      You know, it's really interesting that the first thing

14  they want to say is that these guys were liars, they were

15  cheaters, they were this.  But think about it.  Wasn't that the

16  thing that made them so vital to this whole situation, right?

17      Because, with regards to Mr. Brown, when his cousin is

18  sitting there with DPD, the first thing he throws out, he

19  throws him under the bus.  Don't hang with him, he a thief,

20  steals ATMs and what not, all right?  But he was still the

21  person that he called and talked to and had that conversation

22  at the Zeidman's about committing this murder.

23      If you want to do this, you want to have it in house, you

24  want to have somebody close to you.  You don't go to the door

25  of a seminary and say, hey, can I get a student out here, I

1  need to use you, I want you to go take this hit for me on
2  somebody who is messing with my money, all right?

3     You want somebody who has been involved, who has a
4  criminal record, who has a criminal past, who is susceptible to
5  doing this, and especially if it's your cousin because you feel
6  like with your cousin, they are in-house, they are somebody you
7  can trust.

8     And what do we know?  Out there on the scene, who was out
9  there that was related to him?  His cousin Bailey and then his
10 cousin Brown, who pulls up with Chambers and Watson in the
11 backseat.  All right?  Those are connections to him.

12    So you can't say -- you can't have it both ways.  You
13 can't say, oh, they have felony records and what not.  That's
14 what made them vital.  You want to say Bailey is a fraudster.
15 That's what made him vital in the car fraud scheme because he
16 knew how to hook that up.  That's why you needed him in the car
17 fraud scheme.

18    You heard him in the video with Detective Mitchell talk
19 about Cuz being able to hook your credit up, fix your credit up
20 stuff.  Oh, but now you want to come in and say they are no
21 good, they have felonies, they are this.  Well, that's why you
22 needed them from the get-go.  You weren't complaining then,
23 right?

24    At the meeting at Zeidman's, you're not complaining then:
25 You know, Cuz, I can't use you, you've got a felony.  You know,

1    Bailey, I can't go for this because, you know, you in that

2    fraud stuff.  It doesn't make sense.

3        Yeah, I agree with brother counsel.  When you go back

4    there, you don't check your reason and common sense at the

5    door.  You take that same reason and common sense that you were

6    born with, that you walked in this courtroom three weeks ago

7    with, and you use that in making your decision in this case.

8        You know, they want to talk about witnesses saying things

9    at different times and things of that nature, and I believe

10   this Court is going to give you an instruction that sometimes a

11   witness will see and hear things differently, and that doesn't

12   mean that they are lying or mistaken.

13       For example, I just threw up some coins and they landed.

14   Some of you will say, Mr. Haugabook threw up some quarters and

15   they landed on the floor.  Some of you will say Mr. Haugabook

16   threw up some quarters and some pennies and dimes, and they

17   landed on the floor.  Some of you will simply say Mr. Haugabook

18   threw up some change and it landed on the floor.  But, is there

19   any doubt that each of you are right?  Sometimes witnesses will

20   see and hear things differently, but that doesn't mean that

21   they are incorrect.

22       The next thing, when you're going out and you're

23   committing this murder -- I don't know if you have ever seen

24   Jimmy Kimmell, but sometimes he does this little skit "Dear

25   Diary," all right?  That's the last thing you're trying to do

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 84*

1   when you go out and commit a murder.  I'm going to write down

2   that on this day I talked to this person at this time and what

3   not.  It just doesn't work like that.

4       What we had here was the simple fact that everything was

5   able to be discovered because they made a mistake.  The mistake

6   was they committed this murder on video, and the mistake was

7   they carried these with them because everybody in this day and

8   age knows that when you walk around with your cell phone, as

9   I'm holding up my cell phone, your cell phone can tell on you.

10  Your cell phone can tell where you are, where you have been,

11  who you have been calling, what location you are in.  That's

12  how this was put together.

13      A tip led them to Brown.  They started working up Brown's

14  cell phone evidence.  They immediately brought Mr. Belcher back

15  in, and they started reinterviewing him.

16      And what did he do?  He started lying.  Don't know Brown,

17  don't talk to him, don't deal with him, you know, and one of

18  the things they want to say is that, well, you know, Mr. Shea

19  said, well, you know, the fact that this was a block from his

20  house and, you know, he had his child, are these things

21  consistent with a murderer?

22      Well, when you're sitting down with homicide and you are

23  being asked about why are you having contact with somebody that

24  we believe is involved in a homicide and you start lying, is

25  that consistent with somebody who isn't involved or is that

*16-20143; U.S.A. v. Belcher/Watson*

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 85*

more consistent with somebody who is?  And that's what we have

here, somebody who was lying because they were involved with

the person and in the scheme.  That's what we have here.

