United States District Court
Eastern District of Michigan
Southern Division

United States of America,

    Plaintiff,      Case No. 16-20143

    v.

         Honorable Avern Cohn

D-2 Deaunta Belcher,

    Defendant.

_____/

## Response in Opposition to
## Motion for Judgment of Acquittal or a New Trial [R. 235]

A jury convicted Deaunta Belcher of orchestrating the murder of Devin Wallace outside They Say restaurant in Detroit on September 11, 2015. The jury relied on the testimony of three people involved in the murder, all of whom identified Belcher as the mastermind, as well as phone records linking him to his co-conspirators. Belcher now claims that evidence was insufficient under Federal Rules of Criminal Procedure 29 and 33 by attacking the credibility of the witnesses against him. (R. 215: Motion, 1702). But Belcher ignores that the testimony of one witness alone is sufficient for a jury to convict, and here there were three. Plus, the credibility of witnesses is an issue for

the jury to decide, not the Court, and the jury rejected this argument at trial. Belcher also ignores that his former fiancée, and the mother of his children, testified about his motive for the murder, explaining that Belcher complained that his co-conspirator Wallace was "greedy" and "had to go." In short, the jury had overwhelming evidence from which to find Belcher guilty for the murder of Wallace, and the Court should reject his motion.

## Argument

I. **The evidence supported the jury's verdict.**

The jury's verdict should stand. In reviewing for sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational juror could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This is a very heavy burden for a defendant to overcome. *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013). It is not necessary that each element of the offenses charged be supported by direct evidence. *United States v. Townsend*, 796 F.2d 158, 161 (6th Cir. 1986). In fact, circumstantial evidence alone is sufficient to sustain a guilty verdict. *Tragas*, 727 F.3d

at 617. All reasonable inferences and credibility findings are drawn in favor of the verdict, *id.*, and, if the jury was convinced, the only question is whether its finding "was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam).

The indictment charged Belcher with four counts related to the murder of Devin Wallace. (R. 141: Superseding Indictment, 613). The first count was murder-for-hire, in violation of 18 U.S.C. § 1958; count two was conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; count three was discharging a firearm during and in relation to a drug trafficking crime causing death, in violation of 18 U.S.C. §§ 924(c), (j); and court four was misleading communication to hinder investigation of a federal offense. (*Id.*).

### A. The jury had ample evidence to find Belcher hired Stephen Brown and Andre Watson to kill Devin Wallace.

There are four elements for murder-for-hire:

(1)   The defendant used, or caused another person to use, any facility of interstate or foreign commerce;

(2)   The defendant did so with the intent that a murder be committed in violation of law;

(3)   The defendant did so as consideration for the receipt of, or a

3

>  promise of, or agreement to pay anything of pecuniary value; and
>
> (4) Death resulted.

*United States v. Acierno*, 579 F.3d 694, 699 (6th Cir. 2009); *United States v. Cope*, 312 F.3d 757, 771 (6th Cir. 2002); *see also* 18 U.S.C. § 1958.

In this case, the jury heard from multiple witnesses that Deaunta Belcher and Darnell Bailey offered an item of pecuniary value to Stephen Brown and Andre Watson in exchange for the murder of Devin Wallace. That item differed based on timing—ranging from money to a vehicle or even a condominium. Belcher made this offer at a meeting in the parking lot of Ziedman's, and he often contacted Brown and Watson afterward to provide Wallace's location so the two could find and kill him. Brown and Watson, in turn, looked for Wallace throughout Detroit in an effort to kill him and collect what they were promised. In fact, Watson and Brown drove to the Pantheon Club in Dearborn in August looking for Wallace, but missed him.

Finally, on September 11, 2015, Belcher called Brown and Watson to let them know that he "had a big fish on the line"—meaning, he knew where Wallace would be that day. (R. 190: Tr., 1398). Earlier in the day,

Belcher, Bailey, and Wallace had met at Taylor Chevrolet, and they got into an intense argument. (R. 188: Tr., 1242). Belcher had given the manager a sample of cocaine, and Wallace got upset because he feared this could impact their fraud scheme. Things remained tense after they went their separate ways, and the three planned to meet later to sell a car. They arranged to meet at They Say. Once the location was set, Belcher called Brown so that Brown and Watson could head downtown to kill Wallace. (R. 190: Tr., 1398–99).

