```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION
```

**UNITED STATES OF AMERICA,**

                    Plaintiff,

                                        **HONORABLE AVERN COHN**
        v.
                                        **No. 16-20143**

**D-2 DEAUTA BELCHER and**
**D-3 ANDRE WATSON,**

                    Defendants.
_____/


                    **JURY TRIAL - VOLUME 13**

                    **Monday, October 22, 2018**


Appearances:

Shane Cralle
Terrence Haugabook                  John A. Shea
U.S. Attorney's Office              Law Office
211 W. Fort Street, #2300           120 N. Fourth Avenue
Detroit, Michigan  48226            Ann Arbor, Michigan  48104
(313) 226-9100                      (734) 995-4646
  On behalf of Plaintiff              On behalf of Deft. Belcher

                                    Bertram L. Johnson
                                    Law Ofc of Christian Ray & Assc.
                                    23756 Michigan Avenue, #300
                                    Dearborn, Michigan  48124
                                    (313) 598-4193
                                      On behalf of Deft. Watson


                            -    -    -
            *To obtain a certified transcript, contact:*
             *Sheri K. Ward, Official Court Reporter*
            *Theodore Levin United States Courthouse*
            *231 West Lafayette Boulevard, Room 219*
                     *Detroit, Michigan  48226*
            *(313)234-2604 · ward@transcriptorders.com*

    *Transcript produced using machine shorthand and CAT software.*

*Jury Trial*
*Monday, October 22, 2018/Volume 13*

**I N D E X**

|  | Page | Vol. |
|---|---|---|
| Government's Closing Argument ....................6 | | 13 |
| Defendant Belcher's Closing Argument ...........28 | | 13 |
| Defendant Watson's Closing ......................59 | | 13 |
| Government's Rebuttal Closing ...................84 | | 13 |
| Final Jury Instructions ........................103 | | 13 |
| Certification of Reporter ......................138 | | |

-   -   -

**E X H I B I T S**

| Number | Description | Id'd Rcvd Vol. |
|---|---|---|

***None Marked, Offered or Received***

-   -   -

*16-20143; U.S.A. v. Belcher/Watson*

*Jury Trial*
*Monday, October 22, 2018/Volume 13*

*Vol. 13/Page 3*

1          Detroit, Michigan

2          Monday, October 22, 2018

3          9:01 a.m.

4                    -   -   -

5          **THE CLERK:**  Calling Case Number 16-20143,

6  *United States v. Belcher and Watson*.

7          You may be seated.

8          **THE COURT:**  As we go into oral argument, I am going

9  to give the jurors, as I told you, a copy of the verdict form

10  and read it to them.  That's number one.

11          Number two, the government has one hour front and back,

12  and each of the defendants has up to one hour.  I have a

13  personal problem and might have to call a recess on occasion

14  that's out of order.

15          Anyhow, I don't expect interruptions in the oral argument

16  unless they go to a very important point.  If any of these

17  interruptions get out of hand in my opinion, I am going to give

18  the jury a very forceful reminder that lawyer argument is

19  exactly that, lawyer argument, and that lawyer argument is not

20  evidence.

21          I don't want to have to do that.  I read it in the

22  instructions.  So I would encourage all of you to exercise

23  caution on your objections and be careful with your rhetoric.

24          Now we will have to wait for the jury and wait for the

25  electronic world to catch up with us.

*16-20143; U.S.A. v. Belcher/Watson*

*Jury Trial*
*Monday, October 22, 2018/Volume 13*

*Vol. 13/Page 4*

1    **MR. CRALLE:**  Your Honor, can we have a moment to

2   print -- is there an Elmo working?  Because we could use that

3   as an alternative.

4         **THE COURT:**  What?

5         **MR. CRALLE:**  Is the Elmo working?  We could use that

6   as an alternative.  We could print a copy and then at least go

7   through that without the electronic.

8         **THE COURT:**  That's going to take -- okay.  I'll give

9   you ten minutes.

10        **MR. CRALLE:**  Thank you, Your Honor.

11      (Recess from 9:19 a.m. until 9:31 a.m.)

12        **THE CLERK:**  All rise for the jury.

13      (Jury in at 9:31 a.m.)

14        **THE COURT:**  You may be seated.

15     Okay.  We're going to start final argument.  I'm going to

16  give you a copy now of the verdict form you will be expected to

17  fill out at the end of your deliberations.  This will acquaint

18  you with the questions you are going to have to answer.  That's

19  number one.

20     Number two, the lawyers in their final argument have the

21  right to refer to the jury instructions I'm going to give you

22  after the argument is over, but they can't say "The judge will

23  instruct you."  They can say "I believe the judge will instruct

24  you" because the judge always reserves until the last possible

25  moment a final decision on any.

*16-20143; U.S.A. v. Belcher/Watson*

*Jury Trial*
*Monday, October 22, 2018/Volume 13*

*Vol. 13/Page 5*

1    Now, as to the verdict form, you will see Count One as to

2  Mr. Belcher:

3    "We, the jury, unanimously find the defendant,

4  Deaunta Belcher, on the charge of use of interstate commerce

5  facilities in the commission of murder-for-hire resulting in

6  death."

7    You will check one, not guilty or guilty.

8    Defendant Andre Watson.  "We, the jury, unanimously find

9  the defendant, Andre Watson, on the charge of use of interstate

10  commerce facilities in the commission of murder-for-hire

11  resulting in death:"

12    Not guilty, guilty.

13    Count Two, Conspiracy to Distribute.

14    "We, the jury, unanimously find the defendant,

15  Deaunta Belcher, on the charge of conspiracy to distribute

16  controlled substances:"

17    Not guilty, guilty.

18    The same question applies to Andre Watson.

19    The third question:  "We, the jury, unanimously find the

20  defendant, Deaunta Belcher, on the charge of using and carrying

21  a firearm during and in relation to a drug-trafficking crime on

22  September 11, 2015:"

23    Not guilty, guilty.

24    Question 2.  "Do you unanimously find that the use of a

25  firearm in connection with the commission of this offense

1 caused the death of Devin Wallace?

2      Yes, no.

3      Question 3.  "Do you unanimously find that the killing of

4 Devin Wallace with a firearm in connection with the commission

5 of this offense constituted first-degree murder?"

6      Yes, no.

7      The same questions as to Andre Watson.

8      Then, finally, there is a fourth part.

9      Count Four, misleading communication.  "We, the jury,

10 unanimously find the defendant, Deaunta Belcher, on the charge

11 of engaging in misleading conduct towards another person on

12 September 24, 2015 with the intent to hinder investigation of a

13 federal offense:"

14      Not guilty, guilty.

15      As I will tell you at the end, the answers to each

16 question must be unanimous one way or the other.  Thank you.

17      Mr. Cralle.

18      Show that to the defendants first, please.

19           **MR. HAUGABOOK:**  They have seen it, Your Honor.

20           **MR. SHEA:**  Yes, we have seen it, Your Honor.

21           **THE COURT:**  Hand it up so I can take a look at it.

22      Okay.  Thank you.  Go ahead.

23                                                    (9:36 a.m.)

24           **MR. HAUGABOOK:**  Good morning.

25           **THE JURORS:**  Good morning.

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 7*

1    **MR. HAUGABOOK:** Ladies and gentlemen, I want to thank

2   you for the fulfillment of your civic duty as jurors over the

3   last three weeks.  It has often been said that the performance

4   of jury service is one of the anchors upon which all of our

5   liberties as United States citizens rest upon.  So, on behalf

6   of the Government's trial team, I'm sure my brother counsel and

7   its trial team and this Honorable Court, we would like to

8   thank you for serving as jurors.  Our system of jurisprudence

9   is one of the things that makes us an envy of the world

10   because, whether you know it or not, there are still other

11   countries that don't have this system of government that we do.

12   So thank you.

13       Ladies and gentlemen, based upon the evidence, there is no

14   question Devin Wallace died at the hands of Andre Watson and

15   Deaunta Belcher.  Three of the five participants have all told

16   you of their collective involvement with Belcher and Watson in

17   that murder.  From this we know Watson, an enforcer on

18   Belcher's payroll, along with Brown, killed Wallace in exchange

19   for money and items promised by Belcher.  Phones were used to

20   coordinate it.  Money, cars and a condo were promised.  As a

21   result, Wallace died after Watson shot at him twelve times at

22   point-blank range, with six shots directed to Wallace's head.

23       Before you go back to deliberate I want to describe to you

24   how the evidence you heard over the past three weeks satisfies

25   the elements of the crimes charged beyond a reasonable doubt

1   starting with Count One, Murder for Hire.

2        First, both Deaunta Belcher and Andre Watson are charged

3   with use of a facility of interstate commerce in the commission

4   of a murder for hire.  That sounds complicated, but really it's

5   not.  There are four elements or four different things you must

6   find beyond a reasonable doubt to find the defendants guilty of

7   this offense.

8        First, that the defendants used or caused another person

9   to use a facility of interstate commerce or foreign commerce.

10  In this case that facility is a cellular phone.  So you will

11  simply need to decide whether Deaunta Belcher and Andre Watson

12  used or caused someone else to use a cell phone in connection

13  to this murder-for-hire scheme.

14       Second, that the cell phone, or phones, were used with the

15  intent that a murder be committed.

16       Third, that this murder was done in exchange for something

17  of value.  In other words, it was committed for money, a car or

18  something of value.  Also, that money need not have changed

19  hands actually.  All that is required is a promise to pay

20  someone in exchange for the murder; and

21       Four, that death resulted and that death satisfies the law

22  of Michigan for first-degree murder.

23       During this trial over the past three weeks the evidence

24  has shown that on September 11, 2015 at roughly 5 o'clock

25  Devin Wallace sat outside They Say Restaurant in a white

1 Mercedes Benz, a car that his widow and even Defendant Belcher

2 said he did not frequently drive.

3      Wallace sat in his car talking to Darnell Bailey, his

4 supposed good friend and business partner in a fraudulent car-

5 and truck-trafficking scheme.  Mr. Bailey is the cousin of

6 Defendant Belcher, their other partner in the fraudulent car-

7 and truck-trafficking scheme, who also engaged in drug dealing

8 with Wallace and others.

9      The evidence has shown that their drug dealing was

10 intertwined with their car fraud scheme because certain drug

11 customers' identities were used as sham car buyers in

12 conjunction with other drug customers who worked at the

13 dealership, employees, to push the paperwork through, all

14 for the purpose of faking the purchaser identities on cars

15 that ultimately were subleased to other people in the

16 drug-trafficking world or other drug dealers.  The cycle of

17 drug dealing and car fraud was completely entangled and

18 repeatedly fed itself.  In fact, they were two sides of the

19 same coin.

20      The evidence has shown that an unsuspecting Wallace

21 thought that he was going to meet with several other men,

22 including Deaunta Belcher and Darnell Bailey, to discuss a

23 business deal, but that meeting never happened because days and

24 weeks before this date and at least before August 25th a

25 nefarious plot to kill Wallace was hatched at a meeting at

1  Zeidman's between Belcher, a/k/a Byrd; Bailey, a/k/a Gino;

2  Brown, a/k/a Twin; and Watson, a/k/a Dre, Lil Stunna or Stunna.

3       From the evidence, we know that the plot to kill Watson

4  was in effect by August 25th of 2015 because information from

5  the call detail records or CDRs, as will be discussed in

6  Exhibit 16.13 and 13.5, along with the testimony of Bailey and

7  Brown about a failed attempt, tell us so.

8       Bailey said there was a failed attempt to kill Wallace at

9  the Pantheon Nightclub in Dearborn.  Brown said he and Watson

10 went there based upon a call from Belcher and that they

11 followed Wallace but could not keep up with him.

12      As seen in Exhibit 16.14, Belcher, Watson and Brown all

13 talked on August 25th.  As depicted in Exhibit 13.5, you can

14 see that on August 25th, 2015 Wallace was in the vicinity of

15 the Pantheon Club around the same time as Brown and Watson.

16 Wallace's number ended in 5618, Brown's ended in 1332, Watson's

17 ended in 3909.  In other words, everyone's phone is in the same

18 area.  Everyone was in the same area.

19      On the fateful day of September 11, 2015 the evidence has

20 shown that Wallace, as we are going to see in Exhibit 2, pulled

21 up outside the restaurant at 16:34:05.  Recall that the clock

22 on this video was a minute and 45 seconds fast.  In other

23 words, based upon the time in the video, he really pulled up at

24 16:32.  So, ladies and gentlemen, as you saw in the video, you

25 have to subtract a minute and 45 seconds to get the true time.

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 11*

1   As we are about to see in Exhibit 13.7, by the time the
2   victim pulled up and parked, Chambers, Brown and Watson are
3   already on the way to his location in Chambers' 2007 black
4   Charger.  Looking at Exhibit 13.7 and the testimony of
5   Chambers, Brown and Agent Jenson, between 4:25 and 5:10 p.m.
6   Chambers is en route southbound from Faircrest Street with
7   Brown, his front seat passenger, and Watson, his rear seat
8   passenger, in response to Belcher's follow-up call to Brown
9   about a definite location, that being the They Say Restaurant
10  location, to find, as Brown testified, the big fish on the
11  line.

12      By 16:51:30, as depicted in Exhibit 13.7, Watson, Brown
13  and Chambers have reached the area of They Say Restaurant.  As
14  you can see in Exhibit 13.8, Watson's and Brown's phones are in
15  the immediate area before, during and after the murder.  Recall
16  that Chambers and Brown both told you they were in the car as
17  driver and front seat passenger respectively and that
18  Andre Watson was the rear seat passenger, who exited the car
19  and killed Wallace.

20      As we are about to see in Exhibit 16.5, within that same
21  block of time Brown and Belcher are in contact with one another
22  numerous times.  There is even contact with Belcher from
23  Watson's phone, which aligns with Brown's testimony that due to
24  a battery issue he borrowed that phone from Watson and used it
25  to call Belcher.  Remember, Brown says those calls were related

1   to execution of the plan hatched at Zeidman's to kill Wallace,

2   and, and, and by his refusal to tell the Detroit Police the

3   truth about all he talked about, about all he talked to before

4   and after the murder.

5        I'm sorry, let me start over.  To tell DPD the truth about

6   who all he talked to before and after the murder, Defendant

7   Belcher by that glaring omission and untruth tells you himself

8   that it was indeed Brown he was talking with when he was

9   talking with him about killing Wallace.

10       You saw that video interview with the Detroit Police

11  Homicide Detectives Mitchell and Lucy where they confronted

12  Belcher regarding the number belonging to Stephen Brown and the

13  number of contacts between Belcher and Brown's phone.  In the

14  interview the detectives told Belcher his phone had contact

15  with Brown's phone 188 times the month before September 11,

16  2015 and at least 23 times on the day of the murder.

17       In the interview Belcher refused to say the 1332 number

18  was Brown's or Steph's, as he called him; refused to say he

19  associated with Steph or that he ever talks to Steph, for that

20  matter, even though he talked to Brown as he pulled up to the

21  They Say Restaurant on September 11th, which I'll talk about

22  more in a moment.  In the interview Belcher said the last he

23  heard of Steph was in jail and refused to admit he even knew

24  his last name.  But, as you saw from the video, Detective

25  Mitchell found Brown's full name and picture in the Facebook

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 13*

1   contact from Belcher's phone, one of the second phones he

2   possessed in that interview.

3       But, suffice it to say, Defendant Belcher, by those

4   glaring omissions and untruths, tells you himself that it was

5   indeed Brown that he was talking to.  Defendant Belcher, by all

6   of those glaring omissions and untruths, tells you himself that

7   the calls between he and Brown involved a plan to kill Wallace.

8       Also, recall before the murder he had told his then fiance

9   and drug coconspirator Miss Latasia Banks that Bailey asked him

10  to help take out Wallace, and when confronted by Banks after

11  the murder, he confessed and in his own words said, "Nigga was

12  greedy and had to go."

13      As we are about to see in Exhibit 4, by the 16:48:04 mark

14  in conjunction with Exhibit 16.7, you can see that as Belcher's

15  Camaro arrives he has just been in contact with Bailey's phone,

16  he had just been in contact with Bailey's phone, and he is in

17  contact with Brown's phone twice, a 10-second and a 95-second

18  call.  These are outbound calls, meaning Belcher is calling

19  Brown, calling Brown's phone.

20      The 95-second call starts at 16:48:24 of Exhibit 16.7 and

21  Exhibit 4.  That means, ladies and gentlemen, that that

22  95-second call runs until 16:49:59, and as you can see from the

23  video, Mr. Belcher is still in the car.  He never exited the

24  Camaro until he completed that call with Mr. Brown.  Therefore,

25  before he even gets out of the car with his daughter he is on

1    the phone engaged in fulfilling the plan to execute Wallace.

2        Next, we will look at another clip from Exhibit 4, which

3    ends at the 16:53:03 mark, and compare it with Exhibit 16.7.

4    From this clip you can see that Belcher is back into his

5    Camaro, and a second later at 16:53:04 when we look at

6    Exhibit 16.7 he gets a call from Andre Watson's phone, another

7    call he refused to acknowledge to Detectives Mitchell and Lucy.

8        Looking at Exhibit 13.7, you can see that at 16:51:31, by

9    that little box down there closest to -- it looks like it's

10   sitting in the water there, you can see that at that time when

11   we look at Exhibit -- when we look at that, you can see that he

12   gets a call from Andre Watson's phone number and you can see

13   that Watson's phone is indeed in the immediate area of the

14   restaurant.  In fact, it is already in the area before making a

15   46-second call to Belcher's phone.

16       Brown and Chambers told you that on the -- Brown and

17   Chambers told you that on the ride to They Say Brown and Watson

18   shared each other's cell phones to talk to Belcher.  In fact,

19   Brown told you that due to a battery issue he used Watson's

20   phone to call Belcher.  Remember, Brown told you that they were

21   sitting on the corner of Joseph Campau and Jefferson for a few

22   minutes and there was a phone call with Belcher.

23       Looking at another clip from Exhibit 4, which starts at

24   the 16:53:04 mark, you can see, when we look at Exhibit 16.7,

25   you can see that that call that starts at 16:53:04, which lasts

1   46 seconds, is enough and just long enough for Belcher to

2   arrive a block away onto eastbound Wight Street.  Brown

3   testified Belcher was told they were nearby, and Brown told you

4   they saw Belcher pull off in that Camaro.  As we just saw,

5   Watson's phone was there at 16:51:03, about two minutes before

6   the call and two minutes before the defendant pulled off, and

7   as Brown told you, they could see him pull off in the white

8   Camaro.

9        The evidence proves that by the time he got home a block

10  away to attempt to drop his daughter off, Belcher already made

11  the phone calls to carry out the plan hatched at Zeidman's to

12  kill Wallace.  Given the testimony Belcher was paying for this

13  and held a bitter animosity with Wallace, this all explains why

14  Belcher was definitely in a rush to get in and out of the

15  house, like Ms. Banks said.

16       Belcher wanted to get in and out of the house because, in

17  his words, he had a play on the floor with Darnell Bailey, and

18  that play, ladies and gentlemen, was to kill Wallace.  I submit

19  that Belcher wanted to get back so he could watch the aftermath

20  of Wallace's execution and commence the false narrative that

21  Wallace was killed for snitching.

22       His daughter's return to the scene with him was by sheer

23  happenstance and accident.  In fact, her presence in the car

24  with Belcher did not even stop his phone call and planning with

25  Brown when Belcher first pulled up and parked outside the

1  They Say Restaurant before the murder.

2      Looking at another clip from Exhibit 4, which starts at

3  the 17:03:42 mark, which we will later compare with this

4  Exhibit 16.7.  You can see that after the shooting occurs

5  Bailey is at Belcher's car a block away on Wight Street at

6  17:04:23.

7      Looking at another clip from Exhibit 4, which starts at

8  the 17:04:24 mark, which we will compare to Exhibit 16.7.  You

9  can see Belcher then headed westbound on Wight and circled the

10 block before arriving back at the restaurant scene.

11     Belcher's Camaro arrives and parks on southbound

12 Joseph Campau at the corner of Franklin at 17:06:02.  By the

13 time this clip ends at 17:06:06, in that short window that it

14 takes for him to leave Wight and circle the block and get

15 there, you can see that he doesn't get out the car until after

16 he has had a 36-second call with Andre Watson on the phone.  If

17 you do the math, 17:05:30 plus 36 seconds will take you to

18 17:06:06, which is just before he gets out of the vehicle right

19 there.  As you can see, Belcher was on the phone with Watson

20 before he got out of the car after returning to the scene, and

21 yet that's another communication he denied making to detectives

22 Lucy and Mitchell.

23     You know that payment was promised to Brown and Watson

24 because Brown told you so.  Chambers testified that while in

25 jail Brown said he received some money but was due more.  Brown

1  also testified about this conversation and said he promised to

2  give Chambers a cut of the money he was to receive from

3  Belcher.

4      You also heard that Brown called Belcher for payment and

5  was directed to Bailey, who promised to pay him at Motor City

6  Casino, but Brown could not go because he was on tether and he

7  sent Watson instead.

8      Bailey told this account as well.  You also heard that

9  Brown called Bailey, who said he gave $10,000 to Belcher to pay

10 them.  Brown then contacted Belcher, who said he gave it to

11 Watson, yet Brown did not get a cut of the money.

12     You heard that in one instance Brown sought money from

13 Belcher, but Belcher mocked him and questioned whether he

14 deserved any because he failed to shoot directly with his .40

15 caliber gun.

16     You also heard that Brown was getting the runaround

17 regarding full payment from Belcher.  In fact, Brown and

18 Chambers told you about Brown's hunt for him in the

19 Warren-Conner projects.  Chambers and Brown both told you they

20 found him and that Brown was paid.

