UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DEAUNTA BELCHER,

    Defendant.
_____/

Case No. 16-20143
Honorable Victoria A. Roberts

## ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33 [ECF No. 272]

**I.  INTRODUCTION**

A jury convicted Deaunta Belcher on four counts: (1) use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a); (2) conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(1)(a); (3) use of a firearm during and in relation to a drug trafficking crime causing death, in violation of 18 U.S.C. §§ 924(c)(1) and (j); and (4) misleading communication to hinder investigation of a federal offense, in violation of 18 U.S.C. § 1512(b)(3).

Before the Court is Belcher's motion for new trial pursuant to Fed. R. Crim. P. 33(a). [ECF No. 272]. Belcher says he is entitled to a new trial because Stephen Brown – a co-defendant who pled guilty – gave false trial testimony against him and the government allowed the testimony to stand uncorrected despite knowing it was false.

Belcher fails to show he is entitled to a new trial.

The Court **DENIES** Belcher's motion.

## II. BACKGROUND

This case involves the murder of Devin Wallace (a/k/a "Neff") outside of the They Say restaurant in Detroit on September 11, 2015.

The government charged five people for this murder: (1) Belcher (a/k/a "Byrd"); (2) Brown; (3) Darnell Bailey (a/k/a "Gino"); (4) Andre Watson; and (5) Billie Chambers. Belcher and Watson went to trial. The other three pled guilty and testified against them.

The jury found Belcher and Watson guilty on all counts.

In a recent opinion denying Watson's direct appeal, the Sixth Circuit summarized the general facts presented at trial:

> Darnell Bailey and Devin Wallace had been middle school friends. In 2013, they coincidentally met in a Walmart, and Bailey learned that Wallace, who was a drug trafficker and dealer, owed a significant drug debt. Bailey, who had previously been convicted of several fraud schemes, then

2

came up with a jointly operated tax fraud scheme that allowed Wallace to repay his debt.

Bailey and Wallace then began another illegal venture. Many drug dealers have sufficient cash to purchase or lease a car but lack the documented income required by car dealerships for these transactions. Bailey and Wallace solved this market failure by fraudulently using the personal information of Wallace's drug addicted customers to procure cars from dealerships that they then subleased to Wallace's drug dealer clients. Bailey and Wallace usually obtained cars from dealerships where they had a relationship with a salesperson—often the salesperson was one of Wallace's drug clients—because those salespeople would make the transaction easier by, for example, overlooking missing or deficient paperwork. Although the enterprise was lucrative, there was tension between Bailey and Wallace. According to Bailey, Wallace often "played a lot of games" with money that strained their relationship.

Meanwhile, Deaunta Belcher, who was Bailey's cousin, was dealing drugs from a "dope house" on Beniteau Street in Detroit. Stephen Brown sold drugs for Belcher, and, according to Bailey, Defendant Andre Watson served as an "enforcer" for Belcher. After a chance encounter between Wallace and Belcher at a casino, Belcher was invited to join the car fraud scheme. Belcher's value add was his drug dealing contacts, which allowed the enterprise to expand beyond Wallace's clients, as well as his contacts at car dealerships. Bailey also hoped that Belcher's "street reputation" would encourage Wallace to stop playing games. However, according to Bailey, Wallace's games with money did not stop, and Belcher did not get along with Wallace either.

Three incidents led to an escalation in the tension [with] Wallace. First, Wallace intentionally provided low quality

3

heroin to Belcher. Another issue arose after Bailey and Belcher purchased a couple of cars from a car dealership salesperson, who was one of Belcher's drug customers, "and sold them to a couple of Wallace people." The salesperson asked Bailey and Belcher to return the dealer license plates, and they called Wallace with the request. But Wallace kept stalling and took "a week or two to return them." Bailey and Belcher were angry about Wallace's delay because they did not want to lose the dealership as a source of cars, and Belcher did not want to lose the salesperson as a drug customer. Finally, Wallace was indicted in federal court on drug charges. Following Belcher's subsequent arrest on state drug charges, Bailey and Belcher worried that Wallace was providing the government with incriminating information against them, although they "figured out later on that it wasn't him or ... wasn't sure whether it was him or not."