So he was being investigated by homicide, Mr. Belcher, and

he's being questioned about being in contact, and the first

thing he does is he starts telling different lies and stories.

He says that the sole reason was because, and I submit to you,

the sole reason was because it would unearth the entire

murder-for-hire scheme.  So that's why he doesn't know Brown.

He wants to attribute that number to Block.  He wants to say

that he doesn't hang with his cousin.  He wants to say that his

cousin is still in jail.  Those were all of the reasons that

he's trying to do that because he's trying to distance himself

and hope that nobody uncovers his connection and unravels the

entire murder-for-hire scheme.

I heard brother counsel say there's lots of reasons to

talk to each other and lots of it was illegal, brother counsel,

Mr. Shea.  Yes, I agree with him, and the main illegal reason

was that murder for hire, that murder for hire to kill Wallace.

He wants to talk about that jail call where Ms. Banks

calls in, and he talks about there's a portion, oh, we know you

didn't do that or what have you.  She and Belcher were playing

a role.  As you know, Mr. Belcher is good at playing a role

because he showed up at the scene at the end of the murder and

immediately started playing the role of, you know, this was due

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 86*

1   to snitching and all of this kind of stuff.  He and Bailey, all

2   right, they played a role there.

3       But the problem is, what happened is these guys made a

4   mistake:  They had their cell phones with them.  Their cell

5   phones corroborates their information.  It corroborates

6   Chambers, it corroborates Brown, and it corroborates them when

7   they say that Watson was there.

8       And what do we know?  Bailey said that Belcher told him

9   afterwards that it was indeed Watson.  So it corroborates

10  Belcher as well for telling that to Bailey, and we know that

11  Mr. Belcher was there because he's on the video.

12      Now, brother counsel wants to -- all of this stuff

13  about -- brother counsel for Mr. Belcher put in exhibits of

14  lots of contacts with Brown, but, okay, well and good, but when

15  it came -- push came to shove and you're sitting down with

16  Detective Mitchell, his client wasn't putting in contacts

17  with Brown.  That's the last person he was having contacts

18  with.  The last person he knew, the last person he was having

19  contact with was Brown, didn't even know his last name, his

20  cousin, Facebook friend, don't know his last name.  But that's

21  what happens when you prevaricate, obfuscate and deviate from

22  the truth, as Mr. Belcher did.

23      What do we know?  Mr. Belcher couldn't keep his lies

24  straight because the video evidence belies that.  He exited the

25  Camaro while talking to Brown, two calls, 10 and 95 seconds.

*16-20143; U.S.A. v. Belcher/Watson*

1    He wants to talk about an 80-second call with Bailey.

2  Bailey told you that was, and you all have heard this phrase,

3  that's a butt call because Bailey, standing there on the other

4  side of the car, you never once see Bailey put anything to his

5  ear.  So that's a butt call.  That's an open call.

6    What do we know?  All five of these individuals lied in

7  the beginning.  Yes, they did.  But three of the five knew they

8  couldn't deviate from the facts that we have put before you

9  that shows their guilt, that also corroborates their testimony

10  here, and that's the cell phone evidence.  They could not get

11  away from that, and three of the five have pled guilty to

12  murder for hire and agreed to testify before you and their deal

13  requires them to testify truthfully.

14    And you heard from Agent Rienerth.  The reason why a lot

15  of things differ from statement to statement is because people

16  start remembering things later and more as it goes along.  So

17  at every interview somebody will come along and remember.

18    Like, for example, when I threw those coins down, like I

19  said, if we go back to that, some of you will say what I said

20  you will say, that I just threw coins down, and some will be

21  more specific.  But if you were asked and told ahead of time

22  I'm going to throw coins down, I need you to remember, maybe

23  everybody would do a better job of remembering.

24    But that's not how a murder works.  You don't say we're

25  going to commit this murder but I need everybody to remember,

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 88*

1  you know, Step A, Step B, Step C, all the way to E, Z, F1, F2,

2  all of those things.  That's not how it works.  Use your reason

3  and common sense, ladies and gentlemen.

4       They want to talk about the Pantheon attempt on

5  August 25th.  Well, I'll get to that in a moment.

6       So what do we know here?  They want to talk about whose

7  phones are being called.  The first thing we know is when those

8  shooters are in the area whose phones are they calling?  They

9  are not calling Bailey's.  They are calling Belcher's because

10  he's the money man.  He's putting out the money for this.  They

11  are calling Belcher's phone, and as I had 16.7 on the board, it

12  goes to show that.  It goes to show that.