    Brown called Billie Chambers for a ride. Chambers drove Brown and Watson in his black Dodge Charger to They Say, and they spoke with Belcher repeatedly by phone during the trip. Belcher told them to look for Bailey standing next to a car talking to Wallace. Belcher had driven to They Say and even talked to Bailey and Wallace briefly, and he relayed information about their location to help Brown and Watson find Wallace. Belcher told them, for example, that Wallace was inside a white Mercedes Benz. When Brown and Watson arrived, they found Wallace sitting in a white Mercedes Benz, just as Belcher had described. Chambers drove next to the Mercedes and stopped briefly. Brown fired two shots, but did not hit Wallace. Watson stepped out of

5

the car and pushed Darnell Bailey from harm's way. Watson then shot Wallace repeatedly. Wallace died in his car.



Each member of this plot used a facility of interstate commerce (their cell phones) in furtherance of the plan to kill Devin Wallace. Exhibit 16 below shows the calls that Belcher made to Bailey, Brown, and Watson before and after the murder.

| CALLING_NBR | CALLED_NBR | MOBILE ROLE | Known Individual In Contact with Belcher | START_DATE SYNCED WITH VIDEO** | DURATION (SEC) | Call Type |
|---|---|---|---|---|---|---|
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 16:40:26 | 22 | Voice |
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 16:40:57 | 1 | Voice |
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 16:41:23 | 99 | Voice |
| (313) 848-3799 | (313) 715-1931 | Inbound | Darnell Bailey | 09/11/2015 16:41:40 | 83 | Voice |
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 16:43:26 | 58 | Voice |
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 16:46:30 | 58 | Voice |
| (313) 848-3799 | (313) 715-1931 | Inbound | Darnell Bailey | 09/11/2015 16:47:09 | 25 | Voice |
| (313) 715-1931 | (313) 978-1332 | Outbound | Stephen Brown | 09/11/2015 16:48:00 | 10 | Voice |
| (313) 715-1931 | (313) 978-1332 | Outbound | Stephen Brown | 09/11/2015 16:48:24 | 95 | Voice |
| (313) 978-3909 | (313) 715-1931 | Inbound | Andre Watson | 09/11/2015 16:53:04 | 46 | Voice |
| (313) 715-1931 | (313) 495-5265 | Outbound | | 09/11/2015 16:55:53 | 58 | Voice |
| (313) 848-3799 | (313) 715-1931 | Inbound | Darnell Bailey | 09/11/2015 16:59:02 | 80 | Voice |
| (313) 715-1931 | (313) 978-3909 | Outbound | Andre Watson | 09/11/2015 17:05:30 | 36 | Voice |
| (313) 978-1332 | (313) 715-1931 | Inbound | Stephen Brown | 09/11/2015 17:17:28 | 44 | Voice |

Deaunta Belcher – Call Records – 313-715-1931

911 Call Reported at 5:03 p.m.

6

The murder-for-hire statute requires that the murder be committed as consideration for a promise or agreement to pay anything of pecuniary value. 18 U.S.C. § 1958(a). Thus, a promise to pay by itself is sufficient to satisfy the consideration element. *Acierno*, 579 F.3d at 700–01. But in this case, Belcher and Bailey did more than just offer to pay Brown and Watson. They actually paid them.

After the murder, Brown drove to the Warren and Connor projects and confronted Belcher and Bailey for what they were owed. (R. 190: Tr., 1435–37). Brown was upset and asked, "Damn, man, shit, what's up with that money?" (*Id.* at 1437). Belcher and Bailey initially demurred, but Belcher gave him $500 later that night to soothe tensions slightly. (*Id.* at 1437–38). But a few weeks later, Brown called Bailey and demanded payment, and Bailey agreed to meet him at the casino. (*Id.* at 1442). Brown was on a tether, however, and could not leave his house, so Watson went instead. Watson met Bailey at the Motor City Casino, and Bailey paid him $2,000 as partial compensation for Wallace's murder. (R. 188: Tr., 1260; R. 190: Tr., 1442–43). Later, Brown called Belcher for the rest of the money, and Belcher told him that he had given Watson $10,000. (R. 190: Tr., 1441–42).