21     Brown said he even went there with an AK-47 or chopper

22 because he was so incensed that he was getting the runaround

23 and the money was not being paid off as promised.  You heard

24 Brown say as a result he received some money from Belcher the

25 evening of that encounter in the projects.  You also heard, it

1  was brought out on cross-examination of Agent Rienerth, that

2  Brown told Rienerth he was offered a house and car by Belcher

3  for killing Wallace.

4  Ladies and gentlemen, the Government has overwhelmingly

5  proven the elements of Count One, murder for hire, involving

6  Defendants Belcher and Watson.  Both Belcher's and Watson's

7  involvement with the others in this killing has been

8  established by the testimony of the witnesses and the evidence,

9  and I believe the Court will instruct you on what evidence is.

10  It's the testimony of witnesses and the exhibits admitted into

11  evidence and any stipulations and anything else that the Court

12  tells you you may consider as evidence.

13  However, there is even more evidence of Watson's guilt

14  because of his lies to Agent Rienerth.  You recall Agent

15  Rienerth, who not only testified about the creation of

16  Exhibit 16, but he also testified about his interview of

17  Watson.  Agent Rienerth said that Watson admitted the 3909

18  phone number was his.  A phone with that number was seized by

19  Detroit Police during a traffic stop and arrest of Watson's

20  female companion, as testified to by Officer Penn.

21  However, just like Belcher, Watson's untruths proves his

22  guilt and involvement also.  Watson told Rienerth he did not

23  even know anyone named Chambers, but as we see in Exhibit 24C,

24  he had three contacts for B.J. Chambers saved in his phone,

25  including Chambers' number ending in 1987.  Likewise, in

Exhibit 17B, Chambers had Watson's 3909 phone number saved in his phone under the name Stunna.  Watson said he did not know or associate with Steph, even though there was a video on his phone of him and Steph Brown that was made a couple weeks before their arrests.

Watson denied going downtown or near They Say even though his phone shows him in the area at about the 16:51:03 mark until the murder was concluded.  While in the area, Watson's phone was in contact with Belcher's or Byrd's phone and remained there throughout the murder.  Watson denied knowing Byrd, but as we see in Exhibit 24D, Brown had several entries in his phone for a Byrd and described him as a tall, skinny light-skinned man.  As you heard from Agent Rienerth, those numbers there were other numbers found for Belcher in his drug-trafficking activity.

The lies of Defendants Belcher and Watson in the face of the independent cell phone evidence, such as cell site location and actual cell phone content, coupled with the testimony of Chambers, Brown, Jackson, Bailey, and Ms. Banks, proves these defendants' guilt as to Count One.

There's no question these defendants used a phone, an instrument of interstate commerce, with the intention to commit a murder.

There's no question that they did so based upon a promise to pay.  Brown even mentioned he was promised money, a car and

1   a condo.  This is consistent with Belcher's capability to pay

2   because Ms. Banks told you about Belcher's involvement with a

3   drug customer realtor and Belcher's exchange of a car for a

4   condo or house.  Also, you know that Belcher was involved in a

5   car fraud scheme so it stands to reason that Belcher could

6   indeed promise such things.

7        There is no question these defendants caused the death of

8   Wallace.  They intended to kill him, when you can take into

9   account the Zeidman's plan, the surveillances, the failed

10  attempt on August 25th, and finally the 12 shots fired at

11  point-blank range on September 11th.

12       There's no question that this was a premeditated killing.

13  You take into account the Zeidman's plan, the surveillance, the

14  August 25th attempt, the two calls to Brown about big fish on

15  the line with a promise to call back with a definite location,

16  and in fact a call back with a definite location at They Say,

17  and the calls with the Brown and Watson phones as Defendant

18  Belcher was arriving to the restaurant location, again calls

19  which he denied making and lied about who the other person was

20  on the line when he was interviewed by Detroit Police.

21       The evidence has shown that the execution of this

22  nefarious plan on Mr. Wallace by all participants, including

23  Chambers as the driver, and these two defendants, Belcher and

24  Watson, on September 11 was just plain heinous and cold

25  blooded.

1      As we see from Exhibit 6CC and Exhibit 11, Watson shot at

2  Wallace twelve times, and six of the nine shots struck Wallace

3  in his head.  Nine took effect to his body, four of which

4  exited his head, while the remaining two were removed during an

5  autopsy.

6      There's no question the killing of Wallace was deliberate.

7  The Defendant Belcher had the opportunity to weigh the pros and

8  cons as he pulled up on Franklin Street in the first instance.

9  Watson had the same opportunity as he took that long ride from

10  Faircrest down to They Say, as he sat at the corner of

11  Joseph Campau and Jefferson, even as he sat at the corner of

12  Franklin and Chene watching the events ahead of him.  They each

13  had the opportunity to reflect upon it, weigh the pros and

14  cons.

15      Moving on to Count Two, Conspiracy to Distribute

16  Controlled Substances.  There's overwhelming evidence about

17  Belcher's drug dealing, from the jail call where he sent

18  Ms. Blanks to pick up drug money and deliver drugs, the

19  testimony of Ms. Banks, the testimony of Frank Aday, the

20  drug-related text messages and notations in Belcher's phone,

21  the testimony of Brown that Belcher supplied him with

22  marijuana, the testimony of Bailey regarding Belcher's drug

23  dealings with Wallace and others, and the testimony of Jackson

24  regarding admissions told him by Bailey, which were admitted to

25  you, Mr. Jackson testified for you, to show that Mr. Bailey was

1   being consistent about everything he told you later here in

2   court because before he even had a deal or anything like that

3   he had a catharsis.  He started explaining himself to

4   Mr. Jackson.

5        And there's no question about the inseparable role the

6   drug dealing played in the fraudulent car scheme.

7        There's no question Belcher conspired with others to

8   distribute and did distribute drugs such as marijuana, cocaine

9   and oxycodone.

10        There's no question that the drug conspiracy fed into the

11   car scheme and vice versa.

12        There's no question Belcher knowingly and voluntarily

13   joined the conspiracy with all of his drug coconspirators.

14        With regard to Mr. Watson in Count Two, the elements are

15   there was a conspiracy or agreement among two or more people to

16   commit an illegal act, to wit, sell drugs and the defendant

17   knew of or joined the conspiracy.

18        There's no question that Belcher's car fraud/drug

19   conspiracy existed or that two or more persons conspired or

20   agreed to join it.  So did Watson.  You heard testimony that

21   Watson was an enforcer for Belcher.  That was his role in

22   connection to the drug conspiracy.

23        You heard testimony that Watson was at Zeidman's where

24   Belcher offered him and Brown compensation to kill Wallace.

25   Recall that this was a scheme prompted in part by Belcher's

1  drug trafficking.

2      Afterwards, Watson did surveillance with Brown for the

3  express purpose of finding and killing Wallace.

4      From the testimony of Chambers, Brown and Bailey, who says

5  Belcher told him Watson was the killer.

6      Watson was there on September 11th with his phone and did

7  the killing.

8      Given that Belcher denied calls with Brown's or Watson's

9  phones and Watson denied knowing this Byrd when interviewed by

10  Agent Rienerth and Watson had no explanations for why his phone

11  was in connection with Belcher's or this Byrd's phone on

12  September 11th, coupled with Watson's denial of being in the

13  area of They Say when his phone does put him there by at least

14  16:51:30, all of this shows Watson's consciousness of guilt.

15  It shows Watson's attempts to hide his connection to Belcher

16  and his whole involvement in this murder scheme.

17      One does not solely have to join the car fraud/drug

18  conspiracy as a dealer or customer.  Also, this Court may give

19  you an instruction that to join a conspiracy does not require

20  proof that Watson knew everything about the conspiracy or

21  everyone involved.  Also, I believe this Court may instruct you

22  that once a conspiracy is shown an individual's slight role or

23  connection is enough to find him guilty.  Ladies and gentlemen,

24  that is satisfied by Watson's role as the enforcer for Belcher.

25      Moving on to Count Three, Use of a Firearm.  The third

1   charge is use of a firearm during and in relation to a

2   drug-trafficking crime.  This count dovetails with the drug

3   conspiracy I just finished talking with you about.

4        With regard to Count Three, causing death through the use

5   of a firearm during and in relation to a drug-trafficking

6   crime, to be clear, ladies and gentlemen, although Belcher did

7   not use a gun, the law does not require him to personally use

8   the gun for him to be guilty of this offense.

9        I believe this Judge may instruct you that a person can be

10  guilty of this charge as an aider and abettor or as a

11  coconspirator.  Here, although Watson used a gun and committed

12  the murder, he was aiding and abetting Belcher, who offered to

13  pay him and Brown to commit the murder.  You even heard from

14  Brown that before this proffer was made he didn't know Wallace,

15  he had no reason to go and find Wallace, he had no reason to

16  kill Wallace.

17       There's no question Belcher committed the drug-trafficking

18  crime that was interwoven with this car fraud scheme.  In fact,

19  Belcher and Bailey lured Wallace there to participate in the

20  car fraud and drug-trafficking scheme.  There's no question

21  Belcher and Bailey wanted Wallace dead because of disputes that

22  arose during and in relation to that car fraud and

23  drug-trafficking scheme.

24       There's no question, based upon the testimony, cell site

25  analysis and physical exhibits, that Chambers, Brown and Watson

1  were all there.  Even surveillance video puts Bailey and

2  Belcher there.

3      There were two guns, a .40 caliber and a 9mm, and the

4  testimony was that Watson used the 9mm which killed Wallace.

5      You heard from MSP Officer Molnar, and he told you twelve

6  of those casings were 9mm, eleven of them came from the same

7  gun.  He talked about one just being kind of unavailable to say

8  it was or wasn't, and I submit to you when you looked at the

9  video you saw at least seven or eight vehicles that rolled

10 through there or what have you.  I submit that's what made that

11 inability to read that last shell.  But he also told you that

12 there was a .40 caliber casing there as well.

13     There's no question a gun or guns would be used because

14 the killing had to be quick and fast.  There's no question

15 Watson did the killing based upon Belcher's admission to Bailey

16 and the testimony of Brown and Chambers as supported by the

17 cell site analysis and the spent bullets and gun casings.

18     There's no question that an unsuspecting Devin Wallace

19 lost his life due to twelve of the 9mm bullets being fired at

20 him and six hitting him in the head all at point-blank range.

21     For aiding and abetting I believe that this judge will

22 tell you in the instructions that any assistance is enough.

23 Belcher's assistance to Wallace was the Zeidman's offer of

24 payment to commit the murder, the passing along of information

25 to Watson through the phone call with Brown, the location as

1  well as who was standing outside the car and who was seated

2  inside.

3      As that surveillance video proves, in the split second

4  that he exited the car Mr. Watson already knew to avoid Bailey

5  and go straight to the occupant of the car.  Think about it.

6  Mrs. Wallace said her husband rarely drove that car, and in his

7  video interview Belcher recounted only three times of seeing

8  Mr. Wallace inside that car.  Brown said he and Watson got

9  their information about what cars Wallace drove from Belcher.

10  Brown even talked about seeing Mr. Wallace in a Jeep, in a

11  white Jeep.

12      It took Belcher and his calls to the Brown/Watson phones

13  on September 11 to tell them Wallace was inside that Benz.

14  Even in their failed attempt at surveillance Brown told you and

15  testified that he merely saw Wallace in a white Jeep.  Watson

16  assisted Belcher by performing the execution of Wallace with

17  the firearm based upon the information Belcher passed to Brown

18  as relayed to Watson that Wallace was the occupant of the car

19  and Bailey was standing outside.

20      For Count Three there is another way in which both

21  defendants are liable, and that is under the rule of law that

22  the acts committed by one coconspirator is attributable to all

23  of the members of the conspiracy.  These defendants conspired

24  at Zeidman's to commit a murder.  As I mentioned before, it

25  obviously had to involve a gun or guns to be quick and fast.

*Government's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 27*

1  Both of these defendants joined the conspiracy at the Zeidman's

2  meeting and remained in it until the killing of Wallace was

3  achieved.  The deliberate killing of Wallace was done to

4  continue the car fraud drug scheme without Wallace's

5  participation and interference in the money earned from the

6  scheme.  The killing of Wallace, ladies and gentlemen, was

7  obviously committed during and in relation to the car

8  fraud\drug-trafficking scheme.

9      Count Four, Obstruction.  The fourth and final charge

10  relates to Deaunta Belcher only.  He is charged with making

11  misleading statements to police to hinder the investigation.

12  The evidence is that Belcher knowingly tried to mislead police

13  in September 2015 when he told them:  One, he didn't know

14  Stephen Brown personally; that he did not have Stephen Brown's

15  phone number, two; and three, that he thought Stephen Brown was

16  still in jail.

17      With regard to Count Four, Obstruction of Justice,

18  Defendant Belcher, by being untruthful about calls to his phone

19  before and after the murder, claiming he didn't know

20  Stephen Brown, claiming Stephen Brown was still in jail,

21  claiming the 1332 number belonged to Block, claiming he didn't

22  associate with Stephen Brown, claiming he didn't know

23  Stephen Brown's last name, these false statements obstructed

24  justice.  Deaunta Belcher should have known these false

25  statements would be passed along to DEA because he planted the

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 28*

1   cover story moments after the murder, and you heard what that
2   story was, that Wallace was killed for snitching in a federal
3   investigation.  In fact, I submit he thought his false
4   statement would send the investigation in a different
5   direction, away from him, his cousins Bailey and Brown, and
6   Watson to other drug dealers already under investigation by the
7   DEA.
8        Ladies and gentlemen, over these last three weeks the
9   Government has provided you with overwhelming evidence
10  consisting of exhibits and testimony to prove the defendants'
11  guilt for each crime charged beyond any doubt, certainly beyond
12  a reasonable doubt.  As a result, we ask you to return the only
13  verdict which this evidence supports, and that's that the
14  defendants are guilty on each and every count as charged.
15       I thank you for your time and attention.
16            **THE COURT:**  Mr. Shea.
17            **MR. SHEA:**  Yes.  Thank you, Judge.
18       Good morning, ladies and gentlemen.  I want to start by
19  addressing the less-serious counts because I'm not going to
20  spend a lot of time on them.  I'm going to start in fact with
21  Count Four, which is the count that charges Mr. Belcher with
22  obstruction of justice.
23       One of the elements that -- well, first, I mean, obviously
24  one element is that the person charged did something to mislead
25  or try to deceive law enforcement, and you heard the audio

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 29*

 1  clips of Mr. Belcher's statements to the police on September

 2  the 24th.  This count relates to his interview with DPD on

 3  September the 24th, and I don't think you are going to have too

 4  hard a time concluding that he didn't tell the truth all the

 5  time in that interview, particularly when it came to his

 6  relationship with Mr. Brown.

 7      However, another critical element of that count is that he

 8  must tell those untruths with the intent to hinder, delay or

 9  prevent the communication of that information to a federal law

10  enforcement officer.  I don't think there's any evidence

11  whatsoever to suggest that when he was talking to Detectives

12  Mitchell and Lucy on September the 24th at the Detroit Police

13  Department that he had the specific intent to somehow --

14  whatever it is he was saying was going to get communicated to a

15  federal law enforcement officer.  So I think that, absent that

16  element, you can't convict him of that count.

17      With respect to Count Two, the drug conspiracy, and as I

18  said to you in opening statement, there's been a lot of

19  evidence that's been presented to the effect that Mr. Belcher

20  was a drug dealer and that in connection with his drug dealing

21  he engaged with various people who in one form or another

22  assisted him in connection with that.  That would include

23  Frankie Aday.  That would include Steph Brown.  That would even

24  include Latasia Banks, according to the evidence.  And, of

25  course, you heard Mr. Belcher admit that he was a drug dealer

1    to police on September the 24th.  So the fact that he was a

2    drug dealer is not in dispute.

3           As I also said to you in opening statement, that doesn't

4    make him a murderer, and he's -- Count Two just charges him

5    with the drug conspiracy.  Count Three charges him with the

6    murder of Devin Wallace as an outgrowth of the drug conspiracy.

7    And merely because you may believe that the Government is

8    satisfied with its proofs with respect to Count Two doesn't

9    mean the Government has satisfied its proofs with respect to

10   Count Three, and that's what's of critical importance to

11   Mr. Belcher today.  Nor does the fact that Mr. Belcher was a

12   drug dealer conclusively prove that Andre Watson was in that

13   conspiracy.

14          The fact that Mr. Belcher may have associated with

15   Frankie Aday and Nancy Eaton, Latasia Banks and Steph Brown

16   doesn't mean he's associated with Andre Watson in connection

17   with those drug-dealing activities.  I'll let Mr. Johnson

18   address that more fully because I think that more centrally

19   goes to his client's concerns, but I wanted to point that out.

20          It should be obvious to everybody in this courtroom that

21   the main reason why this trial has taken place is over, at

22   least from Mr. Belcher's point of view, is over whether or not

23   Mr. Belcher was involved in the death of Devin Wallace.  So I'm

24   going to turn to that, and I'm going to spend the rest of my

25   time on that issue, that broad overarching issue.

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 31*

1    And I want to start by saying -- this may help you

2  understand my argument, the structure of it as I go through,

3  and it may help me as I try to keep it structured as I go

4  through.  There are three broad reasons why I will be arguing

5  to you at the conclusion of this summation why I believe you

6  need to acquit Mr. Belcher of the murder charges.

7    First, the Government's case relies primarily on you

8  believing beyond a reasonable doubt a collection of very

9  untrustworthy people, who are habitually untrustworthy, who

10  have lived practically their entire adult lives as being

11  untrustworthy.

12    Second -- and I am talking about again primarily

13  Billy Joe Chambers, Darnell Bailey and Steph Brown.  We'll talk

14  about Latasia Banks and Sean Jackson in a little bit, but the

15  three primary witnesses whom the Government relies on are

16  Chambers, Bailey and Brown.

17    Second, not only did Chambers, Bailey and Brown

18  demonstrate through their lifestyle that they are untrustworthy

19  people, they have undeniable and clear motive to lie about

20  Mr. Belcher in this case.

21    And, third, the evidence that the Government points to

22  that it would argue corroborates these untrustworthy people's

23  version of events does not necessarily corroborate those

24  untrustworthy people's version of events.

25    So, with that sort of structure, let's dive into it in a

1    little more detail.  Let's start with what we know for sure

2    because even the untrustworthy people admit it.

3        We know that Chambers, Brown and Bailey were involved in

4    the murder of Devin Wallace.  Bailey tried like heck to say he

5    wasn't really, and we'll talk about that in a minute as well,

6    but we know, I mean these people have pled guilty to murder for

7    hire.  It's not a whodunit when it comes to them.  The issue is

8    can the Government prove beyond a reasonable doubt to you that

9    Deaunta Belcher was part of their conspiracy.

10       I believe the judge will instruct you, I believe the judge

11   will instruct you that proof beyond a reasonable doubt is proof

12   that is so convincing that you would not hesitate to rely on it

13   in making the most important decisions in your own lives, and I

14   submit to you that the testimonies of Chambers, Bailey and

15   Brown aren't that kind of proof, don't carry that kind of

16   convincing weight.

17       We know that Stephen Brown previously had been convicted

18   multiple times of felonies involving theft and stolen property.

19   We know that he was on parole at the time of the murder.  We

20   know that he's 29 years old.  For virtually all of his 20s he

21   was locked up.

22       We know that Billy Joe Chambers had multiple convictions

23   involving stolen property and robbery.  We know he was on

24   parole at the time of the murder.

25       We know that Darnell Bailey had multiple convictions,

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 33*

1   three I believe, two for unemployment insurance fraud, one for

2   receiving and concealing a stolen automobile.  He was on

3   two separate probations at the time of the murder, and we know

4   that he was engaging in various ongoing frauds, notwithstanding

5   his convictions, up to and through the time of the murder.  We

6   know that Darnell Bailey was so incorrigible in connection with

7   his frauds and deceptions that he sought to educate others,

8   like Sean Jackson, while he was locked up on how to commit

9   frauds and deceptions.

10      We know that he even had his family send a deceptive

11  letter to Judge Marlinga in the Macomb County Circuit Court

12  seeking early discharge from probation, telling the Court that

13  he was at present locked up on charges of murder but that he

14  wasn't a murderer.  This was in October of 2017, a few months

15  before he pled guilty to being a murderer.

16      I don't think I'm saying it too strongly when I say that

17  Misters Brown, Chambers and Bailey are habitual liars and

18  cheats.  Then they come to this case.  During the investigation

19  of this case they remained true to form.

20      Billy Joe Chambers had three separate police interviews.

21  He lied until -- about his own involvement until the very end

22  of the third interview.

23      Mr. Bailey spoke to police twice on September the 11th,

24  wasn't forthright with them; spoke to them on September 17th,

25  wasn't forthright with them; spoke to them on March the 8th,

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 34*

1  wasn't forthright with them.  Always played off that he didn't
2  know anything about it, that he suspected that Wallace was
3  killed by others because he was snitching.

4      Mr. Brown, likewise, in the first interview he gave with
5  the federal agents on March 9, 2015 acknowledged lying
6  throughout that.

7      When they ultimately confessed their involvement, when
8  eventually they put themselves in the crime, they didn't do it
9  out of some sense of moral obligation or ethical obligation.
10 Mr. Chambers told us that he confessed because law enforcement
11 showed him the evidence and he didn't want to go away for life.

12     Mr. Bailey confessed after reviewing the indictment and
13 after having been told by police repeatedly on March 8th, 2016
14 that he needed to do damage control, and they were offering him
15 a way out through cooperation from a life sentence.