In May 2015, Bailey and Belcher drove to Zeidman's pawnshop to meet with Watson and Brown. Upon arriving, Bailey stayed in the car while Belcher offered Watson and Brown a house and a car in exchange for killing Wallace. Bailey joined midway through the conversation and Brown asked him "where could he find Wallace at" to murder him. After the meeting at Zeidman's, Bailey was supposed to meet Wallace at a strip club in Dearborn. While Bailey went to a different strip club, Brown and Watson went to the Dearborn strip club to kill Wallace, but he escaped.

On September 11, 2015, Belcher and Bailey met Wallace at a car dealership. At the dealership, Bailey and Wallace "had an intense argument" about Belcher being at the dealership. Belcher and Bailey then met at a gas station and discussed having Wallace killed. As Belcher, Bailey, and Wallace had a previously scheduled meeting for that afternoon, Belcher called Brown and told him that Wallace was going to be downtown with Bailey and that he would call back with more

4

> information. Brown then called Watson to let him know the news. Later, Belcher called back and told Brown that the location for the meeting was the They Say restaurant. Brown, Watson, and a third man, Billy Chambers, then drove towards the They Say restaurant.
>
> Bailey was the first to arrive at the restaurant and, at some point, Wallace called to say that he was outside in his car. Bailey went to Wallace's car and began talking to him. Belcher then arrived with his daughter, but they left after a short time. Brown and Watson then received a call from Belcher letting them know to look for Bailey because he was standing outside of Wallace's car talking to him. When they arrived, according to Brown and Chambers, Watson got out of the car and shot Wallace. Responding law enforcement found Wallace dead in his car. At some later point, Bailey [and Belcher] gave [money] to Watson [and Brown] for the killing.

*United States v. Watson*, 852 Fed. Appx. 164, 166-67 (6th Cir. 2021) (internal record citations omitted).

Although the Sixth Circuit states that the meeting at Zeidman's occurred in May 2015, Belcher and the government agree that the meeting occurred in August 2015, approximately one month before the murder.

After trial, Belcher filed a motion for judgment of acquittal. The Court denied the motion, finding that there was sufficient evidence for a reasonable juror to convict Belcher on all counts.

While awaiting sentencing, Belcher moved for new counsel. The Court appointed new counsel; he filed the underlying motion for new trial.

5

Belcher makes two arguments in support of his request for new trial: (1) Brown recanted his trial testimony, making a new trial warranted under *Gordon v. United States*, 178 F.2d 896 (6th Cir. 1949); and (2) his due process rights were denied because Brown's testimony was false, and the government failed to correct it despite knowing it was false.

The Court held an evidentiary hearing on June 29, 2021. Brown was the only witness. During the hearing, Brown retracted his prior written recantation, and he testified that he did not lie at trial.

Following the hearing, the parties filed supplemental briefs.

The parties also agreed that Brown's attorney – Allison Kriger – could file a declaration which set forth certain omissions from FBI-302 Reports memorializing the government's meetings with Brown before and after the evidentiary hearing.

## III. LEGAL STANDARD

Federal Rule of Criminal Procedure 33 governs new trials. It provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

The defendant bears the burden to show that a new trial should be granted. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). "The

decision to grant or deny a motion for new trial rests within the district court's sound discretion" and will not be reversed "absent a clear abuse of discretion." *Id*.

It is well established that the government may not use false testimony to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). *Napue* "prohibits the prosecution from using false testimony to obtain a conviction and from allowing such testimony, even if unsolicited, 'to go uncorrected when it appears.'" *Melville v. United States*, 457 Fed. Appx. 522, 527 (6th Cir. 2012) (quoting *Napue*, 360 U.S. at 269). Under *Napue*, "a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *In re Jackson*, 12 F.4th 604, 611 (6th Cir. 2021) (citation omitted).

## IV. DISCUSSION

In his supplemental reply, Belcher acknowledges that "during the evidentiary hearing, [Brown] retracted his prior written recantation of his trial testimony." [ECF No. 363, PageID.4757]. As a result, Belcher abandons his recantation argument and proceeds only with his second argument – i.e., Brown's trial testimony was false and/or misleading and the government allowed the testimony to stand uncorrected.

7

Belcher contends that Brown's testimony was false and/or misleading because it did not comport with what was in the FBI-302 Reports (i.e., what Brown told the government before trial).