13       Mr. Belcher's lawyer, Mr. Shea, says that, you know, Brown

14  couldn't keep things right, but as I indicated -- couldn't keep

15  things straight, but as I indicated, just like with the coin

16  situation, everybody is going to remember things differently.

17  As a matter of fact, when he was even trying to tell you about

18  what Mr. Brown could or could not remember, he couldn't even

19  remember the day that Mr. Brown testified because the first

20  thing he said was days blend together, I can't remember when he

21  testified.  So he wants to challenge other witnesses because

22  they can't remember or they remember things differently?

23       He wants to talk about the voice over the phone, whether

24  that was before going to Zeidman's or after going to Zeidman's.

25  It doesn't matter.  It doesn't matter because what that is

1  saying is that the meeting happened and the statement was made

2  and the statement was made in the presence of Belcher and

3  Watson was there.

4      Brother counsel for Watson wants to talk about the fact

5  that, you know, Watson never said these words of acceptance or

6  anything like that.  Well, I believe this Court is going to

7  tell you that with regard to a particular person in this case

8  you can determine their intent by what they did, what they

9  said, how they said it, how they did it or any other facts or

10 circumstances that come into evidence.

11     When they are standing there with Brown and they are being

12 offered this opportunity for money, a condo and a car to go do

13 it, he goes out with Brown and he starts hunting.  He goes out

14 with Brown on September 11th.  His phone is there even though

15 he tells Agent Rienerth ain't been there, nope, ain't been

16 there, I don't even know Brown, I don't even know Chambers, I

17 don't even know a Byrd.  All of those things were belied by the

18 contacts in his phone.

19     And what do we know?  Bailey paid money that filtered to

20 Brown through Watson.  So why is he picking up money?  Why did

21 he take the $10,000 that Brown said Bailey said he gave to

22 Belcher and that Brown never got?  Because, as you know, that's

23 what ticked Brown off.  Brown got tired of the runaround of not

24 getting his cut, and that's why he went hunting for them.  So

25 whether he said the words of acceptance or not, what he did,

1   those are critical for you to understand that he was part of

2   the deal, his actions, what he did, how he did it, when he did

3   it.

4       Brother counsel says the only person that says there was a

5   motive was Bailey.  That's not true.  Banks told you.  Banks

6   told you that Belcher said he was greedy and had to go.

7       There's a phone call, there's a phone call from Bailey to

8   Brown that took place because Belcher was not answering about

9   Motor City.  So when you look at that, look at that as part of

10  the reason of some of the calls between Bailey and Brown.

11      Bailey did ask other people to kill Wallace.  Ms. Banks

12  told us that.  She also told us that Bailey asked Belcher to do

13  it -- asked Belcher if he did it and Belcher confessed that he

14  had to go.  Bailey was not the only one to reveal the motive.

15  Banks told you, and that was through the words of Belcher.

16      How interesting, ladies and gentlemen, that the lie given

17  by Bailey that Wallace was a snitch just happens to be the same

18  one that Belcher tells police at the scene.

19      Remember, Bailey had no deal when he spilled his guts to

20  Sean Jackson.  Regardless of whether Bailey feels like he

21  should do time, as brother counsel is arguing, you have heard

22  that he will serve 25 years for his involvement in this crime.

23  Counsel suggested Brown and Belcher did not call one another,

24  but as I told you, that's been pointed out to be untrue.

25      With regard to, with regard to what brother counsel for

1  Mr. Watson just argued, let me leave you with this.  He says

2  that there was a lack of evidence, but, ladies and gentlemen,

3  the testimony is evidence, the Court is going to tell you that,

4  and the exhibits are evidence and the exhibits support the

5  testimony of the witnesses.

6      We don't need a gun.  Wallace, was there any dispute that

7  Wallace died from a gunshot wound?  Is there any dispute?  I

8  don't think so.  Circumstantial evidence is enough to convict

9  by itself, ladies and gentlemen, but this is not just a case

10  built on circumstantial evidence.  Brown testified, Bailey

11  testified, Chambers testified.  There's video of the shooting.

12  There's cell site analysis and exhibits that support the

13  testimony of these witnesses.  This, ladies and gentlemen, is

14  direct evidence.

15      So, brother counsel for Mr. Watson said that, again, going

16  back to the no words or acts, we know that he agreed when he

17  shot Wallace, we know that he agreed when he tried and did

18  collect money, we know that he agreed when he went to Motor

19  City and picked up the money.

20      He wants to talk about Brown saying five people as opposed

21  to six, but Brown clarified that as a misstatement, and then he

22  counted off with me, if you remember, the five people.  He said

23  it was Brown, himself, Chambers, Bailey, Watson and Belcher.