Belcher's sole response to this overwhelming evidence is to claim the cooperating defendants were "fundamentally unreliable." (R. 235: Motion, 1941). In support, he notes that he brought his young daughter to the scene of the crime and remained there after the murder to speak with the police. But that argument requires the Court to ignore that the cooperating defendants' testimony corroborated both each other and the independent evidence—the video, cell site location information, and call detail records. It also requires the Court to ignore the testimony of Latasia Banks, his ex-fiancée, who explained that Belcher came home to their apartment—located two blocks from They Say—to drop off their daughter and then rushed out because he "had a play on the floor." In other words, he needed to leave to carry out his illegal scheme. Banks feared the worst and sent their daughter to "get her Daddy"—hoping that his daughter would keep Belcher out of trouble. That Belcher now wants to use his daughter as a shield to his own illegal plot is astounding when her presence in September 2015 did not persuade him from carrying out the murder of Devin Wallace.

In short, all four of the elements of the offense are easily satisfied. Belcher and others used an instrument of interstate commerce (a cell

8

phone) with the intent that a murder be committed. *United States v. Weathers*, 169 F.3d 336, 343–44 (6th Cir. 1999); *see also United States v. Preacher*, 631 F.3d 1201, 1204 (11th Cir. 2011). Belcher offered payment to kill Devin Wallace, and Brown and Wallace, in fact, shot and killed Devin Wallace motivated by this quid pro quo. Regardless of whether the item of pecuniary value was money, a car, or a condominium, the murder of Devin Wallace was motivated by this offer of payment, and after Wallace was killed, Brown and Watson each received money as compensation. *Acierno*, 579 F.3d at 700–01.

### B. The jury also had ample evidence that the murder was intended, at least in part, to facilitate Belcher's drug trafficking scheme.

Likewise, the jury had ample evidence that Belcher had Brown and Watson shoot Wallace during and in relation to a drug trafficking offense because the murder was motivated, at least in part, by Belcher's drug trafficking. This conduct was the basis of counts two and three, which charged Belcher with conspiracy to distribute controlled substances and using and discharging a firearm during and in relation to a drug trafficking offense resulting in death. The gun count did not

9

allege Belcher fired the gun—rather, that he was guilty under a *Pinkerton* theory of liability.

A drug conspiracy is simply an agreement between two or more people to distribute controlled substances of some sort. Proof of the conspiracy may be inferred from circumstantial evidence alone. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). A formal agreement is not required; a tacit understanding among the parties will suffice. *Id.* The existence of the conspiracy, in fact, may be inferred from "circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Indeed, a drug distribution conspiracy is often a "chain" conspiracy such that the agreement "can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004).

But in this case, the drug conspiracy was obvious. Belcher sold marijuana, cocaine, and opioid pills in Detroit and elsewhere, and

10

multiple people testified to this fact. Indeed, one of his customers, Franklin Aday, testified that he purchased cocaine and oxycodone from Belcher for several years. Latasia Banks, Belcher's ex-fiancée, and a co-conspirator in his drug conspiracy, also testified about Belcher selling narcotics in Detroit and elsewhere, and about her role in the conspiracy. A forensic review of Belcher's cell phone confirmed Aday's and Banks's testimony at trial regarding this drug activity. In fact, the evidence on this count was so overwhelming that Belcher conceded that he was a drug dealer. (R. 231: Tr., 1856–57).

The gun charge in count three builds on this drug conspiracy. It has four elements: (1) the commission of a drug trafficking offense; (2) the use or carrying of firearm during and in relation to the crime; (3) the death of a person by the use of the gun; and (4) that death was an unlawful killing with malice aforethought. *United States v. Winston*, 55 F. App'x 289, 300 (6th Cir. 2003).

Because Watson was part of Belcher's drug conspiracy, and because the evidence also showed that Watson killed Devin Wallace by using a gun, the only question is whether the killing of Wallace was during and in relation to the drug trafficking offense. During and in

11

relation simply means that the firearm, and the death, had some purpose, effect, or the potential to facilitate the drug trafficking offense in some way. In other words, it was not an accident or coincidence. *Smith v. United States*, 508 U.S. 223, 237–38 (1993).