16     Stephen Brown acknowledged to us that he had been locked
17 up for most of his 20s, as I have previously mentioned, and he
18 wanted an opportunity to get out some day, and the Government
19 gave him that opportunity through cooperation.

20     None of these people ultimately came to Jesus with respect
21 to their involvement in these cases because they had all of a
22 sudden an epiphany about doing the right thing.  They all came
23 to the table because they wanted something pretty important to
24 them in return, and the fact they didn't have a plea agreement
25 yet doesn't change that elemental fact.  These people came to

*16-20143; U.S.A. v. Belcher/Watson*

1  the table because they wanted something important in return.

2  Their lack of candor continued through their testimony at

3  trial.  Let's start with Mr. Chambers.  No fewer than six times

4  he refused to answer my questions.  I didn't count how many

5  times he refused to answer Mr. Johnson's questions.

6  At least twice he acknowledged testifying at trial

7  differently than he had testified before the grand jury.  At

8  least once he acknowledged testifying at trial to you

9  differently than he had told law enforcement just three weeks

10  earlier.

11  In connection with that last one, you will remember him

12  testifying about bleaching the car and you will remember him

13  testifying to you that Steph Brown didn't help him bleach the

14  car, and then he acknowledged having told law enforcement

15  three weeks earlier for the first time that he had bleached the

16  car and that Steph Brown had helped him.

17  The point is this.  Ultimately Mr. Chambers agreed with me

18  that he didn't always tell facts the same way, and isn't that

19  sort of the essence of somebody who is untruthful and

20  unreliable and how can you believe him in connection with the

21  most important decisions of your life?

22  It also tends to put the lie -- Mr. Chambers had these --

23  it's been a long time, but I think you probably can remember

24  back.  Mr. Chambers had a way of speaking that was kind of

25  repetitive, and one of the things that he kept repeating was "I

lied then, but I'm telling the whole truth now because my

cooperation agreement requires me to be truthful and honest

with the jury and with everybody in the courtroom."  Can you

remember him saying that any number of times?

     Well, when on cross-examination he has to acknowledge he

didn't tell the facts the same way twice even to you, it kind

of undercuts that sentiment.  And, furthermore, how would you

know with somebody like that when they really mean it?  Okay,

I'm telling you the truth now, I really mean it.

     Let's move on to Mr. Bailey and his testimony here.  He

constantly tried to weasel out of responsibility for

everything, it seemed, that he's done in his life that was

wrong.  Early on Mr. Cralle tried to get Mr. Bailey to explain

one of his convictions, it was the receiving and concealing a

stolen automobile conviction, and you will remember Mr. Bailey

saying, well, yeah, I pled guilty to it, but it was really a

technical violation.  I learned afterwards that when a car gets

repossessed it's not really mine anymore, it's theirs, and so

technically I was in possession of a stolen vehicle and that's

why I pled guilty to it.

     He told you that until he got involved with the Government

he didn't consider straw buying to be fraud.  He told you that

when he educated Sean Jackson as to how to commit frauds when

they were together in pretrial detention it was because he

wasn't used to the federal system and didn't realize that he

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 37*

 1  shouldn't have opened up to Mr. Jackson in that sense, in that

 2  respect.  He blamed Mr. Jackson for essentially getting the

 3  information out of him.

 4      He told you that he didn't know that the letter that his

 5  family sent on his behalf to the judge would say what it said.

 6  He told you he didn't know that Mr. Wallace was going to be

 7  killed on September the 11th.

 8      And his last words to me on cross-examination were:  "I

 9  don't feel like I should do any time except for the frauds, to

10  be honest with you," and this is from a guy who earlier this

11  year or late last year, I forget what day it was, but you could

12  check it out, on his Rule 11 Plea Agreement pled guilty to

13  Murder for Hire.  This is a man who not only doesn't have a

14  moral compass, he doesn't seem to have the capacity to be truly

15  forthright even when he's on the witness stand under oath and

16  talking to you.

17      Mr. Brown is another person who can't seem to tell --

18  can't seem to tell a story the same way twice.  I'll give you

19  some examples.

20      To you he testified that he received $500 directly from

21  Deaunta Belcher in partial payment for the murder.  To agents

22  he said he never received anything from Deaunta Belcher.

23      To you he said I didn't have any telephone conversations

24  with Darnell Bailey before the murder.  To agents he said he

25  did have telephone conversations with Darnell Bailey before the

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 38*

1    murder.

2          To you he said he didn't have any discussions with

3    Darnell Bailey after the Zeidman's meeting about getting the

4    murder done.  To agents he did have those discussions.

5          He couldn't keep his story straight even between day one,

6    when he testified on direct examination, and day two, when he

7    testified on cross-examination.  Again, some examples:

8          The Government asked him about whether he had gotten a

9    telephone call from Mr. Belcher about trying to locate

10   Mr. Wallace on Grand River near a mechanic shop, and Mr. Brown

11   said I got a telephone call from Mr. Belcher about that and

12   this occurred between August 26th and -- August 25th and August

13   the 31st.

14         On cross-examination the next time we were in court --

15   maybe it wasn't the next day, I don't remember if there was a

16   weekend in between because the dates blend together, but I

17   think it was the very next day -- his story had changed.  He

18   still says he got the telephone call from Mr. Belcher but that

19   it occurred sometime between August the 11th and August the

20   25th.

21         There is a second example, and then I'm going to tell you

22   why these are important.  On day one in direct exam after the

23   discussion of whether Mr. Brown was asked to try to locate

24   Wallace near Grand River and the mechanic shop, after that the

25   next line of questioning had to do with did you receive

*16-20143; U.S.A. v. Belcher/Watson*

 1  frequent calls from Mr. Belcher after that, between the end of
 2  August and September the 11th, and Mr. Brown described it yes,
 3  he had.  On cross-examination the next day he, again, changed
 4  his mind and, again, he said, well, those calls actually
 5  started -- I got frequent calls between August the 11th and
 6  September the 11th, an entire month.
 7      Why am I harping on this?  Why is this important?  It's
 8  important because, if you accepted Mr. Brown's testimony on
 9  direct day one, you would know they were lies because if you
10  look at the call detail records there were no telephone calls
11  from Mr. Belcher to Stephen Brown from August the 26th until
12  September the 9th.  He could not have been calling Mr. Brown to
13  try to find Wallace on Grand River between the 25th and the
14  31st.  He could not have been calling Brown frequently between
15  the end of the month and September the 11th because they
16  weren't having conversations or at least Mr. Belcher was not
17  calling Mr. Brown.
18      There are times when people aren't telling the truth
19  because they are simply mistaken.  People make mistakes.  Then,
20  there are times when people aren't telling the truth because
21  they don't want to be forthright.  Mr. Brown's -- I'm just
22  giving you some examples.  Mr. Brown's discrepancies, his
23  change of testimony from one day to the next, his change in
24  recollections from one interview to the next or from
25  one interview to his testimony today, they are too numerous,

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 40*

1    they are too regular to simply be mistakes.

2         Mr. Brown's demeanor with the Government was completely

3    different than his demeanor with me.  I could have challenged

4    him on whether the sun rose in the east, and he would have said

5    it didn't or he never testified that it did.

6         He clearly wanted to feed the Government the information

7    that the Government wanted fed and he wanted to fight with

8    everybody else, and he caught himself up in numerous

9    discrepancies as a result of that and that's a sign of someone

10   who doesn't have candor, who is not honest, who is deceptive,

11   not just someone who is mistaken.

12        In addition to these cooperators being liars by nature and

13   liars by habit, it can't be denied that they have a strong

14   motive to lie about Mr. Belcher in this case.  They knew that

15   the only way they were going to have an opportunity to walk the

16   streets again was to cooperate.

17        As we heard Sergeant Eby say to Darnell Bailey, they had

18   to tell on people.  That was the only way they could do damage

19   control.  Implicating Mr. Belcher was not hard to do even if it

20   wasn't the truth.

21        Mr. Chambers was shown four photos and asked to describe

22   the roles of each them.  Well, he knew that Mr. Belcher wasn't

23   in his car.  He knew that Mr. Belcher wasn't at the window of

24   the victim's car.  He knew that Mr. Belcher was a boss of

25   Stephen Brown in the drug business.  He knew that Mr. Belcher

1    and Mr. Bailey were associated.  It's not hard to say, well,

2    jeez, if I'm being shown the photograph he must have a role,

3    his role must be as some guy who gives instructions or is a

4    director of some kind or is behind the scenes in some fashion.

5    It's not hard to make that up.

6        With respect to Stephen Brown, by the time he was

7    cooperating he had the indictment and the indictment laid it

8    out.  This is the original indictment, which is in evidence as

9    Defendant's Exhibit G1, and if back in the jury room you look

10   at Defendant's Exhibit G1 and you go to Page 3 that describes

11   the manner and means of the conspiracy, you will see language

12   that says the Government alleges Deaunta Belcher agreed to pay

13   Stephen Brown a sum of U.S. Currency to murder Devin Wallace

14   because of his cooperation with the DEA.  You will see the next

15   paragraph says that Deaunta Belcher and Darnell Bailey arranged

16   to meet with Devin Wallace on the afternoon of -- at They Say

17   Restaurant, and it will continue on, regarding that being the

18   way that Wallace was killed.  Brown has the indictment by the

19   time he's cooperating.  He knows what the Government's theory

20   is.

21       With respect to Mr. Bailey, he also had the indictment by

22   the time he was cooperating, but in addition to that, he had

23   Sergeant Eby telling him in their interview in March of 2015

24   what everybody's roles were, and Sergeant Eby said to him, hey,

25   we know Belcher was the mastermind, you've got to tell on him.

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 42*

1  It's not hard for any of these three men to know how to frame

2  Deaunta Belcher within the Government's theory.

3      And Bailey was more than happy to adopt that theory

4  because if you look at the evidence it looks kind of compelling

5  that he actually was the one who organized this whole thing.

6  He acknowledged on cross-examination that he had plenty of

7  motive.  Wallace had cheated him out of tens of thousands of

8  dollars over the previous two or three years, and he detailed

9  it.

10      Brown told us that the Zeidman's meeting was initially

11  arranged between him and Belcher by phone so that he could get

12  a resupply of marijuana to sell.  He told agents that when he

13  was on that call with Belcher setting up that meeting he heard

14  another voice over the phone screaming about how the victim had

15  to be killed because he was messing with that guy's money.  At

16  the Zeidman's meeting he met Bailey and he recognized the voice

17  as having been Bailey's.

18      So the first contact, if Brown's statement to the agents

19  is to be believed, that he knew that somebody wanted the victim

20  dead was through Bailey telling him that, not Belcher telling

21  him that.

22      Brown also told agents that he and Bailey communicated by

23  phone before the murder about it and that Brown used a

24  different number than the one we became familiar with through

25  the call detail records, which is why you wouldn't see those

*16-20143; U.S.A. v. Belcher/Watson*

1    calls in the call detail records.

2        The evidence is that Bailey paid money that filtered its

3    way to Brown through the Motor City Casino meeting.  That,

4    Brown testified, was set up by a phone call that he and Bailey

5    had, which confirms that he and Bailey were capable of

6    communicating by telephone directly.

7        Bailey also told us that he was associated with a number

8    of other people who were beefing with Wallace and at least

9    one of whom who had actually said that he wanted Wallace dead,

10   and that these other people knew that Bailey was associated

11   with the victim, Bailey was close to the victim, and presumably

12   could help facilitate state that.

13       We know, just talking about September 11th, we know that

14   the victim was in a hurry.  We know that he kept his engine

15   running.  We know that he didn't want to come into the

16   restaurant.  We know that Bailey engaged him in conversation

17   for 20 minutes outside on the side of the road.  You can watch

18   the full 20 minutes at some point, if you'd like.  We know that

19   Bailey knew he was in a white Benz.  We know that, we have

20   evidence that suggests that Bailey and Brown had the ability to

21   communicate directly with each other.  Bailey actually told us

22   that he knew that Wallace was going to be driving the white

23   Benz before Wallace even arrived at the They Say meeting, and

24   finally, Sean Jackson testified that when Bailey was talking to

25   him about the murder when they were locked up together Bailey

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 44*

1  omitted any mention of Bailey's beefs with Wallace.  Obviously

2  he didn't want to talk about that, he wanted to deflect

3  attention elsewhere, and yet Jackson was insightful enough

4  about Bailey to tell the grand jury that Bailey had a motive to

5  deflect blame onto Belcher so that Bailey wasn't blamed on the

6  street for Wallace's murder.  There's a fair amount of evidence

7  here that points to Bailey as the real mastermind in this

8  conspiracy and not Mr. Belcher.

9      The Government claims that Chambers' and Bailey's and

10 Brown's stories about Mr. Belcher's role in this are

11 corroborated by other evidence, but that isn't necessarily so.

12 There's a series of things.

13     Let's start with the suggestion that Mr. Belcher had

14 motive.  The only person who has told you that Mr. Belcher had

15 a motive to kill Wallace is Mr. Bailey.

16     And what did Mr. Bailey say first about that?  In his very

17 first interview after he signed his proffer agreement in

18 November of 2017 he said that Mr. Wallace and Mr. Belcher had a

19 grudge because Mr. Belcher stiffed Mr. Wallace on a drug deal.

20     He didn't say anything about anything else.  He didn't say

21 Belcher was mad at him because of fraud.  He didn't say Belcher

22 was mad at him because of any other drug-related reason.  But,

23 by the time we got to trial, Bailey's story had morphed into

24 Belcher was mad at Wallace for the same reasons that all of us

25 were, because Wallace kept messing with our money, and also

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 45*

1    because Wallace had sold Belcher some bad heroin.

2        Well, if that were true, why didn't Bailey say that to the

3    agents in the same interview that he signed his proffer

4    agreement where he agreed he was going to tell the truth and he

5    was going to volunteer all information reasonably related and

6    not omit things.  Why didn't he tell it then?

7        The reason Mr. Bailey's story had to change over time is

8    because it doesn't make sense for Mr. Belcher to be mad at

9    Mr. Wallace over the fact that Mr. Belcher stiffed him on a

10   drug debt.  That's not, you know -- if I were Mr. Wallace and I

11   had been stiffed on a drug debt, I might have wanted

12   Mr. Belcher dead, but it doesn't work the other way around.

13   It's doesn't make sense.  So that's why Mr. Bailey's story

14   changed, and that's why it's not reliable.

15       The Government points to the fact that Mr. Belcher lied to

16   police about knowing Brown, about knowing Watson, about Brown's

17   1332 number belonging to another worker of his by the name of

18   Block or Blockhead.  Mr. Belcher did lie about those things.

19   That doesn't make him a murderer.  That doesn't corroborate

20   Bailey's and Brown's and Chambers' story about Belcher being

21   involved in this murder.

22       Detective Mitchell acknowledged that people lie to him all

23   the time in police interviews whether they are guilty or not.

24   He acknowledged that a drug dealer might lie about the identity

25   of persons who work for him, particularly if that drug dealer

*16-20143; U.S.A. v. Belcher/Watson*

1   is under charges himself, which Mr. Belcher was.  That a drug

2   dealer might lie about people who work for him if they have

3   their own troubles with the law, which we know Stephen Brown

4   did.  He was on parole.  He was not supposed to be selling

5   drugs at all, but particularly not when you're on parole.  So

6   there's any number of reasons why Mr. Belcher may have lied to

7   police, but they are unrelated to whether or not he was

8   involved in a murder.

9        The Government points to the Pantheon episode supposedly

10  occurring on August the 25th.  First, I don't know how

11  Steph Brown could have remembered from the witness stand last

12  week that he knew specifically that episode happened on August

13  the 25th, 2015.  He couldn't even tell me how far it was or how

14  long it would take to get from Faircrest Street to the Family

15  Dollar or to get from the Family Dollar to his house,

16  notwithstanding the fact that he was familiar with all of those

17  places, but he remembers specifically August the 25th, that was

18  the date of the Pantheon episode.  I don't think his memory is

19  that good.  He was rehearsed.

20       More to the point, on cross-examination he acknowledged

21  that the Pantheon episode happened at night.  It didn't happen

22  in the afternoon.  He wouldn't have gotten any calls from

23  anybody about where Wallace was at The Pantheon Club after

24  8 o'clock at night.  He said that.

25       So all of the calls that the Government is pointing to in

that Exhibit 16, I think, that showed a bunch of back and forth
between 4:00 and 5:00 or 3:30 and 4:30 or whatever it was are
not related to the Pantheon episode, and they are testament to
the fact that these people talk to each other all the time
anyway about other stuff.  I mean, the Government wants you to
think that they were just fixated, all five of them, on
Devin Wallace all of the time.  That's not true.  They have
other lives.  They were doing other things, a lot of them were
illegal, but they had any number of reasons why they would be
talking to each other.

They point to Zeidman's as the place where the plot was
hatched, except that we know from Mr. Brown's testimony, and he
had no reason to lie about this, that the reason he was going
to Zeidman's in the first place was to get resupplied with
marijuana by Mr. Belcher.  That doesn't mean that he had a
discussion with Mr. Belcher at that meeting about killing
Wallace, although certainly could have had that discussion with
Mr. Bailey at that meeting because he was present.

They point to Latasia Banks, Mr. Belcher's former
girl friend, mother of his children, as corroboration of his
involvement because of her testimony that he confessed to her a
month afterwards.  First, I'm not sure that the words "nigga
too greedy, he had to go" is a confession as opposed to an
observation.  Mr. Belcher may have known why Wallace was
killed.  That doesn't mean he was involved in it.

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 48*

1      But even if you accept it as her testimony, that he

2  confessed to her, you shouldn't believe it.  This is more

3  bought-and-paid-for testimony.  It is testimony that was given

4  in return for leniency in her own very recently brought case,

5  and it's inconsistent with two other significant pieces of

6  evidence.

7      I invite you back in the jury room to listen to jail call

8  Government Exhibit 18A.  That's the call that we heard between

9  Mr. Belcher and her where the call begins with some just

10  general hi, how are you doing sort of things, and then we're

11  going to talk more about that beginning.  It segues.  It was

12  important to the Government because it demonstrated Mr. Belcher

13  instructing Ms. Banks about who owed money for drugs.  So

14  that's why it was played.

15      But, if you go back and you listen to the early portion,

16  you hear Mr. Belcher ask what happened, and you hear Ms. Banks

17  say that on the news the night before they had described him as

18  the one who had put the hit out and then you hear her say, she

19  thought to herself, "yeah, right."  And then you hear

20  Mr. Belcher say, "That shit's crazy, I had nothing to do with

21  that shit."  And Latasia responds, "Keep your head up, babe.

22  Stay strong."

23      This is not the kind of conversation that two people have

24  if they previously had a conversation where Mr. Belcher has

25  confessed to Latasia Banks, "Hey, I had something to do with

*16-20143; U.S.A. v. Belcher/Watson*

1    this."  Go back and listen to that conversation.

2        The second significant piece of evidence that belies her

3    claims that Mr. Belcher confessed to her is the fact that last

4    April she talked to my investigator Desiree Edwards, who asked

5    her whether she had any information that indicated that

6    Mr. Belcher was involved, and she said no.  At that time she

7    didn't have any reason to lie to Desiree Edwards.  She didn't

8    have any reason to mislead me, but she had plenty of reason to

9    lie to the Government.

10       Let me point out one other thing as an aside.  She

11   testified under oath that she was only involved in

12   Mr. Belcher's drug business after his arrest, but we know from

13   Frankie Aday's testimony that's not true.  Frankie Aday

14   testified that early on when he and Nancy were getting drugs

15   from Deaunta they were also getting them from Latasia, and they

16   were getting them dropped off at Nancy's house where Frankie

17   lived and the reason they were getting dropped off there is

18   because it was close to where Latasia worked and Latasia

19   sometimes made the deliveries.  And so she lied to you about

20   that, too.  She's not believable.

21       Let's talk about the call detail records and particularly

22   the call detail records on September 11th.  The Government

23   suggests that these records, combined with the video,

24   corroborate the fact -- corroborate Stephen Brown's testimony

25   that Belcher was giving them directions.

1    I suggest that you can't just look at the dates and times

2    of the records themselves and the video.  You have to pay

3    attention to the testimony that Brown gave in connection with

4    them.

5        And just to introduce this part, remember that there are

6    exhibits, Defense Exhibits K1 and K2, for instance, that show

7    that he and Brown had very regular, very extensive contact for

8    weeks and weeks leading up to September the 11th.  So it

9    certainly wasn't unusual for them to have a lot of discussions.

10       We even heard Agent Rienerth testify that on some days

11   they talked just as often, just as many times on those other

12   days as they did on September the 11th.  So it's not like it

13   sticks out like a sore thumb and that it never happened before.

14       There's nothing intrinsically suspicious about calls

15   between, even a lot of calls, between Belcher and Brown.  What

16   makes them suspicious to the Government is the timing of them.

17   I've got to give them that, the timing is something that if

18   you're the Government you're going to be suspicious about it,

19   but also what Mr. Brown says about those calls.  And so that

20   means you've got to believe Mr. Brown, what he says about those

21   calls.

22       Again, what Stephen Brown actually says about those calls

23   depends on the day on which he was testifying.  On day one he

24   testified that he got all kinds of telephone calls from

25   Mr. Belcher starting with the "big fish" call all the way while

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 51*

1   they were traveling to They Say from Theodore Street and until

2   they arrived there, all of these telephone calls from

3   Mr. Belcher he testified to having occurred on direct

4   examination.  The problem with his testimony is that, again,

5   there aren't that many telephone calls from Mr. Belcher to

6   Mr. Brown on that day.  There's only two.  There's three if you

7   count one that goes to voice mail, but in terms of

8   voice-to-voice contact, there was two.