Belcher points to the following statements by Brown in the 302 Reports: (1) that Belcher was the "middleman" for Bailey and Brown; (2) that Bailey ordered the hit on Wallace; and (3) that the money for the hit was coming from Bailey, albeit through Belcher. [ECF No. 357, PageID.4699, 4701, 4703-04]. Belcher says these statements were material to his position/defense that Bailey was the one who ordered, and paid for, the hit on Wallace.

Belcher argues that Brown's trial testimony was false and/or misleading because it omitted the statements from the 302 Reports. He says that he is entitled to a new trial because, "[d]espite having knowledge of these facts, the prosecution allowed Brown's testimony to stand uncorrected." [*Id.*, PageID.4704].

First and foremost, Belcher is incorrect that Brown's trial testimony omitted these facts.

Belcher's primary argument is that Brown never testified at trial that Belcher was only a middleman. However, while Brown did not use the word "middleman" specifically, he did provide such testimony.

8

Indeed, when asked whether "**anyone [was] the go-between for [him] and Mr. Watson with Mr. Bailey**" for the time period "after the Zeidman's meeting but before the murder," **Brown testified that Belcher was, "[b]ecause he was more familiar with us than Bailey was**." [ECF No. 357, PageID.1395-96 (emphasis added)].

Moreover, Brown testified:

- While speaking to Belcher at Zeidman's, Bailey joined the conversation and "provided more information about why he [i.e., Bailey] wanted Neff [i.e., Wallace] out of the way. . . He really didn't go into too much detail there, but he just said that [Wallace] was getting in the way of his money." [ECF No. 190, PageID.1388].

- While on a call with Belcher to clarify the location of a house (after the Zeidman's meeting), Brown heard Bailey in the background of the other end of the call explaining that "he wanted Neff killed[] because he was getting in the way of his money. He [i.e., Bailey] wasn't able to pick up money. [Wallace (a/k/a Neff)] was picking up his payments before [Bailey] was." [*Id.*, PageID.1390-91].

- Between September 11 and 24, 2015, he met with Belcher and Bailey to ask where his money was, and Belcher "said, 'We're [i.e., Belcher and Bailey] waiting on . . . our homeboy to come back from out of town[,]' . . . and when he came back he was going to have some money for us [i.e., Brown and Watson]." [*Id.*, PageID.1434, 1436-37].

- On October 30, 2015: (1) he contacted Belcher looking for the money he was owed, and Belcher told him "he was waiting on [Bailey]"; (2) Belcher gave him Bailey's number; (3) he called Bailey and asked him "'What's up with that money you owed us?' And he told me he had gave the money to Byrd [i.e., Belcher]."; (4) he then called and asked Belcher if Bailey gave him money for him

9

- and Watson, and Belcher "said, 'Yeah, I already gave it to [Watson].'" [*Id.*, PageID.1441-42].

- On another occasion, he called Bailey and asked if he had money for him, and Bailey "said, 'Yeah, I've got 1600. You can meet me at the Motor City Casino.'" Because he [i.e., Brown] was on a tether at the time, he had Watson pick up the money from Bailey at the casino. [*Id.*, PageID.1442-43].

The premise of Belcher's argument is simply wrong; Belcher did not omit key material facts as to who ordered and paid for the hit on Wallace. Brown's testimony implicated Belcher and Bailey. It does support that Bailey wanted Wallace killed. It disclosed Bailey's motive and that Bailey was involved in arranging payment for the hit. Brown's testimony did support Belcher's defense that Bailey – not he – was the mastermind. While the testimony implicated Belcher too, it was not misleading or indisputably false.

Belcher is correct that the government does not discuss the *Napue* case or its focus. But, the government did highlight Brown's trial testimony to show that the testimony did not contradict Brown's statements in the FBI-302 Reports and was not misleading or false by omission. Moreover, it is clear that Brown's testimony did not deviate from information in the 302s.

Belcher's argument that Brown's testimony was false by omission of material facts fails. Belcher is not entitled to a new trial.

10

## V. CONCLUSION

For the reasons stated above, the Court **DENIES** Belcher's motion for a new trial [ECF No. 272].

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 13, 2022