24      Chambers, you know, he wants to talk about payment and

25  what happened on that day, but remember, Chambers said that was

1  a different day when they were there and Mr. Brown had on the

2  black.  And brother counsel in his own statement said, in

3  arguing to you, he just said the same thing he said with

4  respect to Brown, he was wearing black and, in defense

5  counsel's words, the day before.  So that is consistent with

6  what Mr. Bailey said.

7       Counsel said Watson had a relationship with Belcher.  Yes,

8  enforcer, but Watson said he didn't know Byrd despite having

9  two numbers for Byrd.

10       You will find that for Count One the instruction says that

11  a person used or caused another to use a phone, and as you

12  know, a phone was flying back and forth between Watson and

13  Brown, all right?  So Watson was letting Brown use his phone.

14  Brown was using the phone.  Brown was using his own phone until

15  he had to put it on the charger.  The bottom line, they were in

16  the area being set up, ready to commit the murder based on the

17  information they got from Belcher in the earlier calls from

18  Belcher as he pulled up to the scene.

19       Brown told you that he and Watson talked to Belcher and

20  that they passed the phone back and forth, but independent of

21  that, Watson caused Brown to call when he handed him the phone

22  for the purpose of calling Belcher.

23       Brother Counsel says there was no quid pro quo.  There

24  was.  Watson was picking up money from Bailey because of

25  Brown's inability -- Watson was getting the $10,000 Bailey gave

1   to Belcher and not giving it away to Brown, and this prompted

2   Brown to knock Bailey and Belcher down because of getting the

3   runaround.

4        So let's talk about Brown said that by July he knew no one

5   was facing death.  Remember that.  Brother counsel brought that

6   up.  Brown admitted his involvement in firing the gun and he

7   took a plea to murder for hire, and yes, he took a plea deal

8   that requires him to testify truthfully before you and do

9   20 years.  And his testimony, I submit, was supported by the

10  evidence, that being the cell sites, that being the corporate

11  cases.

12       But, remember, Watson was so worried about Chambers that

13  he had him sign that affidavit, which doesn't fly with anything

14  Paymond came in and told you, and it makes up stuff about

15  Paymond having a dispute with Watson and it makes up stuff

16  about Brown having a dispute with Watson, and you heard that

17  none of that was true.  You haven't heard anybody say that

18  those things were true, I should say.

19       He wants to say nobody knew Watson.  Well, not everybody

20  in the conspiracy needs to know one another, and I suspect the

21  Court will tell you that.  But Belcher knew Watson and knew him

22  to be his enforcer.  Belcher gave him the $10,000, which sent

23  Brown hunting.

24       The last thing I want to bring out for you is what do we

25  know that is consistent with all of this evidence?  Let's talk

1  about the drug dealing.

2       Deaunta Belcher, drug dealer.  You heard him say that.

3  You heard other people say that.  Darnell Bailey said that they

4  were -- that he was a drug dealer and that they had the drug

5  scheme interwoven with the fraud scheme.  Check that off.

6       Franklin Aday said Belcher was a drug dealer.  Check that

7  off.

8       Latasia Banks said she was a drug dealer with Belcher.

9  Check that off.

10      Stephen Brown said that Belcher was his drug dealer

11  because he got marijuana from him.  Check that off.

12      And the cell phone extraction showing drug proceeds, you

13  can check that off, showing drug communications and things of

14  that nature.

15      The car fraud scheme.  Deaunta Belcher told police about

16  it and being involved in it.  Darnell Bailey told you about the

17  car fraud scheme.  Latasia Banks told you about it.

18      Now, there was some, there was some talk about -- by

19  brother counsel for Mr. Belcher that drug dealing does not

20  equate to being a murderer.  Well, let's explore that.

21      The whole point of drug dealing is to make money.  That's

22  the whole point, all right?  But, if someone like Wallace, the

23  smooth talker, as you heard, because this car fraud --

24  remember, I told you it's two sides of the same coin, this car

25  fraud and drug-dealing scheme.  If somebody like Wallace, the

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 95*

1   smooth talker, as we have heard, has the connection and starts

2   interfering with that money, then, yes, drug dealing can equate

3   to murder because what we had here, ladies and gentlemen, you

4   can't just ask him to step aside, he was a smooth talker with

5   connections.

6           So what do you have to do and what was done?  You do a

7   hostile takeover.  You murder him and get him out the way so

8   that he can stop interfering with your money, and that's

9   exactly what happened.

10          What do we know about where that was hatched at?  The

11  hostile takeover was hatched at Zeidman's.  Who told you that?