Again, that element is easily satisfied. Multiple witnesses testified that Belcher was upset with Wallace for "[g]etting in the way of his money." (R. 190: Tr., 1389). And Belcher made his "money" by an interrelated drug and fraud scheme, so, by definition, any murder to remove someone affecting Belcher's "money" had to facilitate his drug trafficking scheme. *Cf. United States v. Cole*, 423 F. App'x 452, 461 & n.1 (5th Cir. 2011) (use of firearm in murder was "during and in relation" to drug trafficking crime when it removed economic rivals to further and protect defendant's drug crimes). Belcher was also upset because Wallace had provided him heroin to distribute but "cut" the heroin too much—in other words, added a substance to dilute the potency of the drug—so that he did not have to supply drugs to Belcher. (R. 188: Tr., 1229–30). When Belcher learned what happened, he was furious. He told people that he put Wallace "on a list" to "get fucked up" because of what he had done. (*Id.*at 1230). In other words, Belcher

12

decided to kill Wallace, in part, because of a dispute over drugs to be sold as part of his drug business.

Belcher argues the evidence showed the murder stemmed from their fraud scheme, not the drug scheme, so it could not have been "during and in relation" to the drug trafficking charge in count two. Not so. A recap will help. Wallace and Bailey supplied high-end vehicles and apartments to criminals to sublease at inflated prices. They did this using stolen identity information from drug addicts, and they obtained the vehicles by supplying drugs to car salesmen at dealerships. (R. 188: Tr., 1214–17). In short, the drug scheme fed the fraud scheme to the point that they could not be separated from one another. Belcher joined the conspiracy to broaden its reach; he had different drug customers to sublease vehicles, and he had different contacts at dealerships to obtain vehicles. (*Id.* at 1225–26).

Wallace complicated this arrangement in several ways. He had been charged in a DEA case, and people suspected he was cooperating with the government. (*Id.* at 1233–34). During this time, Belcher was arrested in Warren for a drug offense, and he thought Wallace set him up. (*Id.* at 1235). Wallace also caused a problem with one of Belcher's

13

drug customers who managed a car dealership in Flint where they got vehicles to lease. Wallace got a vehicle from the dealership but didn't return the dealer's license plate, and the manager got upset because it could be traced back to him. The manager demanded the plate back, but Wallace ignored his request. Belcher feared this would impact his drug business with this customer. (*Id.* at 1233).

The jury need only find that the use of the gun, and the resulting death of Devin Wallace, had some purpose, effect, or the potential to facilitate the drug trafficking offense in some way to satisfy the "during and in relation" element. Here, the jury had many reasons to conclude that Belcher wanted Wallace dead relating to their drug conspiracy: (1) the shoddy heroin; (2) Wallace's DEA case and potential cooperation; (3) the problem with his drug customer at the Flint dealership; and (4) the overall tension in the drug and fraud scheme and its effect on their illegal income stream. (*Id.* 1235–36, 42–43). Each of these reasons alone provided a sufficient basis to conclude that the use of the gun and the murder of Devin Wallace facilitated Belcher's drug business. Whether it was to expand Belcher's share of the income earned, in part, from drugs or to exact revenge on Wallace for leading to his drug arrest (correct or

14

not), each reason had the potential to facilitate his larger drug business. *See United States v. Cole*, 423 F. App'x 452, 462 (5th Cir. 2011) (use of gun to "chastise rivals and intimidate competitors" facilitated and protected the defendant's drug conspiracy); *United States v. Gipp*, 147 F. 3d 680, 690 (8th Cir. 1998) (gun brandished as threat for talking to police was displayed to protect drug trafficking activity). As a result, the jury had a sufficient basis to find each of the four required elements satisfied beyond a reasonable doubt.

C. **The evidence supported the jury's finding that Belcher made misleading statements relating to the possible commission of a federal offense—the murder of a federal informant.**

Finally, the jury had ample evidence that Belcher made misleading statements to police during his September 24, 2015 interview with the intent to hinder, delay, or prevent communication of information to a law enforcement officer of the United States relating to the commission of a possible federal offense. During this interview, Belcher lied repeatedly about Stephen Brown in an attempt to distance himself from one of the people who he had hired to kill Devin Wallace. Belcher told the police he did not know "Steph" (Stephen Brown) personally but rather only knew of him (they are cousins), that he did

15

not have Steph's phone number (when they had spoken by phone multiple times on the day of the murder), and that he believed Steph was still in jail (when he knew Brown to be out of jail). Belcher concedes the lies he made to the police, but argues that he did not make them with the intent to hinder the communication of this information to a federal law enforcement officer.