9        So on day two, of course, Mr. Brown's testimony has

10  changed.  These aren't all telephone calls from Mr. Belcher to

11  him.  They are telephone calls that Mr. Brown has placed to

12  Mr. Belcher, which is a little closer to the truth.  He does

13  place some telephone calls to Mr. Belcher on that day in that

14  period of time.  Not nearly as many as he says and ultimately

15  not at the times he says that he placed them.

16       So, for instance, he says that he sees the white Camaro

17  that Mr. Belcher was driving, driving away from him on

18  Joseph Campau.  We have all seen that on the video.  He makes

19  the left-hand turn off Franklin on Joseph Campau, makes another

20  left-hand turn, we hear from Officer Mitchell, that he parked

21  in front of his residence for a few minutes.

22       Brown testified that after he saw Belcher pull away that

23  he called Belcher from his phone a number of times and he

24  called Belcher one time on Watson's cell phone after he sees

25  Belcher drive away.  This can't be true.  It isn't true.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 52*

1    The video tells us that Belcher pulled off at 4:51 p.m.

2   if you correct the video time by subtracting a minute and

3   45 seconds.  The video tells us that Chambers' car drives that

4   same route down Joseph Campau passing Franklin Street where the

5   Benz is parked and Gino is standing next to the window at

6   4:55 p.m., four minutes after Belcher is already gone.

7    After that, of course, after 4:55, Chambers' car does the

8   big loop to get back to Franklin Street to pull up and ambush

9   Wallace from behind.  There are no calls, no calls, zero calls

10   to or from Belcher and Brown or Belcher and Watson in that

11   period of time.

12    Brown says that when they were stopped behind the school

13   bus very shortly before pulling up on Wallace that's when he

14   used Watson's phone to call Belcher.  Again, there are no

15   records that confirm that.  As a matter of fact, they confirm

16   the opposite.  There were no calls then.

17    So it doesn't make sense for the explanation for these

18   clear inaccuracies to be they are just innocent inaccuracies.

19   Mr. Brown met with the Government prior to taking the stand.

20   He went over his reports.  He went over his anticipated

21   testimony.  There's only one explanation for why Mr. Brown

22   can't tell the story correctly, and that's that he can't keep

23   his lies straight.  He's not believable.

24    It is not Mr. Belcher's burden to prove to you what might

25   explain events differently than how the Government wants you to

*16-20143; U.S.A. v. Belcher/Watson*

1  believe them, but let's think about some things.  One thing

2  that everybody seems to agree with is there was supposed to be

3  a meeting at They Say late that afternoon, and Mr. Bailey said

4  there were two reasons for it:  One was to sell a car and

5  one was to meet with some other people about some other general

6  business-related accounts, some Juan guy and somebody else.

7      It's not disputed that Mr. Bailey arrived first, that

8  Mr. Wallace arrived second, somewhere around 4:30 or 4:35, that

9  Mr. Belcher somewhere around 4:45.  There's no dispute that

10  Mr. Belcher and his daughter exited the Camaro, walked up to

11  the door of They Say, you see some conversation between him and

12  Mr. Bailey, and Mr. Belcher turns around and walks back.

13  Mr. Bailey tells us that he told Mr. Belcher there's nobody

14  here.

15      Mr. Belcher goes back to his car, gets in the car,

16  and after a few minutes drives away at 4:51.  Per

17  Detective Mitchell, who reviewed video that we don't have,

18  but who reviewed the River Place Apartment video, Mr. Belcher

19  arrived home around 4:52.

20      According to the call detail records, Detective Mitchell

21  confirmed Mr. Bailey placed a call to his girl friend at 4:54.

22  We know from the call detail records he got a call from

23  Mr. Bailey at 4:57 that lasted 80 seconds.  During that period

24  of time, if you do the math, Mr. Bailey would have had to have

25  been at the window of Mr. Wallace's car during that

1  conversation.  You can actually see, if you look at the video

2  around that time, Mr. Bailey going into his pocket and pulling

3  something out.

4     According to Detective Mitchell, at 4:59, after the

5  80-second contact with Mr. Bailey, Mr. Belcher leaves the car,

6  goes in the apartment complex where his residence is for a

7  couple minutes, comes back out, it's 5:01, gets back in the

8  car, immediately turns around and heads back to the scene.

9     Belcher could not have known that Wallace had been killed

10  by then.  He hadn't had any communication with anybody to have

11  let him know that.  The more reasonable explanation is he was

12  going back to the scene as an outgrowth of that 80-second call

13  he had gotten from Bailey at 4:57.  That's the more reasonable

14  explanation.

15     Bailey says we didn't actually have a call.  I dialed him,

16  and then I thought better of it and I just forgot to hang up

17  and it was 80 seconds of dead air.  There's a problem with

18  that, ladies and gentlemen.  It's a very serious problem.  It's

19  Mr. Belcher's records that show the 80-second call.

20     If I call one of you and I'm not talking and it sounds

21  like a butt dial, are you going to wait for a minute and-a-half

22  before hanging up?  No, you are going to hang up.  After

23  realizing, okay, this isn't a real call, you are going to hang

24  up.  It's not going to show up as an 80-second call on the

25  recipient's records.  It may show up as an 80-second call if

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 55*

1  it's a butt dial on the dialer's, but the fact that the

2  recipient's records show an 80-second connection indicates that

3  Mr. Belcher was doing something on that connection and what he

4  was doing was talking to Mr. Bailey and probably Mr. Wallace.

5  It's another example of how Mr. Bailey is a liar.

6      Why is Gino lying about that?  Is it because he placed

7  that 80-second call to Mr. Belcher at 4:57 p.m. in order to

8  hold Mr. Wallace at the scene a little bit longer?  Is he doing

9  that because he knew that the shooters were getting close or

10  were imminently arriving, as they did just a couple minutes

11  later, and did he know that because he had the capacity to have

12  direct communications with Stephen Brown that don't show up in

13  the call detail records because Stephen was using a different

14  phone?  Why else would Mr. Bailey lie about not actually having

15  what clearly was an 80-second contact with Mr. Belcher at

16  4:57 p.m.?

17      This doesn't change the fact that Mr. Belcher had contacts

18  with Mr. Brown that afternoon, and he had a couple with

19  Mr. Watson as well.  But, again, in order for you to construe

20  those contacts as being related to the murder of Devin Wallace,

21  you've got to believe Stephen Brown beyond a reasonable doubt,

22  and I don't think that Stephen Brown's testimony carries that

23  weight.

24      I'm almost done here.

25      Let's remember a couple other things.  This murder

1   occurred a block and-a-half from where Mr. Belcher lived at

2   5:00 p.m. on a Friday afternoon, broad daylight.  Who does

3   that?  I mean, if you really want to kill somebody are you

4   going to do it a block and-a-half from your house at 5:00 in

5   the afternoon?  Are you going to go back to the scene, and

6   innocent or not, you are going to take your daughter with you?

7       He told Gino to call 9-1-1.  He stayed and he spoke with

8   the police.  Those are not actions that are consistent with

9   somebody who is involved in a murder.

10       I'm going to conclude.

11       The foundation for the Government's murder case against

12  Mr. Belcher is built on sand.  Every relevant law

13  enforcement -- I'm sorry, non-law enforcement witness in this

14  case is singing for their supper, is telling you something that

15  they want you to believe so the Government gives them something

16  in the end that is very significant, their liberty.  They get

17  to go home.  Maybe not right away, but a hell of a lot sooner

18  than they would otherwise.  That is a powerful, powerful

19  motivator, and they are seeking to bury Mr. Belcher so they can

20  go free.

21       The judge may instruct you on how to consider such

22  evidence, and I ask you to take that instruction really to

23  heart.  These are people who have lived their lives as liars,

24  cheats and thieves, as I have said more than once, and the

25  other evidence in this case, the videos, the call records make

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 57*

1  sense to the murder case only if you believe these liars,

2  cheats and thieves beyond a reasonable doubt, only if you would

3  rely on their word in making the most important decisions in

4  your own life.  I don't think their word is worth that kind of

5  reliance, and so I'm asking you to find Mr. Belcher not guilty

6  of the homicide counts.  Those are Counts One and Three.

7  Thank you.

8           **THE COURT:**  We'll take a short recess, ladies and

9  gentlemen.

10          **MR. JOHNSON:**  Judge, may we approach after the --

11          **THE CLERK:**  All rise for the jury.

12      (Jury out at 11:04 a.m.)

13          **THE COURT:**  Yes, Mr. Johnson.

14          **MR. JOHNSON:**  Yes, Judge, I wanted to approach.

15          **THE COURT:**  Pardon?

16          **MR. JOHNSON:**  I wanted to approach on an evidentiary

17  issue.

18          **THE COURT:**  Go ahead.

19          **MR. JOHNSON:**  I believe that Mr. Haugabook argued to

20  the jury that my client made a statement, he talked about the

21  substance of that statement, and he based an argument on that

22  statement.  That statement never came in.  There was no

23  testimony to that statement.  That statement was not admitted,

24  no, and -- unless I overlooked it.

25          **MR. CRALLE:**  You did.  The statement came in.

*Defendant Belcher's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 58*

1  Special Agent Rienerth testified on Monday about his interview

2  with your client.  He did not introduce the oral statement.  He

3  testified to the substance.  Every single bit of that came in.

4  We can pull the transcript.

5      I asked the questions.  That was the testimony.  That was

6  Monday.

7           **MR. JOHNSON:**  I don't recall that, Judge.

8           **MR. CRALLE:**  Well, I recall it distinctly, last

9  Monday.

10          **THE COURT:**  The jury will recall the testimony.  You

11  can argue that he didn't make the statement, but it's up to the

12  jury to decide whether he made it or not.

13     I'm not going to correct anything Mr. Haugabook said.  You

14  can argue that Mr. Haugabook said Mr. Watson made a statement.

15  "My recollection, ladies and gentlemen of the jury, is he did

16  not make a statement.  It's for you to decide."  I mean, you

17  will deal with that in your argument, and you will deal with it

18  in your argument.

19          **MR. CRALLE:**  Yes, Your Honor.

20          **THE COURT:**  Thank you.  I'll be back.

21          **MR. SHEA:**  How long, Judge?

22          **THE COURT:**  I will tell you, the Marshals govern the

23  time of the recess, okay?  You have control of it.

24          **MARSHAL:**  You've got it.  All right.

25          **THE COURT:**  I may not like what you do, but you still

1    have it.

2           **MARSHAL:**  Will do.

3           **THE COURT:**  Unless you want to use the public

4    restroom.

5         (Recess from 11:07 a.m. to 11:37 a.m.)

6           **THE COURT:**  Okay.  Everybody be seated, please.

7         Bring in the jury.

8           **THE CLERK:**  All rise for the jury.

9         (Jury in at 11:38 a.m.)

10          **THE COURT:**  Be seated.

11        Mr. Johnson.

12                                              (11:39 a.m.)

13          **MR. JOHNSON:**  Good morning, ladies and gentlemen.

14        Thank you for serving.  Thank you for your attentiveness.

15   If there's been any exchanges between me and the judge or the

16   Government lawyers that you find offensive, I apologize, and I

17   ask you not to hold that against my client.  I have the utmost

18   respect for counsel at this table as well as the Court.

19        If you recall when we first met, I told you that I was

20   going to make a promise to you, and that promise was to try to

21   dig into this case and deliver you facts and information that

22   you wouldn't normally get through the Government and I asked

23   you in return to be attentive and to be objective and I thought

24   that if we worked together it would help you reach a verdict, a

25   verdict that was fair based on objective and impartial,

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 60*

1   unbiased consideration.  Even though I didn't have the burden,
2   I told you I was going to take on that burden.

3       I think from watching you, from being here with you, that
4   you have been attentive.  This has been a very difficult task
5   because of the nature of the evidence, and when I say "nature
6   of the evidence," I mean, as brother counsel pointed out, the
7   lies, the inconsistencies, the sort of witnesses that we're
8   dealing with here.

9       So I want to further assist you in ferreting out this
10  evidence, and in doing that, I'm not going to go over a lot of
11  things that brother counsel has gone over.  He's done a fine
12  job pointing out those things, but what I want to do -- and I
13  told you when we first met, I told you I thought you had a very
14  difficult task, and that difficult task, it seems to be
15  extremely difficult in this case because of the nature of the
16  evidence, and the nature of the evidence are lies and
17  inconsistencies based on testimony coming from liars, cheats,
18  murderers, thieves, professional impersonators, and that's very
19  difficult.

20      And the instructions the judge may give you will talk
21  about the nature of the evidence, but what I want to do is I
22  want to get into the nuts and bolts of the instructions because
23  that's where you are going to have to go.  And I'm not going to
24  go through all of the testimony of these liars.  I'm going to
25  take out that testimony that I think you can pigeon-hole into

1  these instructions so that when you get back in the back you

2  will understand these instructions and how to apply the --

3  adjudicate the facts, the facts that this case turns on.  So

4  I've got a little bit more work to do with you so just bear

5  with me.

6      I'm going to talk about some of the instructions that the

7  Court may give that I think are very important for you to

8  consider and that I want you to consider strongly in my case,

9  and that is -- and I'm going to try to move as quickly as I can

10  because I'm on a time schedule here.

11      There may be an instruction that talks about proof beyond

12  a reasonable doubt, and what I want you to know is that the big

13  thing that I'm relying on in this, in this instruction is that

14  you have to look at the possible doubts and doubts based purely

15  on speculation are not reasonable doubts.  So you've got to

16  look at that testimony real close.

17      I'm real big in this case on the lack of evidence, and the

18  lack of evidence I think is so important in this case because a

19  lack of evidence you can attach a reasonable doubt to.  So

20  you've got to look at the evidence, and if there's a lack of

21  evidence in respect to where is the gun, a lack of evidence

22  into a number of factors, you can attach reasonable doubt.

23      You have to look at all the evidence.  If it has more than

24  one reasonable explanation, and I'm going to give you some

25  examples, if there's more than one reasonable explanation,

1   there may be a reasonable doubt.  If there's two or

2   three reasonable explanations, there may be a reasonable doubt,

3   and that's why I think the lack of evidence is so important.

4        It's also important when you talking about circumstantial

5   evidence, you know, and that circumstantial evidence gets into

6   the links in the chain, you know, does the links connect.  The

7   Government has a theory.  I want you to look at that theory.  I

8   want you to look at if there's -- follow that theory.  Follow

9   my theory.  My theory is going to talk about the evolution of

10  the lie, where the lie started, where the lie ends.  There can

11  be more than one reasonable explanation to this case, to their

12  theory, and if I give you one, then we may -- you can say

13  there's a reasonable doubt.  So that's very important.

14       The nature of the evidence.  You clearly have to look at

15  the fact that this evidence comes in through liars, cheaters,

16  con artists.  You've got to look at that because that's the

17  nature of this case.  So credibility is going to be very

18  important on your part, looking at whether the evidence is

19  credible.

20       Judge the testimony of the snitches, okay?  They are the

21  government witnesses, but I need you to, as the instructions

22  will tell you, use your common sense.  I just need you to use

23  your common sense, common sense when you're talking about what

24  Watson did when he was standing next to someone while an

25  agreement was being made, were there words spoken, were there

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 63*

1  acts, were there gestures.  Remember, I told you in the
2  beginning that you have to connect -- if you commit a crime,
3  you have to connect the actus reus with the mens rea.  You
4  can't have a crime unless you connect the mental state with
5  some sort of act.
6      So if you're looking at what Watson may have said, did he
7  say anything?  I'm big on that.  I'm talking about were there
8  words spoken, not what somebody else said, and is there
9  corroborating facts, okay?
10      So that instruction, I think, is very important, and when
11  you're talking about reasonable doubt, it will explain to you
12  what it means, and I always like to say, and recall I said,
13  demand the quality of evidence that you would want your loved
14  one to be, if they were on trial, and I think that's big.
15      In this case the Government had the burden of proof.
16  There's been hours of interrogation with Brown, Bailey,
17  Paymond, the interrogating detectives.  There were audio
18  recordings of statements by my client.  They didn't produce
19  that.  The Government didn't produce that so you won't see
20  that.  You won't see all of the evidence in this case so I have
21  to ferret through what you do have, but you can look at -- I'm
22  here to try to get to the truth.  Sometimes the Government
23  doesn't give you all the evidence, okay?  And you can look at
24  that, but the only thing you can judge is the evidence before
25  you.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 64*

1    I want to go to another instruction that talks about the
2  circumstances, and I talked to you about that, the chains in
3  the link -- the links in the chains, I'm sorry.
4    Now, another instruction is very important here, and
5  that's the state of mind, the intent, okay?  That's very
6  important because they want you to believe that -- they want
7  you to read Watson's mind in this case when Watson is with
8  Brown, when Watson is in the car, when Watson is at Zeidman's.
9  Watson doesn't say anything.  There's nothing to say that
10  Watson said anything so they want you to read their minds.
11  Well, this instruction talks about that.  No one can read
12  another person's mind and tell what that person is thinking,
13  but a defendant's state of mind can be proven indirectly from
14  the surrounding circumstances.  So when you're looking at the
15  Zeidman's and you're looking at him being in the car with
16  Brown, you've got to look at are there any other corroborating
17  facts besides what Brown says was in Watson's mind?
18    Let's take, for instance, the Zeidman's meeting.  Remember
19  the evolution of a lie?  And I'm going to get to that, but the
20  lie evolves to a point where we get to a meeting at Zeidman's.
21  And the facts that you've got to remember and look at closely,
22  I believe, is Brown and Bailey infer, they try to infer that
23  Watson was present.  We don't know, but they say Watson was
24  present, and Brown was offered a car, a condo and money.
25    The conclusion was that, of Bailey and Brown at some point

1    was Watson stood there so Watson heard and agreed.  The

2    inference was he stood there and Watson heard and agreed, but

3    there's no way to infer what was in Watson's mind from his just

4    being present at an alleged meeting.  We don't have Watson's

5    words, acts or gestures to weigh what was in his mind.  Nothing

6    independent to show he agreed or acknowledged and agreed.  No

7    actus reus, no mens rea, no act that we can infer his mental

8    state.

9        Mental state.  Words of intent are very important, and

10   when you look through this case, for instance, Brown, when you

11   look at Brown, there's evidence.  You can look.  Brown says the

12   only thing that's on the mind is to kill Devin Wallace and get

13   a car and get a condo.  That's corroboration.  That gives you

14   an opportunity to weigh what's in Brown's mind.  You see -- and

15   that's very important.  That's instruction 13 when you start

16   talking about intent.

17       Brown testified he and Watson rode together.  Well, what

18   happened then?  What did they talk about?  Does he ever talk

19   about what they talked about?  Nobody really testifies to what

20   Watson ever really said in this case.  Nobody.  There's no

21   words or acts that anybody can assert that Watson made.  No one

22   has given us Watson's actual words.

23       Another part of -- I think is very important and I told

24   you when I first started out in this case, I think I mentioned

25   that I didn't think demeanor was going to be that important in

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 66*

1   this case because we had professional liars.  We had con

2   artists.  We had impersonators that could take that stand

3   without sweating, could take that stand with a stern face and

4   testify, but it didn't turn out to be that way and instruction

5   number 7 that the judge may give, it talks about looking at the

6   demeanor of the witness, and the demeanor evidence -- demeanor

7   evidence is evidence.

8        And you can look at that demeanor.  Look at Brown.  Look

9   how Brown sat.  Look how Brown got vague.  Look how when I

10  asked Brown about you said there were six, there were five and

11  you, and I asked him and he wouldn't answer.  He became silent.

12  Well, his silence spoke.  Six people in that -- involved,

13  possibly four people in the car.

14       Look at Paymond.  Paymond's demeanor was fairly good after

15  he decided that he was going to tell the truth.  I had to turn

16  him around a little bit.  My cross-examination sometimes were

17  objected to, but they weren't to try to put my words in his

18  mouth but to create a relationship.  Let's look at what Paymond

19  said.  Let's look at what Paymond gave us.

20       Paymond was one of the Government's better witnesses.  His

21  demeanor was fairly good after I got him to tell the truth.  He

22  first gives us nothing.  He denies really knowing Watson.  He

23  knows Steph and BJ.  He tells us BJ and Steph are together on

24  9/11.  He tells us that Steph and BJ leave around 4:00 p.m.

25  That's what the detectives really were trying to pound him in,

1    to get into their theory that timeline.  He tells us that Steph

2    and BJ leave around 4:00 p.m. and return afterwards.  He

3    clearly supports the Government's theory at first.

4         However, on cross-examination I open him up.  I stress the

5    importance of the truth.  He begins to agree with me and

6    appears to start telling the truth.  His demeanor is good, his

7    eye contact.  He recalls good.  He's not vague.  He answers the

8    questions.  And what facts did we learn?  We learned he watched

9    the video.  We learned he saw the commission of the crime.  We

10   learned he originally slanted the truth because he feared being

11   charged with new crimes.  That was real.

12        But he revealed -- he also revealed he deals with stolen

13   goods and auto parts, which he didn't want to do that at first.

14   He didn't want to do that too much with the interrogations of

15   the officers because he didn't want to get charged with any new

16   crimes.

17        But he also gave us some of the culture that you can rely

18   on.  He tells us -- he agreed that he knows Watson steals cars

19   and deals in stolen parts.  He's an in-between man on deals.

20   That's his hustle.  Brown and Watson hang together a lot.  It's

21   important because Brown tries to play down -- Brown, if you

22   recall, tries to play down his relationship with Watson

23   initially.