12  Darnell Bailey.  Who else told you that?  Stephen Brown.

13          What do we know about the Pantheon Nightclub?  It doesn't

14  matter if it was day or night.  The phone records support

15  Watson and Belcher being there.  Who told you about that?

16  Darnell Bailey and Stephen Brown, call detail records.  So it

17  doesn't matter whether it was day or night, the phone records

18  put them there as going to hunt for Wallace.

19          The Faircrest was brought up for you just so that you can

20  understand the frame of reference of where they left from so

21  that you have the vantage point of knowing where those cell

22  towers are hitting showing them moving down to do the killing.

23          And who told you they were at Faircrest just before the

24  killing?  Stephen Brown, Billy Joe Chambers, and the call

25  detail records.

*16-20143; U.S.A. v. Belcher/Watson*

1    And where were they headed to and where were they going

2  to?  Well, Brown told you.  Well, you know from the security

3  video they came down to They Say.  You know from Darnell Bailey

4  that they were there at They Say to do the killing, and you

5  know from Stephen Brown that he had gotten that final call from

6  Belcher telling him that the big fish was on the line and to

7  report to They Say.

8    Who else told you?  Billy Joe Chambers, he was there and

9  he told you.  The call detail records, they verify that.

10    Who shot Wallace?  How do we know that?  Darnell Bailey

11  tells you because he said that Belcher told him that it was

12  indeed Watson.  Stephen Brown told you because he was in the

13  car, and he told you how he fired and how Watson got out and

14  fired.  Billy Joe Chambers told you because he was the driver

15  and Brown was his front seat passenger.  So Billy Joe Chambers

16  told you he jumped out of the backseat and did the firing.  The

17  call detail records tell you all three of them were in the

18  area, and the surveillance video tells you.

19    What was this lie that was created?  What was the

20  snitching cover story?  Because, again, it was to keep the

21  information about everybody's involvement from getting back to

22  federal law enforcement.  It was to hinder that information.

23  As a matter of fact, that's why -- you know, they want to talk

24  about the indictment being charged.  Remember, that's why it's

25  charged that way.  The indictment that they admitted as an

1  exhibit was based on this theory that was implanted by Belcher

2  all related to the fact that Wallace was a federal witness

3  until the real deal came out in terms of the investigation and

4  we knew that that was a cover story.

5      But who all shared in this snitching cover story?

6  Deaunta Belcher, Darnell Bailey, and Mr. Jackson, who told you

7  that Darnell Bailey told him that in 2016.  This was before any

8  plea deals.

9      Do we know that money was involved, that this was a

10  motive, money was a motive?  Uh, yeah.  What about the Parkside

11  project situation?  Stephen Brown was incensed he wasn't

12  getting his cut so he hunted him down with a chopper.

13      Who else told you about Stephen Brown showing up in the

14  Parkside projects?  Darnell Bailey.  And who else?

15  Billy Joe Chambers, because, as Chambers told you, he was then

16  driving his girl friend's Rendezvous.

17      Did money change hands?  Yes.

18      Who told you that?  Darnell Bailey and Stephen Brown.

19      Because Darnell Bailey told you that he met Watson at the

20  casino and handed him money, and Brown told you that he

21  couldn't go because he was on a tether and he sent Watson and

22  Watson came back and brought him the money.

23      And, finally, what do we know this was all about?  Again,

24  it was a hostile takeover, and the motive was greed.  Who told

25  you that there was some discourse and descension underlying all

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 98*

1    of that, this was all about money?  Darnell Bailey.

2         Who told you that?  Stephen Brown, because he heard a

3    phone conversation about dog messing with my money.

4         So Stephen Brown, and who else told you that?

5    Sean Jackson, because he was told that by Mr. Bailey as he was

6    his bunkee.

7         And who else told you that?  Latasia Banks because what

8    did she say Deaunta Belcher confessed to her?  Wallace had to

9    go.

10        Ladies and gentlemen, thank you for your time and

11   attention over these last three weeks.  As you can see, the

12   Government has proven each and every element of these offenses

13   charged beyond a reasonable doubt.  We ask you to return the

14   only verdict which this evidence supports, and that's that

15   these two defendants are guilty with the rest of the three for

16   the counts charged as well as the murder for hire.

17        Thank you for your time and attention.

18        (End of excerpt.)

19                         -    -    -

20                  **C E R T I F I C A T I O N**

21        I certify that the foregoing is a correct transcription of

22   the record of proceedings in the above-entitled matter.

23

24   s/ Sheri K. Ward                    5/10/2019
     Sheri K. Ward                      Date
25   Official Court Reporter

*16-20143; U.S.A. v. Belcher/Watson*