Belcher reads the intent element too narrowly. The purpose of § 1512(b)(3) is to protect "the integrity of even *potential* federal investigations." *United States v. Eaton*, 784 F.3d 298, 306 (6th Cir. 2015) (emphasis in original). The statute does not require a specific intent to mislead federal officials; nor does the misleading information have to be conveyed to federal law enforcement officers. *United States v. Carson*, 560 F.3d 566, 580 (6th Cir. 2009). A person violates the statute when they make misleading statements to state investigators and a possibility or likelihood exists that the information will be transferred to a federal agent. *Id.* at 580–81 (citing *United States v. Veal*, 153 F.3d 1233, 1252–53 (11th Cir. 1998).

While there may be circumstances where information provided to a state law enforcement officer is too attenuated from a federal offense

16

that an attempt to prevent its communication would not violate this statute, that is not this case. Detroit police were investigating a murder, and the information provided at the scene—by Bailey and Belcher—was that the victim was a DEA informant. Police immediately contacted the DEA to determine whether this murder related in any way to Wallace's cooperation with federal authorities. Because "relates to" in the context of § 1512(b)(3) merely requires the "possible commission of a federal crime," the investigation of a murder of a federal informant like Wallace would provide the required nexus to a potential federal investigation to support a 1512(b)(3) offense, even if the murder actually resulted from something other than the informant's cooperation. *Eaton*, 784 F.3d at 306 (explaining that "information 'relates to' the commission or possible commission of a federal crime if it concerns the incident or occurrence in connection with which the crime may have occurred"). As a result, the jury had sufficient evidence to find Belcher made the misleading statements in relation to the possible commission of a federal offense.

II. **The verdict was not against the weight of the evidence so Belcher should not receive a new trial.**

17

Alternatively, Belcher asks for a new trial under Federal Rule of Criminal Procedure 33, though this claim relies on the same argument about the witnesses' credibility as his motion for judgment of acquittal. A district court may grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). This may include circumstances where the verdict is against the manifest weight of the evidence. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). But such motions are granted only in extraordinary circumstances, and the evidence must preponderate *heavily* against the verdict. *Id.* The district judge, in reviewing a motion for new trial, sits as the "thirteenth juror" and is free to weigh the evidence and credibility of witnesses. *Id.* at 593.

In this context, the Court can, in fact, weigh the credibility of witnesses and should conclude that the government's witnesses were consistent with respect to the key facts. Multiple witnesses testified about Belcher's interrelated drug and fraud scheme in conjunction with Devin Wallace and Darnell Bailey. They also testified that Belcher and Bailey offered *both* Brown and Watson items of pecuniary value to kill Devin Wallace because he was getting in the way of Belcher's money. An agreement can be inferred from the actions of the parties, *Martinez*,

18

430 F.3d 330, and *three* different people testified that Belcher called Brown and Watson repeatedly on the day of the murder using a cell phone—a facility of interstate commerce—and Watson killed Wallace because of Belcher's offer to pay him.The co-defendants' testimony was not the only evidence of Belcher's involvement in the murder. His phone records, as illustrated above in Exhibit 16, show numerous contacts between Belcher and Bailey, Brown, and Watson before and after the murder. Given this evidence, the jury had overwhelming evidence to find Belcher guilty on all counts, so its verdict was not against the manifest weight of the evidence required to grant Belcher a new trial.

## Conclusion

For these reasons, the Court should deny the motion.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Shane Cralle
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9551
Fax: (313) 226-5892
shane.cralle@usdoj.gov

Dated: July 25, 2019

## Certificate of Service

I certify that on July 25, 2019, I electronically filed the Response in Opposition to Motion for Judgment of Acquittal or a New Trial, with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorney of the defendant:

>John A. Shea
>jashea@earthlink.net

>/s/ Shane Cralle
>Assistant United States Attorney