24        We learned that the DPD maintained that Steph fired the

25   shots from the car.  DPD is telling Paymond that's their

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 68*

1   theory.  He told us he agreed with the police that Steph had on

2   black as he wore on 9/11 while at his house the day before.  He

3   gives us a limited ID.

4        He tells us four people are in the car.  He gave their

5   description, 6'1", 6'2," the men got in the car.  Detective Eby

6   never told you that they believed Watson was the shooter.

7        He tells us he never saw Watson carrying a gun.  So we get

8   a lot from Paymond.  Paymond also tells us DPD told him how

9   they believe Brown and Chambers were involved in the murder.

10  This begins to start that lie, that lie to evolve.  He tells us

11  that the FBI was trying to get him to accept their scenario of

12  the shooting.

13       DPD told him they had cell phone results from Brown being

14  at his house, that he could not identify the guy in the video

15  who done the shooting.  He didn't -- he was real.  He said he

16  couldn't identify him, but he could identify the clothing.

17       After constant presentation of the agents and the police,

18  he agreed it could be Brown, and that's how these facts evolve.

19  He never seen Watson carrying a gun.  He never knew Watson to

20  do hits or shoot people, and nobody ever came back and told him

21  Watson was the shooter.

22       So, you see, that even with Paymond the Government is

23  beginning to push their theory.  They want to disregard the

24  other two men in the car.  There's no real investigation going

25  on with respect to suspect Brown, but Brown becomes one of the

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 69*

1    main suspects of DPD.

2         See, DPD, if you remember, with Detective Mitchell, DPD

3    did a solid investigation.  DPD had a video.  DPD got the phone

4    records.  DPD watched the video.  Mitchell was straightforward.

5    Mitchell talked about his crew.  They finally got Brown as a

6    suspect.  They used him to insert his information in the

7    affidavits, to get cell phone records, and Brown became a

8    suspect.

9         But Brown wasn't arrested at that point.  Brown was out

10   there with Chambers and had an opportunity to talk about the

11   case, look at the case, and finally Brown was named as the

12   suspect.

13        Well, what happened later is that the feds came in, and at

14   some point the feds decided they were going to arrest and bring

15   an indictment, and it was at that point that Brown decided that

16   he could be a shooter.  That's how the lie begins to evolve.

17        Let's go back to the instructions and talk about

18   Count One.  Count One of the indictment charges the defendants

19   with the use of certain interstate facilities in the commission

20   of a murder for hire.  The judge may give an instruction that

21   you are going to have to look at these elements, and I would

22   like to point you to element C, the third, and the reason I

23   want to go there is because it talks about as consideration for

24   receipt of a promise or agreement to pay anything of pecuniary

25   value.  Also, in Count One it talks about the use of certain

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 70*

1   interstate facilities in the commission for hire.

2       Well, the Court may instruct you that you must prove each

3   and every element beyond a reasonable doubt, and if you look

4   at -- I'm going to ask you to look at A when you get back

5   there.  A is going to become important.  Did Watson use the

6   phone?  And you are going to have to prove that Watson used the

7   phone beyond a reasonable doubt to in some way further this

8   theory of murder for hire.

9       Let's refer to the most credible evidence to some extent

10  that the Government has.  It was the phone records that first

11  led to the discovery of Brown as the shooter.  We heard from

12  the experts.  We heard from their opinions.  We have heard

13  their analysis.  We have talked about the cell towers, then

14  finally we were hit with the Government's toll records

15  analysis.

16      And what we know, and I'm going to go straight to the

17  jugular on this, the Government only decided to use Belcher's

18  phone records that led to other phone call and records to

19  support their theory, and it's based upon their circumstantial

20  evidence that they want you to find beyond a reasonable doubt

21  my client used a telephone to commit this murder.

22      So I'm going to refer you to Government's Exhibit 16A, and

23  when you get back in the back, you will be able to review this

24  exhibit, and as you will see, I'm going to point you to

25  Andre Watson at 978-3909.  That shows one incoming call and one

1   outgoing call.  Now, this is on September 11th at the scene of
2   the crime between 4:38 p.m. to 5:15 p.m., and in those records
3   it will show you a timeline on these calls.  And when you look
4   at these facts, you will see that Watson's phone did not get
5   busy until -- remember what Brown said.  Brown said -- and
6   again, that message is the link in the chain of the
7   Government's theory because up until -- these phone records
8   they rely heavily on.  The phone records are probably some of
9   the most credible evidence the Government has, and that's what
10  they base their theory on.

11       As you know, there weren't requests made to get phone
12  records for a lot of other times that might have been relevant.
13  However, dealing with this, we have got Andre Watson.  Well,
14  this was fine until their witness gets on the stand and says,
15  oh, I used Andre Watson's phone at that time.  If you recall,
16  at 4:51 Watson's phone called Belcher.  It will show that, but
17  Brown says he gave the phone to Watson.  Brown says, I plugged
18  my phone in to charge it, and I used Watson's phone and I
19  called Belcher.

20       Now, as brother counsel said, we don't know what the
21  nature of those calls are.  We know that there's another
22  exhibit of Mr. -- I think it's my exhibit, Watson's Exhibit
23  Number 1, that talks about other phones that were used with
24  Belcher's number.  Well, we know that Watson had a relationship
25  with Belcher.  We know that Watson had called Belcher on other

1   occasions.  So -- but Watson wasn't calling everybody around

2   the time of the incident.  Brown was.  Brown was, and I'm going

3   to point that out to you.  Brown was making the calls to

4   everybody, and the phone records are going to show that.

5       What was Watson's purpose in calling Brown?  If Watson in

6   fact did call -- I mean, call Belcher -- what was it for?  It

7   could have been for anything.  The first call Andre Watson

8   is -- it's an incoming call, and then Belcher has an outgoing

9   call.  In looking at these records, there is really no pattern

10  in the calls to suggest Watson was planning or participating in

11  a plan to execute Wallace at the time he was shot.

12      Belcher, by this, calls back, but that could be for any

13  reason.  That could be because a call came in to him.  He

14  talked to Brown, and he returned that call.  That doesn't

15  necessarily mean that that's the only explanation for that call

16  and that that call was related to the homicide.  It's also

17  reasonable to conclude that Belcher called back because he had

18  just talked to Brown on the phone.  So when you look at that

19  instruction, weigh that evidence heavily, on whether or not he

20  used the phone to in fact facilitate the homicide.

21      When you look further into that instruction, it's

22  important to look at, as I said, C and 7 on Page 18.  7 talks

23  about:

24      The Government must prove a quid pro quo between the

25  person who solicits the murder and the person who would commit

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 73*

1    the murder.  In other words, it requires a mutual understanding

2    that something of value will be exchanged for committing a

3    murder.  You may find the defendant guilty regardless of

4    whether the payment occurred or was to occur in the future.

5         B, and I'm going to tie it together, B says that:

6         The defendant did so with the intent that a murder be

7    committed under violation of a Michigan law.

8         So we really don't have any evidence of Watson's intent.

9    What we do know is intent must be shown by words and actions.

10   So if you look at what Brown did, Brown testified that Chambers

11   covered up the plate.  Brown said he got out, looked at the

12   plate, and made sure it was covered.  Brown went into -- Brown

13   went in and bought the gloves.  Brown claims he fired his gun

14   at Wallace and he intended to kill Wallace.  Brown testified

15   that Mr. Chambers pulled off when the bus moved.  Brown used

16   Watson's phone just before the murder.  Brown agreed to accept

17   money, condo and car to kill Wallace.  Brown said his purpose

18   was to kill Wallace.  Brown asked Bailey for locations of

19   Wallace.  Brown was in communication with Bailey on an unknown

20   phone.

21        There's no testimony to corroborate independently of the

22   lies of Brown or the other con artists or the thieves or the

23   other professional liars that Watson was involved at that time.

24   We don't have any acts that we can attribute to Mr. Watson

25   other than their lies that he shot and things of that sort.

1    The quid pro quo?  That brings us to looking at what

2  really happened at Zeidman's.  Brown tells us a lot about

3  Zeidman's on cross-examination.  Mr. Brown agreed he never saw

4  Watson get any of the money or property offered at Zeidman's.

5  Brown agreed he never heard Watson accept $2,000 for the

6  killing of Wallace.  Brown agreed he never heard Watson accept

7  15,000 for the Wallace killing.  Brown agreed he never heard

8  Watson agree to kill anybody for any amount of money at that

9  time.  Brown agreed he never heard Watson tell Bailey that

10  Watson would get involved and kill Wallace because Wallace was

11  getting in the way of Byrd or Gino's drug business.

12    That's important.  That's going to be important when it

13  comes to looking at the conspiracy count and the

14  drug-trafficking count.  Brown agreed he didn't know of

15  Watson's contacting Belcher after the beating.

16    What did Bailey testify to about the Zeidman's killing?

17  And this goes to quid pro quo and things of that sort.  Bailey

18  testified Brown walked up to the car window.  Brown talked to

19  Belcher, as brother counsel said.  That was supposed to be

20  about marijuana, but what would Watson know?  Watson was in his

21  car with a girl, but Brown, Brown didn't want to really testify

22  to that.  He was untruthful.  We had other evidence that came

23  in that said Brown was with a girl -- I mean, Watson was with a

24  girl.

25    Brown is discussing marijuana with Belcher.  Bailey agreed

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 75*

1  Watson never got out of the car and approached him at
2  Zeidman's.  These are acts that never happened.  There's
3  nothing to infer from Watson's conduct at that time other than
4  the fact that he was present.

5      Bailey agreed that Watson didn't get out of the car and
6  talk to him about killing Wallace.  Watson didn't get out of
7  the car, and Bailey never offered him 15,000 to kill Wallace.
8  Bailey agreed he did not promise Mr. Watson payment of any sort
9  for killing Mr. Wallace.  Bailey said we never discussed it
10 ever.

11     These are words.  These are the kind of corroborating
12 facts that you can use that are independent of what somebody is
13 trying to get you to infer.

14     Remember, the claim is Bailey also wanted Wallace killed,
15 but Bailey makes it unequivocally clear there was no
16 discussions in the presence -- in his presence with Watson to
17 kill.

18     Brown attempts to inject Watson's mental state and intent
19 by asserting Watson agreed with him to kill.  That's what Brown
20 does throughout the case.  Brown begins to put Watson with him
21 because around March 8th when the indictment came down Brown
22 learned that he was facing death.  Brown learned that he could
23 no longer be the shooter.  Brown knew that he had to make
24 someone else the shooter.

25     There's no evidence Watson agreed with any solicitors.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 76*

1  Who was soliciting?  They maintain it was Belcher and Bailey.

2  There's nothing to suggest that Watson ever spoke with

3  Mr. Belcher throughout this case about killing anyone.

4       There's no evidence independent of what Brown, BJ and

5  Bailey are saying Watson did.  All we have is the testimony of

6  the liars, the cheaters and so on.

7       Brown tells Chambers at the detention center that he wants

8  to get his money, 15,000, a car and a condo.  He wants his

9  money for the deal that he made for the killing that he, he had

10  done.  Brown tells Chambers Watson was offered the same thing.

11  Here again, we have got Brown telling Chambers that Watson was

12  offered the same thing, but we have those facts before us.

13       You have to use your common sense in these instances.

14  Have you ever stood next to someone?  One person is making a

15  representation, you are standing there, and you are like I'm

16  not agreeing with what he's saying.  I'm not with that.  That's

17  the kind of common sense that we have to look at here.

18       Brown told Chambers I hope my cousin don't play me because

19  if he do I'm going to kill him too.  This is when he's talking

20  about getting his payment.  But you don't have any, any words

21  or acts that you could infer that type of intent with Watson.

22       Brown and Bailey even agree that Brown was offered a car,

23  money and condo to kill Wallace.  This is all in the evidence.

24  This is what's before you.  This is what you take back and

25  apply to these instructions.

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 77*

1   There's no facts that Watson tried to reach a mutual
2   understanding about what he would do or what he would receive
3   for killing Wallace.  Where do we get those facts?  Where do we
4   get the facts that Watson said anything out there?

5   When Brown said he went to the Family Dollar, Brown said I
6   went in and purchased gloves.  That's different than a lot of
7   evidence we heard on the Family Dollar.  We know Brown said
8   earlier in other statements he didn't even go to a Family
9   Dollar.

10  And Brown says he bought gloves, not any other items.
11  Brown then says -- he changes.  He says, well, that was
12  something else.

13  Watson never spoke any words while allegedly standing near
14  Bailey, Brown or Belcher while in discussion of any plan.  The
15  only facts we have that Watson received anything are based on
16  Brown and Bailey's statements.  Brown pled.  He was made an
17  offer.  He pled it in his plea agreement, though at first he
18  tried to deny it.

19  He pled.  He was made an offer.  Not him and Watson.
20  Watson stood near.  Those are the facts.

21  Brown and Chambers testified that Brown went looking for
22  Belcher and Bailey for payment.  Brown told us he was armed
23  with a chopper, an AK, and in the car with Chambers.  Brown and
24  Chambers again.

25  Brown says when he pulls up, "Damn, man, shit, what's up

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 78*

1   with that money?"  Those are words spoken.  You can take those

2   to the bank.  Those are real facts.

3       "I told Chambers to pull in front of Belcher's car."

4   Those are the kind of facts you plug in.

5       Brown gave Chambers the chopper.  And I asked him, "You

6   were trying to put somebody in fear?"  He didn't, didn't say he

7   had the .40 caliber that he allegedly had.  He's got a chopper.

8       Brown tells Chambers in the detention center -- see, these

9   go to number 7, pecuniary, what were you getting?  Receipt,

10  payment.

11      Brown tells Chambers in the detention center that he's

12  going to give him a couple of dollars.  We further learn Brown

13  called Bailey.  Bailey said, "I've got 1600 for you."  Brown

14  tells Bailey he has a tether.  That's what Brown tells us, he's

15  on a tether.  Brown says he sent Watson.  What do we have to

16  support that?  What do we have to corroborate that fact other

17  than a liar?  You saw his demeanor.  He lied when he wanted to.

18      So then Brown says he sent Watson.  Did Watson go?  Do we

19  have any evidence that Watson ever went to the casino?  Do we

20  have any videos?  Is there any other corroborating facts that

21  that occurred?

22      And if Watson did go, do we know that Watson even knew

23  what he was receiving money for?  It's just we don't have

24  anything there but Brown's words.

25      Bailey says he gave Watson $2,000.  So these lies are

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 79*

1  inconsistent, and my argument is they are made to just tie

2  Watson into the conspiracy to kill and to establish he received

3  proceeds for his part in the killing.

4      Bailey says when he saw Watson at the casino we did not

5  talk.  He just handed Watson the money, and he left.  Bailey

6  paid that money to Watson allegedly because he wanted to get

7  Brown paid something, he says, because Brown was looking for

8  his money.

9      When you go down and you look at the rest of Count One of

10  the indictment, you will be able to consider the intent that we

11  talked about.

12      And, as you go into Count Two of the indictment, Count Two

13  is talking about conspiracy to distribute controlled

14  substances.  I think that this is going to be a little bit more

15  easier for you to deal with at the beginning, but it gets

16  complicated at the end, and we believe that there's no, no

17  criminal partnership whatsoever with Belcher and Bailey in the

18  drug conspiracy, and you will be able to look at that and I'm

19  going to move quickly through that.

20      There's no testimony that Mr. Watson distributed or sold

21  cocaine, Oxycontin or any other drugs, and you can go down and

22  look at whether or not there was an agreement with anyone.  Of

23  course there's no evidence of that, no evidence he ever joined

24  a conspiracy.

25      And the instructions that the judge may give you can plug

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 80*

1   in the facts, as we have been doing.  Bailey testified that

2   Watson never accompanied him or Belcher on any runs or anything

3   of that sort.  You've got to look at who did he conspire with,

4   and I think these instructions, you know, you have to look at

5   the facts.  There's nothing to suggest that he was ever present

6   packaging, delivering, anything that shows that he acted in

7   furtherance of the conspiracy.  More importantly, there's no

8   facts that he was present and associated with Belcher, that he

9   agreed to work for Belcher or sell drugs for Belcher.

10      And there's another issue that the Government is going to

11  really attempt to ride on, and that is enforcer.  And the

12  enforcer first came up based on my cross-examination, and I

13  cross-examined because I had no fear there.  I wanted you to

14  know how the lie had evolved.  See, the enforcer came in later,

15  recent.  That's one of the most recent fabrications.  That's

16  how far the lie evolved.

17      So now we had enforcer, and you've got to look at that

18  evidence.  You've got to look at Brown trying to, to hint that,

19  that he saw Watson standing on the porch on Beniteau.  Well, if

20  you look at these instructions, and one of the main

21  instructions is going to be in one, two, three, part four of

22  that instruction.

23      One more point about the agreement.  The indictment

24  accuses the defendants of conspiring to commit several drug

25  crimes.  The Government must prove an agreement to commit at

*16-20143; U.S.A. v. Belcher/Watson*

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 81*

1  least one of them.

2       And then if you look at 4 of Part C:  But proof that a

3  defendant simply knew about a conspiracy or was present at

4  times or associated with members of the group is not enough.

5       You see, Brown tries to say at one point he saw Watson

6  standing on a porch with a gun hanging off of him.  The

7  testimony was so bad.  Hanging off from where?  I mean, hanging

8  off from where?  You've got to look at that.  I mean, it speaks

9  for itself.

10      It's not enough to put him there.  He's trying to, what,

11  make him an enforcer?  Look, use your common sense.  We know

12  what enforcers do.  Enforcers don't go around killing the

13  people that owe the debt.  They go around threatening.  They go

14  around collecting.  They go around trying to get payment for

15  the debt.  There's no evidence.  There's not one incident.

16      Aday didn't know him.  Mr. Belcher's woman didn't know

17  him.  Nobody's seen him.  No evidence that he approached

18  anybody to collect a debt.  No evidence that he worked with

19  anybody, Brown, as an enforcer.

20      So look and see closely what the Government attempts to do

21  in this case.  They can't give you anything else that ties him

22  to a drug conspiracy, and the fact that he was at somebody's

23  house, the fact that he was seen, the fact that he even knew

24  Belcher sold drugs, the fact that he knew Belcher sold drugs

25  and other things is not enough to make him a part of the

1    conspiracy.

2        Read that closely.  It's big on association.  Even if he

3    approved of what was happening, that's not enough.  Even if he

4    had done something that he didn't even know that he helped,

5    it's not enough.

6        You've got to look at the drug-trafficking count with this

7    conspiracy to sell drugs because that's where they are

8    trying -- you are not going to find any evidence of the drug

9    conspiracy, but what happens is they are trying to connect it

10   to the drug trafficking, the use of a firearm, the homicide.

11   That's what they are trying to do, and there's no testimony

12   Watson knew the murder was going to happen.  They want to place

13   him in the car.  All we have is the conflicting evidence, no

14   independent corroborating facts to support any circumstances.

15       And, again, you are going to have to look at the intent.

16   Brown says me and Chambers pulled off after the bus pulled off.

17   Look at those facts.  I talked to you about what Brown and

18   Chambers did, and look at how the lie evolved.  Just 30 days

19   before this trial we get a new statement from the Government

20   and the agents that says Brown and Chambers took the vehicle

21   13 days after the killing, washed it down with bleach to hide

22   the evidence, and they found a slug, a shell casing in the car.

23       How convenient.  How self-serving.  I'll bet you it was a

24   .40 caliber, right?  That shows the evolution of the lie.  That

25   shows you how still -- their incentive to lie to try to better

*Defendant Watson's Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 83*

1   their deal.

2        Remember, they violated -- that shows -- these recent lies

3   show that they violated every agreement that they ever entered

4   into.  The *Kastigar* agreement, I questioned him on that.

5   *Kastigar* says tell everything.  The plea agreements.  The

6   cooperation agreements.  They are liars, they are cheaters, and

7   they violated every, every promise that they made to the

8   Government, and the Government --

9            **THE COURT:**  Mr. Johnson, you have five minutes.

10           **MR. JOHNSON:**  That quick?

11           **THE COURT:**  Five minutes.

12           **MR. JOHNSON:**  Oh, Lord.  Okay.  Judge, I'm going to

13  need more time.

14       All right.  Ladies and gentlemen, look at the indictment.

15  I believe the indictment is part of the evolution of the lie.

16  They couldn't make this case, they couldn't make this case so

17  they brought a superseding indictment.  Look at that closely.

18  Look at that closely.

19       And what I want to say to you is that when you go back and

20  decide this case, look at the facts.  I need you to carry the

21  ball in this case.  Don't be intimidated by anybody else, their

22  education, their status or anything of that sort, but I need

23  each and every one of you all to hold the line.  If you believe

24  after you hear this evidence, if you believe that there's not

25  sufficient evidence, then I need you to hold the line.

*16-20143; U.S.A. v. Belcher/Watson*

1    That means, when you get back there and you talk about

2  this case and you deliberate and you objective and you go over

3  it, if you believe in your mind as an individual that my client

4  is not guilty, I need you to hold the line.  If you have to

5  come back out and be instructed by that judge again, if you,

6  you go back, you discuss this case again with an open mind, but

7  if you believe that the Government has not proved each and

8  every element on each one of these counts beyond a reasonable

9  doubt, then I need you, each and every one of you all, to hold

10  the line.

11    My client deserves to go home.  I believe that if you look

12  at the evidence squarely that you can enter a verdict of not

13  guilty.  I believe that the evidence will show that the

14  government has not met its burden.

15    Thank you.  I'm out of time.

16      **THE COURT:**  Thank you, sir.

17    Mr. Cralle.

18                                            (12:37 p.m.)

19      **MR. HAUGABOOK:**  Ladies and gentlemen, the Government

20  agrees.  You should not convict unless you find them guilty

21  beyond a reasonable doubt, but in this case there is no doubt.

22    I want to start first with Mr. Shea, and one of the things

23  that he said, brother counsel, Mr. Shea, he said during that

24  week there were no phone calls.  Well, I want to call your

25  attention to Exhibit 16.2.  It should be on the screen here.

1    And if you look at Exhibit 16.2, it shows that during that
2    week there were phone calls between Belcher and all of the
3    people involved.  Between the week of the murder he said that
4    there was no calls there.  There were calls in that week.  It's
5    right there, Exhibit 16.2.

6    You know, it's really interesting that the first thing
7    they want to say is that these guys were liars, they were
8    cheaters, they were this.  But think about it.  Wasn't that the
9    thing that made them so vital to this whole situation, right?

10   Because, with regards to Mr. Brown, when his cousin is
11   sitting there with DPD, the first thing he throws out, he
12   throws him under the bus.  Don't hang with him, he a thief,
13   steals ATMs and what not, all right?  But he was still the
14   person that he called and talked to and had that conversation
15   at the Zeidman's about committing this murder.

16   If you want to do this, you want to have it in house, you
17   want to have somebody close to you.  You don't go to the door
18   of a seminary and say, hey, can I get a student out here, I
19   need to use you, I want you to go take this hit for me on
20   somebody who is messing with my money, all right?

21   You want somebody who has been involved, who has a
22   criminal record, who has a criminal past, who is susceptible to
23   doing this, and especially if it's your cousin because you feel
24   like with your cousin, they are in-house, they are somebody you
25   can trust.

1    And what do we know?  Out there on the scene, who was out

2    there that was related to him?  His cousin Bailey and then his

3    cousin Brown, who pulls up with Chambers and Watson in the

4    backseat.  All right?  Those are connections to him.

5    So you can't say -- you can't have it both ways.  You

6    can't say, oh, they have felony records and what not.  That's

7    what made them vital.  You want to say Bailey is a fraudster.

8    That's what made him vital in the car fraud scheme because he

9    knew how to hook that up.  That's why you needed him in the car

10   fraud scheme.

11   You heard him in the video with Detective Mitchell talk

12   about Cuz being able to hook your credit up, fix your credit up

13   stuff.  Oh, but now you want to come in and say they are no

14   good, they have felonies, they are this.  Well, that's why you

15   needed them from the get-go.  You weren't complaining then,

16   right?

17   At the meeting at Zeidman's, you're not complaining then:

18   You know, Cuz, I can't use you, you've got a felony.  You know,

19   Bailey, I can't go for this because, you know, you in that

20   fraud stuff.  It doesn't make sense.

21   Yeah, I agree with brother counsel.  When you go back

22   there, you don't check your reason and common sense at the

23   door.  You take that same reason and common sense that you were

24   born with, that you walked in this courtroom three weeks ago

25   with, and you use that in making your decision in this case.

1    You know, they want to talk about witnesses saying things

2    at different times and things of that nature, and I believe

3    this Court is going to give you an instruction that sometimes a

4    witness will see and hear things differently, and that doesn't

5    mean that they are lying or mistaken.

6        For example, I just threw up some coins and they landed.

7    Some of you will say, Mr. Haugabook threw up some quarters and

8    they landed on the floor.  Some of you will say Mr. Haugabook

9    threw up some quarters and some pennies and dimes, and they

10   landed on the floor.  Some of you will simply say Mr. Haugabook

11   threw up some change and it landed on the floor.  But, is there

12   any doubt that each of you are right?  Sometimes witnesses will

13   see and hear things differently, but that doesn't mean that

14   they are incorrect.

15       The next thing, when you're going out and you're

16   committing this murder -- I don't know if you have ever seen

17   Jimmy Kimmell, but sometimes he does this little skit "Dear

18   Diary," all right?  That's the last thing you're trying to do

19   when you go out and commit a murder.  I'm going to write down

20   that on this day I talked to this person at this time and what

21   not.  It just doesn't work like that.

22       What we had here was the simple fact that everything was

23   able to be discovered because they made a mistake.  The mistake

24   was they committed this murder on video, and the mistake was

25   they carried these with them because everybody in this day and

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 88*

1   age knows that when you walk around with your cell phone, as

2   I'm holding up my cell phone, your cell phone can tell on you.

3   Your cell phone can tell where you are, where you have been,

4   who you have been calling, what location you are in.  That's

5   how this was put together.

6         A tip led them to Brown.  They started working up Brown's

7   cell phone evidence.  They immediately brought Mr. Belcher back

8   in, and they started reinterviewing him.

9         And what did he do?  He started lying.  Don't know Brown,

10  don't talk to him, don't deal with him, you know, and one of

11  the things they want to say is that, well, you know, Mr. Shea

12  said, well, you know, the fact that this was a block from his

13  house and, you know, he had his child, are these things

14  consistent with a murderer?

15        Well, when you're sitting down with homicide and you are

16  being asked about why are you having contact with somebody that

17  we believe is involved in a homicide and you start lying, is

18  that consistent with somebody who isn't involved or is that

19  more consistent with somebody who is?  And that's what we have

20  here, somebody who was lying because they were involved with

21  the person and in the scheme.  That's what we have here.

22        So he was being investigated by homicide, Mr. Belcher, and

23  he's being questioned about being in contact, and the first

24  thing he does is he starts telling different lies and stories.

25  He says that the sole reason was because, and I submit to you,

1   the sole reason was because it would unearth the entire

2   murder-for-hire scheme.  So that's why he doesn't know Brown.

3   He wants to attribute that number to Block.  He wants to say

4   that he doesn't hang with his cousin.  He wants to say that his

5   cousin is still in jail.  Those were all of the reasons that

6   he's trying to do that because he's trying to distance himself

7   and hope that nobody uncovers his connection and unravels the

8   entire murder-for-hire scheme.

9       I heard brother counsel say there's lots of reasons to

10  talk to each other and lots of it was illegal, brother counsel,

11  Mr. Shea.  Yes, I agree with him, and the main illegal reason

12  was that murder for hire, that murder for hire to kill Wallace.

13      He wants to talk about that jail call where Ms. Banks

14  calls in, and he talks about there's a portion, oh, we know you

15  didn't do that or what have you.  She and Belcher were playing

16  a role.  As you know, Mr. Belcher is good at playing a role

17  because he showed up at the scene at the end of the murder and

18  immediately started playing the role of, you know, this was due

19  to snitching and all of this kind of stuff.  He and Bailey, all

20  right, they played a role there.

21      But the problem is, what happened is these guys made a

22  mistake:  They had their cell phones with them.  Their cell

23  phones corroborates their information.  It corroborates

24  Chambers, it corroborates Brown, and it corroborates them when

25  they say that Watson was there.

1    And what do we know?  Bailey said that Belcher told him

2  afterwards that it was indeed Watson.  So it corroborates

3  Belcher as well for telling that to Bailey, and we know that

4  Mr. Belcher was there because he's on the video.

5    Now, brother counsel wants to -- all of this stuff

6  about -- brother counsel for Mr. Belcher put in exhibits of

7  lots of contacts with Brown, but, okay, well and good, but when

8  it came -- push came to shove and you're sitting down with

9  Detective Mitchell, his client wasn't putting in contacts

10  with Brown.  That's the last person he was having contacts

11  with.  The last person he knew, the last person he was having

12  contact with was Brown, didn't even know his last name, his

13  cousin, Facebook friend, don't know his last name.  But that's

14  what happens when you prevaricate, obfuscate and deviate from

15  the truth, as Mr. Belcher did.

16    What do we know?  Mr. Belcher couldn't keep his lies

17  straight because the video evidence belies that.  He exited the

18  Camaro while talking to Brown, two calls, 10 and 95 seconds.

19    He wants to talk about an 80-second call with Bailey.

20  Bailey told you that was, and you all have heard this phrase,

21  that's a butt call because Bailey, standing there on the other

22  side of the car, you never once see Bailey put anything to his

23  ear.  So that's a butt call.  That's an open call.

24    What do we know?  All five of these individuals lied in

25  the beginning.  Yes, they did.  But three of the five knew they

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 91*

1  couldn't deviate from the facts that we have put before you

2  that shows their guilt, that also corroborates their testimony

3  here, and that's the cell phone evidence.  They could not get

4  away from that, and three of the five have pled guilty to

5  murder for hire and agreed to testify before you and their deal

6  requires them to testify truthfully.

7      And you heard from Agent Rienerth.  The reason why a lot

8  of things differ from statement to statement is because people

9  start remembering things later and more as it goes along.  So

10  at every interview somebody will come along and remember.

11      Like, for example, when I threw those coins down, like I

12  said, if we go back to that, some of you will say what I said

13  you will say, that I just threw coins down, and some will be

14  more specific.  But if you were asked and told ahead of time

15  I'm going to throw coins down, I need you to remember, maybe

16  everybody would do a better job of remembering.

17      But that's not how a murder works.  You don't say we're

18  going to commit this murder but I need everybody to remember,

19  you know, Step A, Step B, Step C, all the way to E, Z, F1, F2,

20  all of those things.  That's not how it works.  Use your reason

21  and common sense, ladies and gentlemen.

22      They want to talk about the Pantheon attempt on

23  August 25th.  Well, I'll get to that in a moment.

24      So what do we know here?  They want to talk about whose

25  phones are being called.  The first thing we know is when those

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 92*

1   shooters are in the area whose phones are they calling?  They

2   are not calling Bailey's.  They are calling Belcher's because

3   he's the money man.  He's putting out the money for this.  They

4   are calling Belcher's phone, and as I had 16.7 on the board, it

5   goes to show that.  It goes to show that.

6       Mr. Belcher's lawyer, Mr. Shea, says that, you know, Brown

7   couldn't keep things right, but as I indicated -- couldn't keep

8   things straight, but as I indicated, just like with the coin

9   situation, everybody is going to remember things differently.

10  As a matter of fact, when he was even trying to tell you about

11  what Mr. Brown could or could not remember, he couldn't even

12  remember the day that Mr. Brown testified because the first

13  thing he said was days blend together, I can't remember when he

14  testified.  So he wants to challenge other witnesses because

15  they can't remember or they remember things differently?

16      He wants to talk about the voice over the phone, whether

17  that was before going to Zeidman's or after going to Zeidman's.

18  It doesn't matter.  It doesn't matter because what that is

19  saying is that the meeting happened and the statement was made

20  and the statement was made in the presence of Belcher and

21  Watson was there.

22      Brother counsel for Watson wants to talk about the fact

23  that, you know, Watson never said these words of acceptance or

24  anything like that.  Well, I believe this Court is going to

25  tell you that with regard to a particular person in this case

1 you can determine their intent by what they did, what they

2 said, how they said it, how they did it or any other facts or

3 circumstances that come into evidence.

4     When they are standing there with Brown and they are being

5 offered this opportunity for money, a condo and a car to go do

6 it, he goes out with Brown and he starts hunting.  He goes out

7 with Brown on September 11th.  His phone is there even though

8 he tells Agent Rienerth ain't been there, nope, ain't been

9 there, I don't even know Brown, I don't even know Chambers, I

10 don't even know a Byrd.  All of those things were belied by the

11 contacts in his phone.

12     And what do we know?  Bailey paid money that filtered to

13 Brown through Watson.  So why is he picking up money?  Why did

14 he take the $10,000 that Brown said Bailey said he gave to

15 Belcher and that Brown never got?  Because, as you know, that's

16 what ticked Brown off.  Brown got tired of the runaround of not

17 getting his cut, and that's why he went hunting for them.  So

18 whether he said the words of acceptance or not, what he did,

19 those are critical for you to understand that he was part of

20 the deal, his actions, what he did, how he did it, when he did

21 it.

22     Brother counsel says the only person that says there was a

23 motive was Bailey.  That's not true.  Banks told you.  Banks

24 told you that Belcher said he was greedy and had to go.

25     There's a phone call, there's a phone call from Bailey to

*Government's Rebuttal Closing*
*Monday/October 22, 2018/Vol. 13*

*Vol. 13/Page 94*

1   Brown that took place because Belcher was not answering about

2   Motor City.  So when you look at that, look at that as part of

3   the reason of some of the calls between Bailey and Brown.

4       Bailey did ask other people to kill Wallace.  Ms. Banks

5   told us that.  She also told us that Bailey asked Belcher to do

6   it -- asked Belcher if he did it and Belcher confessed that he

7   had to go.  Bailey was not the only one to reveal the motive.

8   Banks told you, and that was through the words of Belcher.

9       How interesting, ladies and gentlemen, that the lie given

10  by Bailey that Wallace was a snitch just happens to be the same

11  one that Belcher tells police at the scene.

12      Remember, Bailey had no deal when he spilled his guts to

13  Sean Jackson.  Regardless of whether Bailey feels like he

14  should do time, as brother counsel is arguing, you have heard

15  that he will serve 25 years for his involvement in this crime.

16  Counsel suggested Brown and Belcher did not call one another,

17  but as I told you, that's been pointed out to be untrue.

18      With regard to, with regard to what brother counsel for

19  Mr. Watson just argued, let me leave you with this.  He says

20  that there was a lack of evidence, but, ladies and gentlemen,

21  the testimony is evidence, the Court is going to tell you that,

22  and the exhibits are evidence and the exhibits support the

23  testimony of the witnesses.

24      We don't need a gun.  Wallace, was there any dispute that

25  Wallace died from a gunshot wound?  Is there any dispute?  I

1   don't think so.  Circumstantial evidence is enough to convict

2   by itself, ladies and gentlemen, but this is not just a case

3   built on circumstantial evidence.  Brown testified, Bailey

4   testified, Chambers testified.  There's video of the shooting.

5   There's cell site analysis and exhibits that support the

6   testimony of these witnesses.  This, ladies and gentlemen, is

7   direct evidence.

8           So, brother counsel for Mr. Watson said that, again, going

9   back to the no words or acts, we know that he agreed when he

10  shot Wallace, we know that he agreed when he tried and did

11  collect money, we know that he agreed when he went to Motor

12  City and picked up the money.

13          He wants to talk about Brown saying five people as opposed

14  to six, but Brown clarified that as a misstatement, and then he

15  counted off with me, if you remember, the five people.  He said

16  it was Brown, himself, Chambers, Bailey, Watson and Belcher.

17          Chambers, you know, he wants to talk about payment and

18  what happened on that day, but remember, Chambers said that was

19  a different day when they were there and Mr. Brown had on the

20  black.  And brother counsel in his own statement said, in

21  arguing to you, he just said the same thing he said with

22  respect to Brown, he was wearing black and, in defense

23  counsel's words, the day before.  So that is consistent with

24  what Mr. Bailey said.

25          Counsel said Watson had a relationship with Belcher.  Yes,

1    enforcer, but Watson said he didn't know Byrd despite having

2    two numbers for Byrd.

3         You will find that for Count One the instruction says that

4    a person used or caused another to use a phone, and as you

5    know, a phone was flying back and forth between Watson and

6    Brown, all right?  So Watson was letting Brown use his phone.

7    Brown was using the phone.  Brown was using his own phone until

8    he had to put it on the charger.  The bottom line, they were in

9    the area being set up, ready to commit the murder based on the

10   information they got from Belcher in the earlier calls from

11   Belcher as he pulled up to the scene.

12        Brown told you that he and Watson talked to Belcher and

13   that they passed the phone back and forth, but independent of

14   that, Watson caused Brown to call when he handed him the phone

15   for the purpose of calling Belcher.

16        Brother Counsel says there was no quid pro quo.  There

17   was.  Watson was picking up money from Bailey because of

18   Brown's inability -- Watson was getting the $10,000 Bailey gave

19   to Belcher and not giving it away to Brown, and this prompted

20   Brown to knock Bailey and Belcher down because of getting the

21   runaround.

22        So let's talk about Brown said that by July he knew no one

23   was facing death.  Remember that.  Brother counsel brought that

24   up.  Brown admitted his involvement in firing the gun and he

25   took a plea to murder for hire, and yes, he took a plea deal

1  that requires him to testify truthfully before you and do

2  20 years.  And his testimony, I submit, was supported by the

3  evidence, that being the cell sites, that being the corporate

4  cases.

5       But, remember, Watson was so worried about Chambers that

6  he had him sign that affidavit, which doesn't fly with anything

7  Paymond came in and told you, and it makes up stuff about

8  Paymond having a dispute with Watson and it makes up stuff

9  about Brown having a dispute with Watson, and you heard that

10  none of that was true.  You haven't heard anybody say that

11  those things were true, I should say.

12       He wants to say nobody knew Watson.  Well, not everybody

13  in the conspiracy needs to know one another, and I suspect the

14  Court will tell you that.  But Belcher knew Watson and knew him

15  to be his enforcer.  Belcher gave him the $10,000, which sent

16  Brown hunting.

17       The last thing I want to bring out for you is what do we

18  know that is consistent with all of this evidence?  Let's talk

19  about the drug dealing.

20       Deaunta Belcher, drug dealer.  You heard him say that.

21  You heard other people say that.  Darnell Bailey said that they

22  were -- that he was a drug dealer and that they had the drug

23  scheme interwoven with the fraud scheme.  Check that off.

24       Franklin Aday said Belcher was a drug dealer.  Check that

25  off.

1    Latasia Banks said she was a drug dealer with Belcher.
2 Check that off.

3    Stephen Brown said that Belcher was his drug dealer
4 because he got marijuana from him.  Check that off.

5    And the cell phone extraction showing drug proceeds, you
6 can check that off, showing drug communications and things of
7 that nature.

8    The car fraud scheme.  Deaunta Belcher told police about
9 it and being involved in it.  Darnell Bailey told you about the
10 car fraud scheme.  Latasia Banks told you about it.

11    Now, there was some, there was some talk about -- by
12 brother counsel for Mr. Belcher that drug dealing does not
13 equate to being a murderer.  Well, let's explore that.

14    The whole point of drug dealing is to make money.  That's
15 the whole point, all right?  But, if someone like Wallace, the
16 smooth talker, as you heard, because this car fraud --
17 remember, I told you it's two sides of the same coin, this car
18 fraud and drug-dealing scheme.  If somebody like Wallace, the
19 smooth talker, as we have heard, has the connection and starts
20 interfering with that money, then, yes, drug dealing can equate
21 to murder because what we had here, ladies and gentlemen, you
22 can't just ask him to step aside, he was a smooth talker with
23 connections.

24    So what do you have to do and what was done?  You do a
25 hostile takeover.  You murder him and get him out the way so

1  that he can stop interfering with your money, and that's
2  exactly what happened.

3      What do we know about where that was hatched at?  The
4  hostile takeover was hatched at Zeidman's.  Who told you that?
5  Darnell Bailey.  Who else told you that?  Stephen Brown.

6      What do we know about the Pantheon Nightclub?  It doesn't
7  matter if it was day or night.  The phone records support
8  Watson and Belcher being there.  Who told you about that?
9  Darnell Bailey and Stephen Brown, call detail records.  So it
10 doesn't matter whether it was day or night, the phone records
11 put them there as going to hunt for Wallace.

12     The Faircrest was brought up for you just so that you can
13 understand the frame of reference of where they left from so
14 that you have the vantage point of knowing where those cell
15 towers are hitting showing them moving down to do the killing.

16     And who told you they were at Faircrest just before the
17 killing?  Stephen Brown, Billy Joe Chambers, and the call
18 detail records.

19     And where were they headed to and where were they going
20 to?  Well, Brown told you.  Well, you know from the security
21 video they came down to They Say.  You know from Darnell Bailey
22 that they were there at They Say to do the killing, and you
23 know from Stephen Brown that he had gotten that final call from
24 Belcher telling him that the big fish was on the line and to
25 report to They Say.

1      Who else told you?  Billy Joe Chambers, he was there and

2  he told you.  The call detail records, they verify that.

3      Who shot Wallace?  How do we know that?  Darnell Bailey

4  tells you because he said that Belcher told him that it was

5  indeed Watson.  Stephen Brown told you because he was in the

6  car, and he told you how he fired and how Watson got out and

7  fired.  Billy Joe Chambers told you because he was the driver

8  and Brown was his front seat passenger.  So Billy Joe Chambers

9  told you he jumped out of the backseat and did the firing.  The

10 call detail records tell you all three of them were in the

11 area, and the surveillance video tells you.

12     What was this lie that was created?  What was the

13 snitching cover story?  Because, again, it was to keep the

14 information about everybody's involvement from getting back to

15 federal law enforcement.  It was to hinder that information.

16 As a matter of fact, that's why -- you know, they want to talk

17 about the indictment being charged.  Remember, that's why it's

18 charged that way.  The indictment that they admitted as an

19 exhibit was based on this theory that was implanted by Belcher

20 all related to the fact that Wallace was a federal witness

21 until the real deal came out in terms of the investigation and

22 we knew that that was a cover story.

23     But who all shared in this snitching cover story?

24 Deaunta Belcher, Darnell Bailey, and Mr. Jackson, who told you

25 that Darnell Bailey told him that in 2016.  This was before any

1   plea deals.

2      Do we know that money was involved, that this was a

3   motive, money was a motive?  Uh, yeah.  What about the Parkside

4   project situation?  Stephen Brown was incensed he wasn't

5   getting his cut so he hunted him down with a chopper.

6      Who else told you about Stephen Brown showing up in the

7   Parkside projects?  Darnell Bailey.  And who else?

8   Billy Joe Chambers, because, as Chambers told you, he was then

9   driving his girl friend's Rendezvous.

10      Did money change hands?  Yes.

11      Who told you that?  Darnell Bailey and Stephen Brown.

12      Because Darnell Bailey told you that he met Watson at the

13   casino and handed him money, and Brown told you that he

14   couldn't go because he was on a tether and he sent Watson and

15   Watson came back and brought him the money.

16      And, finally, what do we know this was all about?  Again,

17   it was a hostile takeover, and the motive was greed.  Who told

18   you that there was some discourse and descension underlying all

19   of that, this was all about money?  Darnell Bailey.

20      Who told you that?  Stephen Brown, because he heard a

21   phone conversation about dog messing with my money.

22      So Stephen Brown, and who else told you that?

23   Sean Jackson, because he was told that by Mr. Bailey as he was

24   his bunkee.

25      And who else told you that?  Latasia Banks because what

1  did she say Deaunta Belcher confessed to her?  Wallace had to

2  go.

3       Ladies and gentlemen, thank you for your time and

4  attention over these last three weeks.  As you can see, the

5  Government has proven each and every element of these offenses

6  charged beyond a reasonable doubt.  We ask you to return the

7  only verdict which this evidence supports, and that's that

8  these two defendants are guilty with the rest of the three for

9  the counts charged as well as the murder for hire.

10       Thank you for your time and attention.

11       **THE COURT:**  Thank you.

12       Ladies and gentlemen, we are going to recess now until a

13  quarter to 2:00.  Marie has your lunch.  She will have to bring

14  it over from our chambers over to here and a quarter to 2:00 I

15  will instruct you on the law of the case.  Thank you.

16       You are excused.

17       **THE CLERK:**  All rise for the jury.

18       (Jury out at 1:05 p.m.)

19       **THE COURT:**  Sit down for one minute, please.

20       I anticipate that the instructions will be completed by a

21  quarter to 3:00 --

22       **MR. HAUGABOOK:**  Yes, sir.

23       **THE COURT:**  -- or 2:30.  I'm going to tell the jury

24  that after they are fully instructed if they want to go home

25  and start deliberating in the morning that's their privilege.

1   If they want to start their deliberations this afternoon and if

2   they haven't finished by 4:30, send me a note if they want to

3   continue or they want to go home, but it's up to them.

4         **MR. HAUGABOOK:**  Yes, sir.

5         **THE COURT:**  Thank you.

6         **MR. HAUGABOOK:**  Thank you.

7      (Recess from 1:06 p.m. until 1:53 p.m.)

8         **THE COURT:**  Everybody be seated.  Be seated.

9      Let me have one of the folders.

10     Ladies and gentlemen, I'm going to give you a folder.  You

11  will take it with you in the jury room, but take out of it the

12  instructions so you don't have to take notes.  You can follow

13  me as I read them.  But the folder also contains for each of

14  you a copy of the indictment, witness lists and exhibit lists

15  that you can use for reference purposes, okay?

16     Member of the jury, now it is time for me to instruct you

17  about the law that you must follow in deciding this case.

18     I will start by explaining your duties and general rules

19  that apply in every criminal case.

20     Then I will explain the elements, or parts, of the crimes

21  that the defendants are accused of committing.

22     Then I will explain some rules that you must use in

23  evaluating particular testimony and evidence.

24     And, lastly, I will explain the rules that you must follow

25  during your deliberations in the jury room and possible

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 104*

1  verdicts you may return.

2      Please listen carefully to everything I say.

3      You have two main duties as jurors.  The first one is to

4  decide what the facts are from the evidence that you saw and

5  heard here in the court.  Deciding what the facts are is your

6  job, not mine.  Nothing that I have said or done during this

7  trial was meant to influence your decisions about the facts in

8  any way.

9      Your second duty is to take the law that I give you, apply

10 it to the facts, and decide if the government has proved either

11 defendant guilty beyond a reasonable doubt.  It is my job to

12 instruct you about the law, and you are bound by the oath you

13 took at the beginning of the trial to follow the instructions

14 that I give you even if you personally disagree with them.

15 This includes the instructions I gave you before and during the

16 trial and these instructions.  All of the instructions are

17 important, and you should consider them as a whole.

18      Now, the lawyers may have talked about the law during

19 their argument.  But, if what they said is different from what

20 I say, you must follow what I say.  What I say about the law

21 controls.

22      Perform these duties fairly.  Don't let any bias, sympathy

23 or prejudice that you may feel towards one side or the other

24 influence your decision in any way.

25      As you know, the defendants have pled not guilty to the

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 105*

1   crimes charged in the indictment.  The indictment is not

2   evidence at all of guilt.  It is just the formal way the

3   government tells a defendant what crimes the defendant is

4   accused of committing.  It does not even raise any suspicion of

5   guilt.

6       Instead, each defendant starts the trial with a clean

7   slate with no evidence at all against him.  The law presumes

8   that he is innocent.  This presumption of innocence stays with

9   him unless the government presents evidence here in the

10  courtroom that overcomes the presumption and convinces you

11  beyond a reasonable doubt that the defendant is guilty.

12      This means that a defendant has no obligation to present

13  any evidence at all or prove to you in any way that he is

14  innocent.  It is up to the government to prove that he is

15  guilty, and this burden stays on the government from start to

16  finish.  You must find a defendant not guilty unless the

17  government convinces you beyond a reasonable doubt that he is

18  guilty.

19      The government must prove every element of a crime charged

20  beyond a reasonable doubt.  Proof beyond a reasonable doubt

21  does not mean proof beyond all possible doubt.  Possible

22  doubts, or doubts based purely on speculation, are not

23  reasonable doubts.  A reasonable doubt is based on reason and

24  common sense.  It may arise from the evidence, from the lack of

25  evidence or the nature of the evidence.

*16-20143; U.S.A. v. Belcher/Watson*

1    Proof beyond a reasonable doubt means proof of which is so
2  convincing that you would not hesitate to rely and act on it in
3  making the most important decisions in your own lives.  If you
4  are convinced that the government has proven a defendant guilty
5  beyond a reasonable doubt, say so by returning a guilty
6  verdict.  If you are not convinced, say so by returning a not
7  guilty verdict.

8    You must make your decision based solely on the evidence
9  that you saw and heard here in court.  Don't let rumors,
10 suspicions or anything else that you may have seen or heard
11 outside of court influence your decision in any way.

12   Now, the evidence in this case includes only what the
13 witnesses said while they were testifying under oath, the
14 exhibits I allowed in evidence and the stipulations that the
15 lawyers agreed to.

16   Nothing else is evidence.  The lawyers' statements and
17 arguments are not evidence.  Their questions and objections are
18 not evidence.  My legal rulings are not evidence, and my
19 comments and questions are not evidence.

20   During the trial I may not have let you hear some answers
21 to some of the questions the lawyers asked.  I also ruled, I
22 think, that some of the exhibits the lawyers wanted you to see
23 you couldn't see.  Sometimes I may have ordered you to
24 disregard something you saw or heard.  You must completely
25 ignore all of these things.  Don't even think about them.

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 107*

1   Don't speculate about what a witness might have said or what an

2   exhibit might have shown.  These things are not evidence, and

3   you are bound by your oath not to let them influence your

4   decision in any way.

5        Make your decision based only on the evidence as I have

6   defined it and nothing else.

7        You should use your own common sense in weighing the

8   evidence.  Consider it in light of your everyday experience

9   with people and events, and give it whatever weight you may

10  believe it deserves.  If your experience tells you that certain

11  evidence reasonably leads to a conclusion, you are free to

12  reach that conclusion.

13       Now, some of you may have heard the terms direct evidence

14  and circumstantial evidence.  Direct evidence is simply

15  evidence like the testimony of an eyewitness which, if you

16  believe it, directly proves a fact.  If a witness testified

17  that he saw it raining outside, and you believed him, that

18  would be direct evidence that it was raining.

19       Circumstantial evidence is simply a chain of evidence that

20  indirectly proves a fact.  If someone walked into the courtroom

21  wearing a rain coat covered with drops of water and carrying a

22  wet umbrella, that would be circumstantial evidence from which

23  you could conclude it was raining.

24       It is your job to decide how much weight to give the

25  direct and circumstantial evidence.  The law makes no

1 distinction between the weight that you give to one or the

2 other or that one is better evidence than the other.  Consider

3 all of the evidence, both direct and circumstantial, and give

4 it whatever weight you believe it deserves.

5     Another part of your job as jurors is to decide how

6 credible or believable each witness was.  This is your job, not

7 mine.  It is up to you to decide if a witness's testimony was

8 believable and how much weight you think it deserves.  You are

9 free to believe everything that a witness said, only part of it

10 or none of it at all, but you should act reasonably and

11 carefully in making these decisions.

12     Let me suggest some things for you to consider in

13 evaluating each witness's testimony.

14     Ask yourself if the witness was able to clearly hear or

15 see the events.  Sometimes even an honest witness may not have

16 been able to see or hear what was happening and may make a

17 mistake.

18     Ask yourself how good the witness's memory seemed to be.

19 Did the witness seem able to accurately remember what happened?

20     Ask yourself if there was anything else that may have

21 interfered with the witness's ability to perceive or remember

22 the events.

23     Also ask yourself how the witness acted while testifying.

24 Did the witness appear to be honest?  Or did the witness appear

25 to be lying?

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 109*

1   Ask yourself if the witness had any relationship to the
2   government or to the defendant, or anything else to gain or
3   lose from the case that might influence the witness's
4   testimony.

5   Ask yourself if the witness had any bias or prejudice or
6   reason for testifying that might have caused the witness to lie
7   or to slant the testimony in favor of one side or the other.

8   Ask yourself if the witness testified inconsistently while
9   on the stand or if the witness said or did something or failed
10  to say or do something at any other time that is inconsistent
11  with what the witness said while testifying.  If you believe
12  that the witness was inconsistent, ask yourself if this makes
13  the witness's testimony less believable.  Sometimes it may.
14  Other sometimes it may not.  Consider whether the inconsistency
15  was about something important or about some unimportant detail.
16  Ask yourself if it seemed like an innocent mistake or if it
17  seemed to be deliberate.

18  Ask yourself how believable the witness's testimony was in
19  light of all of the other evidence.  Was the witness's
20  testimony supported or contradicted by other evidence that you
21  found believable?  If you believe that a witness's testimony
22  was contradicted by other evidence, remember that people
23  sometimes forget things and that even two honest people who
24  witness the same event may not describe it exactly the same
25  way.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 110*

1   These are only some of the things you may consider in

2   deciding how believable each witness was.  You may also

3   consider other things that you think shed some light on the

4   witness's believability.  Use your common sense and everyday

5   experience in dealing with other people, and then decide what

6   testimony you believe and how much weight you think it

7   deserves.

8       One more point about witnesses.  Sometimes people wonder

9   if the number of witnesses who testified makes any difference.

10  Do not make any decisions based only on the number of witnesses

11  who testified.  What is more important is how believable the

12  witnesses were and how much weight you think their testimony

13  deserves.  Concentrate on that, not the numbers.

14      There is one more general subject I want to talk to you

15  about before I begin explaining the elements of the crimes

16  charged.  The lawyers for both sides objected to some of the

17  things that were said or done during the trial.  Do not hold

18  that against either side.  The lawyers have a duty to object --

19  a lawyer has a duty to object whenever the lawyer thinks that

20  something is not permitted by the rules of evidence.  These

21  rules are designed to make sure that both sides receive a fair

22  trial.

23      And do not interpret my rulings on their objections as any

24  indication of how I think the case should be decided.  My

25  rulings were based on the rules of evidence, not how I feel

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 111*

1   about the case.  Remember, your decision must be based only on

2   the evidence you heard and saw in the courtroom.

3        Now, that concludes the part of your instructions

4   explaining your duties and the general rules that apply in

5   every criminal case.  In a moment I will explain the elements

6   of the crimes that each defendant is accused of committing.

7        Before I do that I want to emphasize that the defendants

8   are only on trial for the particular crimes charged in the

9   indictment.  Your job is limited to deciding whether the

10  government has proved the crimes charged.

11       And keep in mind that whether anyone else should be

12  prosecuted and convicted for these crimes is not a proper

13  matter for you to consider.  The possible guilt of others is no

14  defense to a criminal charge.  Your job is to decide if the

15  government has proved the defendant guilty.  Do not let the

16  possible guilt of others influence your decision in any way.

17       The defendants have each been charged with several crimes

18  together, and one of the defendants has been charged separately

19  with another crime.  I will explain to you in more detail

20  shortly which defendant has been charged with what crime, but

21  before I do I want to emphasize several things.

22       The number of charges is no evidence of guilt and should

23  not influence your decision in any way.  And in our system of

24  justice, guilt or innocence is personal and individual.  It is

25  your duty to separately consider the evidence against each

1  defendant on each charge and to return a separate verdict for

2  each one of them.  For each one you must decide whether the

3  government has presented proof beyond a reasonable doubt that a

4  particular defendant is guilty of a particular charge.

5     Your decision on any one defendant or charge, whether it

6  is guilty or not guilty, should not influence your decision on

7  any of the other -- on the other defendant or charges.

8     Now I want to say a word about the date mentioned in the

9  indictment.  The indictment charges that the crimes happened on

10 or about September 11, 2015 and September 24, 2015.  The

11 government does not have to prove that the crimes happened on

12 these exact dates, but the government must prove that the

13 crimes happened reasonably close to those dates.

14    Now I want to explain to you something about a defendant's

15 state of mind.  Ordinarily there is no way that a defendant's

16 state of mind can be proved directly because no one can read

17 another person's mind and tell what that person is thinking.

18    But a defendant's state of mind can be proved indirectly

19 from the surrounding circumstances.  This includes things like

20 what a defendant said, what a defendant did, how a defendant

21 acted and other facts or circumstances in evidence which show

22 what was in a defendant's mind.

23    You may also consider the natural and probable results of

24 any acts that a defendant knowingly did or did not do and

25 whether it is reasonable to conclude that a defendant intended

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 113*

1  those results.  This, of course, is all for you to decide.

2      Let me now discuss the specific charges.  I will do this

3  by describing the various counts and what the government must

4  prove to establish their guilt.

5      Although the words of the indictment charge that the law

6  was violated by acts that are connected by the word "and," it

7  is sufficient if the evidence establishes a violation of the

8  law by any one of the acts charged.  Of course, this must be

9  proved beyond a reasonable doubt.

10     Count One of the indictment charges the defendants with

11 the use of certain interstate facilities in the commission of a

12 murder-for-hire.  For you to find a defendant guilty of this

13 crime, you must be convinced that the government has proven

14 each of the following elements beyond a reasonable doubt:

15     First, that the defendant used or caused another person to

16 use any facility of interstate or foreign commerce;

17     Second, that the defendant did so with the intent that a

18 murder be committed in violation of the law;

19     Third, as consideration for the receipt of, or a promise

20 of, or agreement to pay anything of pecuniary value;

21     Fourth, that death resulted.

22     Murder, as defined by the law, has the following

23 four elements:

24     First, that the defendant caused the death of another

25 person, that is, the other person died as a result of the act

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 114*

1    or acts committed by the defendant.

2         Second, that the defendant intended to kill the deceased.

3         Third, that this intent to kill was premeditated, that is,

4    thought out beforehand.

5         Fourth, that the killing was deliberate, which means that

6    the defendant considered the pros and cons of the killing and

7    thought about it and chose his actions before he did.  There

8    must have been real and substantial reflection for long enough

9    to give a reasonable person a chance to think about the intent

10   to kill.  The law does not say how much time is needed, but the

11   killing cannot be the result of a sudden impulse without

12   thought or reflection.  It is for you to decide if enough time

13   passed under the circumstances of the case.

14        "Anything of pecuniary value" means anything of value in

15   the form of money, a negotiable instrument, a commercial

16   interest or anything else that the primary significance of

17   which is economic advantage.

18        A "facility of interstate commerce" includes a means of

19   transportation and communication.  This includes the use of a

20   cellular telephone, a cellular network and the internet.

21        However, while the defendant must use a facility of

22   interstate commerce, the use itself may be either intrastate or

23   interstate.  In other words, you need not find that someone

24   traveled out of state or made a telephone call to a person in

25   another state.  All that is required is that a defendant used

1  or caused another to use such a facility of interstate

2  commerce.

3       The government must prove a quid pro quo between the

4  person who solicits the murder and the person who would commit

5  the murder.  In other words, it requires a mutual understanding

6  that something of value will be exchanged for committing a

7  murder, and you may find a defendant guilty regardless of

8  whether the payment occurred or was to occur in the future.

9       If you are convinced that the government has proved all of

10 these elements for this charge, say so by returning a guilty

11 verdict on this charge.  If you have a reasonable doubt about

12 any one of these elements, you must find the defendant not

13 guilty of this charge.

14      Count Two of the indictment charges the defendants with

15 conspiracy to distribute a controlled substance, specifically

16 cocaine and oxycodone.  It is a crime for two or more persons

17 to conspire or agree to commit a drug crime even if they never

18 actually achieve their goal.

19      A conspiracy is a kind of criminal partnership.  For you

20 to find a defendant guilty of the conspiracy charge, the

21 government must prove each and every one of the following

22 elements beyond a reasonable doubt:

23      First, that two or more persons conspired or agreed to

24 distribute a mixture or substance containing cocaine, oxycodone

25 or both;

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 116*

1    Second, that the defendant knowingly and voluntarily
2  joined the conspiracy.

3    Now I will give you a more detailed description of some of
4  these terms.

5    The term "distribute" means to deliver or transfer a
6  controlled substance.  The term distribute includes the actual
7  constructive or attempted transfer of a controlled substance.
8  The term to distribute also includes the sale of a controlled
9  substance.

10    With regard to the criminal agreement, the government must
11  prove that two or more persons conspired or agreed to cooperate
12  with each other to distribute a mixture or substance containing
13  cocaine, oxycodone or both.

14    This does not require proof of any formal agreement,
15  written or spoken.  Neither does this require proof that
16  everyone involved agreed to all the details.  But proof that
17  people simply met together from time to time and talked about
18  common interests or engaged in similar conduct is not enough to
19  establish a criminal agreement.  These are things that you may
20  consider in deciding whether the government has proven an
21  agreement, but without more they are not enough.

22    What the government must prove is that there was a mutual
23  understanding, either spoken or unspoken, between two or more
24  people to cooperate with each other to distribute a controlled
25  substance.  This is essential.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 117*

1    An agreement can be proved indirectly by facts and
2  circumstances which lead to a conclusion that an agreement
3  existed, but it is up to the government to convince you that
4  such facts and circumstances existed in this particular case.

5    One more point about the agreement.  The indictment
6  accuses the defendants of conspiring to commit several drug
7  crimes, specifically to distribute both cocaine and oxycodone.
8  The government does not have to prove that defendant agreed to
9  commit both of these crimes.  The government must prove an
10 agreement to commit at least one of them for you to return a
11 guilty verdict on the conspiracy charge.

12    With regard to the second element, the defendants'
13 connection to the conspiracy, the government must prove that a
14 defendant knowingly and voluntarily joined the agreement.

15    The government must prove that the defendant knew the
16 conspiracy's main purpose and voluntarily joined the conspiracy
17 intending to help advance or achieve its goals.  You must
18 consider each defendant separately in this regard.

19    This does not require proof that a defendant knew
20 everything about the conspiracy or everyone involved or that he
21 was a member from the very beginning, nor does it require proof
22 that a defendant played a major role in the conspiracy or that
23 his connection to it was substantial.  A slight role or
24 connection may be enough.

25    Further, this does not require proof that the defendant

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 118*

1  knew the drug involved was cocaine or oxycodone.  It is enough

2  that the defendant knew that it was some kind of controlled

3  substance.  Nor does the government have to prove that the

4  defendant knew how much cocaine or oxycodone was involved.  It

5  is enough that the defendant knew that some quantity was

6  involved.

7      But proof that a defendant simply knew about a conspiracy

8  or was present at times or associated with members of the group

9  is not enough, even if he approved of what was happening or did

10 not object to it.  Similarly, just because a defendant may have

11 done something that happened to help a conspiracy does not

12 necessarily make him a conspirator.  These are all things that

13 you may consider in deciding whether the government has proved

14 that a defendant joined a conspiracy, but without more they are

15 not enough.

16     A defendant's knowledge can be proved indirectly by facts

17 and circumstances which lead to a conclusion that he knew the

18 conspiracy's main purpose.  But it is up to the government to

19 convince you that such facts and circumstances existed in this

20 particular case.

21     You must be convinced that the government has proved all

22 of these elements beyond a reasonable doubt in order to find

23 any one of the defendants guilty of the conspiracy charge.

24     Count Three of the indictment charges the defendants with

25 causing death through the use of a firearm during and in

1  relation to a drug-trafficking crime.  For you to find the
2  defendant guilty of this crime, you must find that the
3  government has proved each and every one of the following
4  elements beyond a reasonable doubt:

5      First, that the defendant committed the drug-trafficking
6  crime charged in Count 2.  Conspiracy to distribute a
7  controlled substance is a drug-trafficking crime which may be
8  prosecuted in a Court of the United States;

9      Second, defendant knowingly used a firearm;

10     Third, that the use of the firearm was during or in
11  relation to the drug trafficking conspiracy;

12     Fourth, in the course of doing so the defendant caused the
13  death of another person through the use of a firearm;

14     Fifth, the death was an unlawful killing of a human being
15  with malice aforethought.

16     I will give you some more detailed instructions on some of
17  these terms now.

18     To establish the use of a firearm, the government must
19  prove active employment of a firearm during and in relation to
20  the crime charged in Count Two.  Active employment means
21  activities such as brandishing, displaying, bartering, striking
22  and, most obviously, firing or attempting to fire a firearm.

23     The term "firearm" means any weapon which will or is
24  designed to or may readily be converted to expel a projectile
25  by the action of an explosive.

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 120*

1   The phrase "during and in relation to" means that the
2   firearm must have some purpose or effect with respect to the
3   crime charged in Count Two.  In other words, the firearm must
4   facilitate or further or have the potential of facilitating or
5   furthering the crime charged in Count Two, and its presence or
6   involvement cannot be the result of an accident or coincidence.

7   The term "knowingly" means voluntarily and intentionally
8   and not because of mistake or accident.

9   The phrase "with malice aforethought" means deliberately
10  and intentionally.

11  If you are convinced that the government has proved all of
12  these elements for this charge, say so by returning a guilty
13  verdict on this charge.  If you have reasonable doubt about any
14  of these elements, then you must find the defendant not guilty
15  of this charge.

16  With respect to Count Three, which charges the defendants
17  with using a firearm during and in relation to a
18  drug-trafficking offense and causing death through the use of a
19  firearm in the course of the offense, there are three different
20  ways in which a defendant can be held responsible.  The first
21  is if you find that the defendant committed the act charged
22  with the necessary mental state, as I have instructed you.

23  Under the law it is not necessary for you to find that a
24  defendant personally committed the crime for you to find him
25  guilty of the offense.  You may also find him guilty if he

intentionally helped or encouraged someone else to commit the

crime.  A person who does this is an aider and abettor.  This

is the second way in which a defendant can be held responsible.

But for you to find the defendant guilty of using a

firearm to cause death during and in relationship to a

drug-trafficking offense as an aider and abettor, you must be

convinced that the government has proved each and every one of

the following elements beyond a reasonable doubt:

First, that the crime of using a firearm during and in

relation to a drug-trafficking crime was committed;

Second, the defendant helped to commit or encouraged

someone else to commit the crime of using a firearm during and

in relation to a drug trafficking crime;

Third, that the defendant intended to help commit or

encourage the crime of using a firearm during and in relation

to a drug-trafficking crime.  The defendant intended to aid or

abet the crime of using a firearm during and in relation to a

drug-trafficking crime if he had advance knowledge that an

accomplice would use a firearm during the commission of a

drug-trafficking crime.

"Advance knowledge" means knowledge at a time the

defendant can attempt to alter the plan or withdraw from the

enterprise.  Knowledge of the firearm may but does not have to

exist before the underlying crime is begun.

Fourth, that the defendant knew or expected that the

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 122*

1   firearm would be used during and in relation to the

2   drug-trafficking crime to cause the death of another person;

3       Fifth, that the death was an unlawful killing of a human

4   being with malice aforethought.

5       If you are convinced that the government has proved all of

6   these elements, say so by returning a guilty verdict on this

7   charge.  If you have a reasonable doubt about any of these

8   elements, then you cannot find the defendant guilty of using a

9   firearm during and in relation to a drug-trafficking crime as

10  an aider and abettor.

11      The law also provides a third way in which the defendant

12  can be held responsible for the offense.  Under this rule all

13  members of a conspiracy are responsible for acts committed by

14  the other members as long as those acts are committed to help

15  advance the conspiracy and are within the reasonably

16  foreseeable scope of the agreement.

17      In other words, under certain circumstances the acts of

18  one conspirator may be treated as the act of all.  This means

19  that all the conspirators may be convicted of a crime committed

20  by only one of them even though they did not all personally

21  participate in the crime themselves.

22      For you to find any of the defendants guilty of Count

23  Three based on this legal rule, you must be convinced that the

24  government has proved each and every one of the following

25  elements beyond a reasonable doubt:

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 123*

1   First, there was a conspiracy or agreement to use a

2   firearm during and in relation to the drug-trafficking

3   conspiracy charged in Count Two of the indictment and to use

4   the firearm or commit a murder as part of the agreement;

5   Second, that the defendant joined this conspiracy or

6   agreement, and after he joined conspiracy and while he was

7   still a member of it one or more of the other members committed

8   the crime of using a firearm to cause the death of

9   Devin Wallace during and in relation to a drug-trafficking

10  crime;

11  Third, that this crime was committed to help advance the

12  conspiracy;

13  Fourth, the death of Devin Wallace was an unlawful killing

14  of a human being with malice aforethought;

15  Fifth, that the use of the firearm to commit the murder

16  was within the reasonably foreseeable scope of the unlawful

17  project.  The crime must have been one that the defendant could

18  have reasonably anticipated as a necessary or natural

19  consequence of the agreement.

20  This does not require proof that each defendant

21  specifically agreed or knew that the crime would be committed,

22  but the government must prove the crime was within the

23  reasonable contemplation of the persons who participated in the

24  conspiracy.  No defendant is responsible for the acts of others

25  that go beyond the fair scope of the agreement as the defendant

 1   understood it.

 2       If you are convinced that the government has proved all of

 3   these elements, say so by returning a guilty verdict on this

 4   charge.  If you have at reasonable doubt about any one of them,

 5   then the legal rule that the act of one conspirator is the act

 6   of others would not apply.

 7       Count Four of the indictment charges Deaunta Belcher with

 8   obstruction of justice.  For you to find him guilty of this

 9   crime, you must find that the government has proven each and

10   every one of the following elements beyond a reasonable doubt:

11       First, that the defendant knowingly engaged in misleading

12   conduct towards another person;

13       Second, that defendant acted with intent to hinder, delay

14   or prevent the communication of information to a law

15   enforcement officer of the United States or judge of the

16   United States;

17       Third, that there was a reasonable likelihood that at

18   least one of the relevant communications would have been

19   transferred to a federal law enforcement officer;

20       Fourth, such information related to the commission or

21   possible commission of a federal offense.

22       Now, as to a more detailed instructions, the term

23   misleading conduct means knowingly making a false statement,

24   intentionally omitting material information from the statement,

25   and thereby causing a portion of such statement to be

1    misleading or intentionally concealing a material fact and

2    thereby creating a false impression by such statement.

3        The defendant need not have directly communicated with and

4    the misleading conduct need not have been directed to a federal

5    officer, nor does the defendant need to have specifically

6    intended to mislead federal officials.  In other words, the

7    specific intent to mislead a federal official is not required.

8    The information need not be material.  Instead, it need only

9    relate to the possible commission of a federal offense.

10        If you are convinced that the government has proven all of

11    these elements for this charge, say so by returning a guilty

12    verdict on this charge.  If you have reasonable doubt about any

13    one of these elements, then you must find the defendant not

14    guilty of the charge.

15        Now some people who may have been involved in these events

16    are not on trial.  This does not matter.  There is no

17    requirement that all members of a conspiracy be charged and

18    prosecuted or tried together in one proceeding.

19        Nor is there any requirement that the names of all of the

20    other conspirators be known.  An indictment can charge a

21    defendant with a conspiracy involving people whose names are

22    not known as long as the government can prove that the

23    defendant conspired with one or more.  Whether they are named

24    or not does not matter.

25        This now concludes my instructions explaining the elements

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 126*

1  of the crimes.  Next I will explain some rules you use in

2  considering some of the testimony and the evidence.

3      A defendant has an absolute right not to testify or

4  present evidence.  The fact that a defendant did not testify

5  cannot be considered by you in any way.  Do not even discuss it

6  in your deliberations.

7      Remember, it is up to the government to prove each

8  defendant guilty beyond a reasonable doubt.  It is not up to

9  the defendant to prove that he is innocent.

10     You have heard the evidence of Dr. David Moons and Special

11 Agent Joseph Jensen, who testified as opinion witnesses.  You

12 do not have to accept their opinions.  In dealing with how much

13 weight to give it, you should consider the witness's

14 qualifications and how he reached his conclusion.  Also

15 consider the other factors discussed in these instructions for

16 weighing the credibility of the witness.

17     Remember that you alone decide how much of a witness's

18 testimony to believe and how much weight it deserves.

19     You have heard the testimony of Deandre Paymond,

20 Billie Chambers, Darnell Bailey, Stephen Brown and

21 Latasia Banks.  You have also heard that before this trial the

22 witness made a statement that may be different from their

23 testimony here in court.

24     The earlier statement was brought to your attention only

25 to help you describe how believable a witness's testimony was.

*16-20143; U.S.A. v. Belcher/Watson*

1  You cannot use it as proof of anything else.  You can only use

2  it as one of the ways of evaluating testimony here in open

3  court.

4        You have heard the testimony of Deandre Paymond,

5  Billie Chambers, Darnell Bailey and Stephen Brown.  You have

6  also heard before trial the witnesses were convicted of one or

7  more crimes.

8        The earlier conviction was brought to your attention only

9  as one way of helping you decide how believable the witness's

10  testimony was.  Do not use it for any other purpose.  It is not

11  evidence of any kind.

12        You have heard the testimony of Billie Chambers,

13  Stephen Brown, Darnell Bailey, Franklin Aday, Sean Jackson and

14  Latasia Banks.  You have also heard that the government has

15  promised these witnesses that it will recommend a reduced

16  sentence and/or not be prosecuted for certain other crimes in

17  exchange for their cooperation.

18        It is permissible for the government to make such a

19  promise, but you should consider these witnesses' testimony

20  with more caution than the testimony of other witnesses.

21  Consider whether the testimony may have been influenced by the

22  government's promise.  Do not convict a defendant based on the

23  unsupported testimony of such a witness standing alone unless

24  you believe their testimony beyond a reasonable doubt.

25        The Court admitted into evidence the plea agreements and

1  cooperation agreements for Billie Joe Chambers, Darnell Bailey,

2  Stephen Brown and Latasia Banks.  These agreements are not

3  substantive evidence of the offenses charged in this case.

4  They were admitted only to show that these persons received a

5  benefit for their testimony, which requires you to treat their

6  testimony with the same caution described in the previous

7  instruction.

8       During the trial you have heard or seen summary evidence

9  in the form of a chart, spreadsheet or similar material.  This

10 summary was admitted in evidence in addition to the material it

11 summarizes because it may assist you in understanding the

12 evidence that has been presented.  But the summary itself is

13 not evidence of the material it's summarizing, only as valid as

14 reliable as the underlying material it summarizes.

15      You have heard testimony that after the crime was supposed

16 to have been committed Deaunta Belcher suggested the murder of

17 Devin Wallace resulted from his "snitching."  If you believe

18 that the defendant made this statement, then you may consider

19 this conduct along with all of the other evidence in deciding

20 whether the government has proved beyond a reasonable doubt

21 that Deaunta Belcher committed the crimes charged.  This

22 statement may indicate that he thought he was guilty and was

23 trying to avoid punishment.  On the other hand, it may have

24 been true.  The defendant has no obligation to prove that he

25 had an innocent reason for his conduct.

1 You have heard some recordings that were received in
2 evidence and you were given some written transcripts of the
3 tapes.

4 Keep in mind that the transcripts are not evidence.  They
5 were given to you only as a guide to help you follow what was
6 being said.  The tapes themselves are the evidence.  If you
7 noticed any difference between what you heard on the tapes and
8 what you read in the transcripts, you must rely on what you
9 heard, not what you read.  And if you could not hear or
10 understand certain parts of the tapes, you must ignore the
11 transcripts as far as those tapes are concerned.

12 You have heard evidence that a defendant made a statement
13 in which the government claims that he admitted certain facts,
14 including that he sells illegal drugs.  It is for you to decide
15 whether defendant made the statement and, if so, how much
16 weight it deserves.  In making these decisions, you should
17 consider all of the evidence about the statement, including the
18 circumstances under which the defendant allegedly made it.

19 You may not convict a defendant solely on his own
20 uncorroborated statement or admission.

21 Now, that concludes the part of the instructions
22 explaining the rules for considering some of the testimony and
23 evidence.  Let me finish up by explaining some things about
24 your deliberations in the jury room and your possible verdicts.

25 The first thing you should do when you get to the jury

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 130*

1    room is choose someone to be your foreperson.  This person will

2    help guide your discussions and speak for you here in the open

3    courtroom.

4          Once you start deliberating, don't talk to the jury

5    officer or me or anyone else except each other about the case.

6    If you have any questions or messages, you must write them down

7    on a peace of paper, sign them, and then give it to the jury

8    officer.  The officer will give it to me, and I will respond as

9    soon as I can.  I may have to talk to the lawyers about what

10   you asked so it may take some time to get back to you.  Any

11   questions or messages normally should be sent to me through

12   your foreperson.

13         If you want to see any of the exhibits that were admitted

14   in evidence, you may send me a message and these exhibits will

15   be provided to you.

16         One more thing about messages.  Don't ever write down or

17   tell anyone, including me, how you stand on your votes.  For

18   example, don't write down or tell anyone that you are split 6-6

19   or 8-4 or whatever your vote happens to be.  That should stay a

20   secret until you are finished.

21         Remember, that you must make your decision based only on

22   the evidence that you saw and heard here that the courtroom.

23         During your deliberations you must not communicate with or

24   provide any information to anyone else by any means about the

25   case.  You may not use any electronic device or media, such as

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 131*

telephone, cell phone, smart phone, iPhone, Blackberry or
computer, the internet or any internet service or any text or
instant messaging service, any internet chat room, blog or
website, such as Facebook, MySpace LinkedIn, YouTube or
Twitter, to communicate with anyone any information about the
case or to conduct any research about the case until I accept
your verdict.  In other words, you can't talk to anyone on the
phone, nor correspond with anyone or electronically communicate
with anyone about the case.  You can only discuss the case in
the jury room with your fellow jurors during deliberations.  I
expect you will inform me as soon as you become aware of
another person's violation of these instructions.

You may not use these electronic means to investigate or
communicate about the case because it is important to decide
this case solely on the evidence presented in the courtroom.
Information on the internet or information through social media
may be wrong, incomplete or inaccurate.  You are only permitted
to discuss this case with your fellow jurors during
deliberations because they have seen and heard the same
evidence you have.  In our judicial system it is important that
you are not influenced by anything or anyone outside of the
courtroom.  Otherwise, your decision may be based upon
information known only to you and not your fellow jurors or the
parties.  This would unfairly and adversely impact the judicial
process.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 132*

1    A juror who violates these restrictions jeopardizes the
2  fairness of these proceedings and a mistrial could result,
3  which would require the entire trial process to start over.

4    Your verdict, whether guilty or not guilty, must be
5  unanimous as to each count.

6    To find a defendant guilty of a particular count, every
7  one of you must agree that the government has overcome the
8  presumption of innocence with evidence that proves guilt beyond
9  a reasonable doubt.

10    To find a defendant not guilty of a particular count,
11  every one of you must agree that the government has failed to
12  convince you beyond a reasonable doubt.

13    Either way, guilty or not guilty, your verdict must be
14  unanimous as to each count.

15    Now that the evidence and the arguments are completed, you
16  are free to talk about the case in the jury room.  In fact, it
17  is your duty to talk with each other about the evidence and to
18  make every reasonable effort you can to reach unanimous
19  agreement.  Talk with each other, listen carefully and
20  respectfully to each other's views, and keep an open mind as
21  you listen to what your fellow jurors have to say.  Try your
22  best to work out your differences.  Don't hesitate to change
23  your mind if you are convinced that other jurors are right and
24  that your original position was wrong.

25    But do not ever change your mind just because another

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 133*

1  juror sees things differently just to get the case over with.

2  In the end, your vote must be exactly that, your own vote.  It

3  is important for you to reach unanimous agreement but only if

4  you can do so honestly and in good conscience.

5       No one will be allowed to hear your discussions in the

6  jury room and no record will be made of what you say.  So you

7  should feel free to speak your mind.

8       Listen carefully to what your fellow jurors have to say

9  and then decide for yourself if the government has proven a

10 defendant guilty beyond a reasonable doubt.

11      If you decide the government has proven a defendant

12 guilty, then it will be my job to decide what the appropriate

13 punishment should be.  Deciding what the punishment should be

14 is my job, not yours.  It would violate your oath as a juror if

15 you consider the possible punishment in deciding your verdict.

16 Your job is to look at the evidence and decide whether the

17 government has proven a defendant guilty beyond a reasonable

18 doubt.

19      I have prepared a verdict form for you.  You should use it

20 to record your verdict.  I'm not going to read the verdict form

21 over to you.  It's in your folder.

22      If you decide the government has proven the charges

23 against a defendant beyond a reasonable doubt, say so by your

24 foreperson marking the appropriate place in the form.  If you

25 decide the government has not proved a charge beyond a

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 134*

1  reasonable doubt, say so by having your foreperson mark the

2  appropriate place on the form.  Your foreperson should then

3  sign the form, date it and return it to me.

4      Remember, a defendant is only on trial for the particular

5  crimes charged in the defendant.  Your job is to decide whether

6  the government has proved a crime charged.

7      Also remember whether anyone else should be prosecuted for

8  these crimes is not a proper matter for you to consider.  The

9  possible guilt of others is no defense in a criminal charge.

10  As I have told you, your job is to decide whether the

11  government has proved a defendant guilty.  Don't let the

12  possible guilt of others influence your decision in any way.

13      Let me finish up by repeating something I said to you

14  earlier.  Nothing that I have said or done during this trial

15  was meant to influence your decision in any way.  You decide

16  for yourself if the government has proved a defendant guilty

17  beyond a reasonable doubt.

18      That, ladies and gentlemen, are your instructions.  Now it

19  will be necessary for me to withdraw one of you as the

20  alternate.

21          **THE COURT:**  Juror Number 12.  Let's do it from this

22  end.  Jonathan Swoveland, thank you, you are the alternate.  Do

23  you have anything in the jury room?

24          **A JUROR:**  Yes.

25          **THE COURT:**  If you have something in the jury room,

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 135*

1  go and get it and come back out, and then I have some special
2  instructions for you.

3      Okay.  Now, where is -- wait a minute, wait a minute.

4          **MR. SHEA:**  Your Honor, instruction 41 was not read.

5          **THE COURT:**  What?

6          **MR. SHEA:**  Instruction 41 was not read, the very last
7  one.

8          **THE COURT:**  Okay.  Did I miss this?  Okay.  I
9  apologize, I didn't realize there was another one.  Wait a
10 second.

11     Remember, if you elected to take notes during the trial,
12 your notes should be used as a memory aid.  You should not give
13 your notes greater weight than your independent recollection of
14 the evidence.  You should rely on your own independent
15 recollection of the evidence or lack of the evidence.  You
16 should not be unduly influenced by the notes of the other
17 jurors.

18     Notes are not entitled to any more weight than the memory
19 of each juror.  Whether you took notes or not, each of you must
20 form or express your own opinion as to the facts of the case.
21 In other words, don't get into an argument about your notes.

22     Okay.  Now, I'm going to give you a green folder.  You
23 will take it to the jury room.  It also has forms called
24 Messages From the Jury in case you want to give me a message.

25     Give me a verdict form.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 136*

1   Okay.  Now, the green folder performs another function.
2   If you recess tonight, as I'm about to explain to you, you give
3   the jury officer a copy of the folder.  That means in the
4   morning as you assemble you don't talk about the case.  You
5   only talk about the case when the folder is in the room.  If
6   one of you per chance should leave the room for a moment,
7   you've got to give the jury person the folder.  This is a
8   signal that you only deliberate when all 12 of you are in the
9   room.  Thank you.

10   Now let me give you your oath.

11   Raise your right hand.

12   (The bailiff was sworn.)

13       **THE COURT:**  Okay.  It's now a quarter to 3:00.  When
14   you go to the jury room, the first thing you should do is elect
15   a foreperson.

16   The second thing you should do is decide whether or not
17   you want to go home now and start your deliberations in the
18   morning or you want to start deliberating now and if you
19   haven't reached agreement by 5 o'clock then I'm going to excuse
20   you until the morning.  It's up to you.  But, in any event, if
21   you don't reach agreement today, you come back and assemble in
22   the jury room and Marie will then take you down, we're going to
23   use a different jury room than this courtroom, okay?

24   Thank you.  You are all excused.

25   No, the alternate, you don't go back.  You come up here.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 137*

1    (Jury out at 2:48 p.m.)

2        **THE COURT:**  I'm going to excuse you, but you are not

3   discharged as a juror.  Before they end their deliberations

4   it's possible that I may have to excuse one for some reason,

5   then I have to get ahold of you and bring you back and then you

6   become a juror.  That means you don't talk about the case to

7   anyone, don't let anyone talk to you about it, but you don't

8   have to sit by your telephone.  I have to find you, okay?  And

9   we'll let you know when the jury is done and you are free.  And

10  I would appreciate you going out that door not through the jury

11  room.  Take your material.  And I thank you for your service,

12  sir.

13       (Juror out at 02:49 p.m.)

14       **THE COURT:**  Okay.  We're now in recess.  You can take

15  the defendants downstairs, but you can't leave the building

16  with them until we tell you that we have excused the jury,

17  okay?

18       And then you have to bring them into the building at

19  9 o'clock tomorrow morning but not upstairs.

20       We will be using a different jury room tomorrow.  It's

21  around the hall down there, but I think -- I don't know what

22  courtroom we will be using.  Marie will let you know.  We have

23  been dispossessed of this courtroom because Judge Cox wants it

24  back.  He has patiently waited while we occupied it.

25  Thank you.

*16-20143; U.S.A. v. Belcher/Watson*

*Final Jury Instructions*
*Monday/October 22, 2018/Volume 13*

*Vol. 13/Page 138*

1     (Proceedings adjourned at 2:50 p.m.)

2                    -   -   -

3              **C E R T I F I C A T I O N**

4     I certify that the foregoing is a correct transcription of

5  the record of proceedings in the above-entitled matter.

6

7  s/ Sheri K. Ward                       3/13/2020
   Sheri K. Ward                          Date
8  Official Court Reporter

9                    -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*16-20143; U.S.A. v. Belcher/Watson*